AO 91 (REV.5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

**UNDER SEAL**

v.

CRIMINAL COMPLAINT

BRODERICK JONES (aka "Dink" and "Thirsty"),
COREY FLAGG (aka "Big Pun"),
DAREK HAYNES,
EURAL BLACK,
JOSEPH WILSON,
JAMES WALKER (aka "Quick"),
JOEL MONTGOMERY (aka "JoJo"), and
STANLEY DRIVER, JR.

**FILED 05CR0070**

**MAGISTRATE JUDGE MASON**

JAN 2 6 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CASE NUMBER:

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief. From at least July 2004 through December 2004, in Cook County, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants

> did knowingly and intentionally conspire with each other and with others to distribute and to possess with intent to distribute controlled substances, namely in excess of 5 kilograms of cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2.

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this complaint is based on the following facts:

*See* Attached Affidavit

Continued on the attached sheet and made a part hereof:    X  Yes  ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

January 26 2005                    at      Chicago, Illinois
Date                                         City and State

Michael T. Mason, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF ILLINOIS      )
                               )
COUNTY OF COOK     )

**UNDER SEAL**

## AFFIDAVIT

I, Joshua Skule, being first duly sworn on oath, depose and state as follows:

### I.    *Introduction*

1.    I am a Special Agent of the United States Department of Justice, Federal Bureau of Investigation (FBI), and have been a Special Agent of the FBI for approximately six and ½ years. I have received specialized training in corruption matters and narcotics and dangerous drug investigations while employed as a Special Agent. I am familiar with and have participated in all of the normal methods of investigations, including but not limited to visual surveillance, general questioning of witnesses, and use of search warrants, informants, cooperating witnesses, pen registers and undercover agents. I have been personally involved in investigations of controlled substance-related offenses involving the possession, sale, and distribution of cocaine, cocaine-base, and heroin by individuals trafficking in narcotics in the Chicago area. Since August 2001, I have been assigned to an FBI Public Corruption squad. As a member of the FBI public corruption squad, I have been involved in the investigation of law enforcement officers engaged in various forms of criminal conduct, including conspiracy to possess and distribute narcotics and extortion.

2.    The information contained in this Affidavit is derived from my knowledge of and prior experience in Chicago area narcotics and public corruption investigations including those at the local, state, and federal levels; information obtained during past interviews with numerous drug dealers and criminal informants conducted by me and

1

other law enforcement officers; information obtained by me and from other investigators experienced in narcotics and police corruption investigations; information provided by cooperating witnesses and confidential sources; pen register and telephone record analysis; and information contained in recorded conversations, including conversations intercepted pursuant to court-ordered Title III wiretaps. As a result of my personal participation in this investigation, my receipt of information from other federal agents and Chicago Police Department (CPD) officers, including those with experience in corruption and drug investigations, my review of information provided by confidential sources and cooperating individuals, my review of recorded conversations, including conversations intercepted pursuant to court-ordered Title III wiretaps, and my review of documents and records, including telephone records, I am familiar with the facts and circumstances of this investigation.

3.     This affidavit is also made in support of an application for warrants to seize the following vehicles, which vehicles are the proceeds and/or instrumentalities of narcotics offenses, and thus, are subject to forfeiture pursuant to 21 U.S.C. § 853:

   a.     a 2002 Cadillac Escalade, VIN# 1GYEK63N22R124631, (Illinois license plate number 5399422)[1] (hereinafter "Jones's Escalade"); and

---

[1]Illinois Secretary of State records indicate that this vehicle is registered to Broderick Jones.

2

      b.     a 2000 Cadillac Escalade, VIN# 1GYEK63R0YR219586 (Illinois license plate number 5689336)[2] (hereinafter "Haynes's Escalade").

4.     Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. More specifically, I have set forth only the facts that I believe are necessary to establish the requisite probable cause.

## II.    *Incorporation of Affidavit in Support of Criminal Complaint*

5.     I have also prepared an Affidavit in support of a Criminal Complaint for BRODERICK JONES (aka "Dink" and "Thirsty"), DAREK HAYNES, and others, charging that they did conspire with each other and with others knowingly and intentionally to possess with the intent to distribute and to distribute controlled substances, namely in excess of 5 kilograms cocaine, a Schedule II Narcotics Drug Controlled Substance, in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2 (the "Jones Complaint Affidavit"). I hereby incorporate the Jones Complaint Affidavit, in its entirety, into this Affidavit in support of seizure warrants. The Jones Complaint Affidavit is attached hereto as Exhibit A.

## III.    *Information in Support of Applications for Seizure Warrants*

13.    As noted in several paragraphs of the Jones Complaint Affidavit, Jones's Escalade (*see* ¶¶ 28-30, 33, 37, 42-44, 59, 73, 94, 106, 143, 145, 148, 150, 169, 187, and 219) and Haynes's Escalade (*see* ¶¶ 161, 163, 195, 200, 207, 213, and 219) were used to facilitate the drug conspiracy charged in the Jones Complaint Affidavit. In that regard,

---

[2]Illinois Secretary of State records indicate that this vehicle is registered to Icy Carter.

these vehicles were the proceeds of, and/or were used and intended to be used, in any manner or part, to commit or to facilitate the commission of controlled substance offenses under 21 U.S.C. §§ 841(a)(1) and 846. Accordingly, there is probable cause to believe that these two vehicles are subject to forfeiture pursuant to the provisions of Title 21, United States Code, Section 853.

14. In order to ensure the availability of the vehicles is preserved for forfeiture, Title 21, United States Code, Section 853(e) authorizes the entry of a restraining order or any other action necessary to preserve the property. Title 21, United States Code, Section 853(f) states, in the same manner as provided for a search warrant, a seizure warrant may be issued when the property would, in the event of conviction, be subject to forfeiture and a restraining order may not be sufficient to assure the availability of the property for forfeiture. The government seeks a seizure warrant under § 853(f) because a restraining order or any other action is not sufficient to assure the availability of the subject vehicles for forfeiture. Courts have long recognized that the unique circumstances involved in searching vehicles due to their inherent mobility. Moreover, in *Florida v. White*, 526 U.S. 559 (1999), the Supreme Court found that a warrantless seizure did not violate the Fourth Amendment where there was probable cause to believe that the automobile was subject to forfeiture because movable contraband may be "spirited away."

15. In my experience, I know that motor vehicles are easily transferred or hidden thereby making them difficult to locate. Moreover, I am aware that the appearance of a motor vehicle can be altered or it can be concealed in a garage or storage area making it difficult, if not impossible, to find for the purpose of forfeiture proceedings.

4

Additionally, motor vehicles can be transported outside the district further increasing the potential unavailability of these motor vehicles for forfeiture in the event of conviction. Furthermore, I know that unless a motor vehicle is seized, it can be difficult to preserve the value of the motor vehicle for forfeiture purposes because financial obligations relating to the vehicle, including insurance payments and loan obligations are not satisfied, when an owner is notified that it is likely his property will be subject to forfeiture.

 

                                         _____

                                         Joshua Skule, Special Agent
                                         Federal Bureau of Investigation

Sworn to and subscribed before
me this 26th day of January, 2005

_____
Michael T. Mason
United States Magistrate Judge
Northern District of Illinois

UNITED STATES                          )
                                       )
NORTHERN DISTRICT OF ILLINOIS          )

### AFFIDAVIT

I, Joshua Skule, Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, having been duly sworn, state:

## I. INTRODUCTION

1.      I am a Special Agent of the United States Department of Justice, Federal Bureau of Investigation (FBI), and have been a Special Agent of the FBI for approximately seven years. I have received specialized training in corruption matters and narcotics and dangerous drug investigations while employed as a Special Agent. I am familiar with and have participated in all of the normal methods of investigations, including but not limited to visual surveillance, general questioning of witnesses, and use of search warrants, informants, cooperating witnesses, pen registers, undercover agents, consensual recordings, and Title III wiretaps. I have been personally involved in investigations of controlled substance-related offenses involving the possession, sale, and distribution of cocaine, cocaine-base, and heroin by individuals trafficking in narcotics in the Chicago area. Since August 2001, I have been assigned to an FBI Public Corruption squad. As a member of the FBI public corruption squad, I have been involved in the investigation of law enforcement officers engaged in various forms of criminal conduct, including conspiracy to possess and distribute narcotics and extortion.

2.      The information contained in this Affidavit is derived from my knowledge of and prior experience in Chicago area narcotics and public corruption investigations including those at the local, state, and federal levels; information obtained during past interviews with numerous drug dealers and criminal informants conducted by me and other law enforcement officers;

information obtained by me and from other investigators experienced in narcotics and police corruption investigations; information provided by cooperating witnesses and confidential sources; pen register and telephone record analysis; and information contained in recorded conversations, including conversations intercepted pursuant to court-ordered Title III wiretaps. As a result of my personal participation in this investigation, my receipt of information from other federal agents and Chicago Police Department (CPD) officers, including those with experience in corruption and drug investigations, my review of information provided by confidential sources and cooperating individuals, my review of recorded conversations, including conversations intercepted pursuant to court-ordered Title III wiretaps, and my review of documents and records, including telephone records, I am familiar with the facts and circumstances of this investigation.

3.     This joint investigation by the FBI and the Internal Affairs Division (IAD) of the Chicago Police Department (CPD) addresses allegations that CPD officers are involved in criminal activity, including drug[1] trafficking, robbery, and extortion, on the south side of Chicago.

4.     During the course of this investigation, other law enforcement officers and I have utilized various investigative techniques, including, among other things, interviewing witnesses, conducting physical surveillance, and recording and listening to consensually-monitored conversations and conversations intercepted pursuant to court-authorized Title III wiretaps. Specifically, from July through December 2004, the FBI obtained authority from the Chief Judge

_____

[1]The terms "drug" and "illegal drug" are used in this Affidavit as general references to controlled substances such as cocaine and marijuana.

-2-

in this district to intercept conversations over telephones being used by JOSEPH WILSON

("Wilson Telephone"), BRODERICK JONES ("Jones Telephone"), and JAMES WALKER

("Walker Telephone").[2]  Summaries of several of these Title III conversations are set forth

throughout this affidavit,[3] and they reveal the corrupt nature of the relationship among JONES,

the other defendants charged in this Complaint, and others.

     5.     This affidavit is made for the limited purpose of establishing probable cause in

support of a criminal complaint charging that from at least in or about July 2004 through

December 2004, BRODERICK JONES (aka "Dink" and "Thirsty"), COREY FLAGG (aka "Big

Pun"), DAREK HAYNES, EURAL BLACK, JOSEPH WILSON, JAMES WALKER (aka

---

[2]These Orders include the following:
> (i) Acting Chief Judge Zagel's July 29, 2004 Order authorizing the interception of wire communications over Wilson Telephone (a Nextel cellular telephone assigned number (708) 768-2303 (predecessor number (708) 768-1111), bearing IMSI# 316010026685480, and subscribed to JOSEPH WILSON);
> (ii) Chief Judge Kocoras's August 26, 2004 Order authorizing the interceptions over Jones Telephone (a Nextel cellular telephone assigned number (773) 491-7909, and bearing IMSI# 316010016521659, and subscribed to BRODERICK C. JONES, 2nd);
> (iii) Chief Judge Kocoras's October 6, 2004 Order authorizing the continued interception over Jones Telephone, as well as interception over Walker Telephone (a Nextel cellular telephone assigned number (773) 491-2683 (predecessor number to (773) 491-2938), bearing IMSI# 316010016489195, and subscribed to BRODERICK C. JONES, 2nd); and
> (iv) Chief Judge Kocoras's November 5, 2004 Order authorizing the continued interception of wire communications over Jones Telephone and Walker Telephone.

[3]Throughout this affidavit, I describe various conversations that were intercepted pursuant to court-authorized Title III wiretaps, often including my understanding of what is being said. This understanding and interpretation of the intercepted conversations is based on the contents and context of the conversations, my experience as a law enforcement officer and the experience of other law enforcement officers in this investigation, including our experience listening to the intercepted conversations as a whole, as well as the investigation to date. All times listed are approximate. The summaries of the conversations set forth in this affidavit are based on draft – not final – transcriptions. Finally, the summaries below do not include all potentially criminal calls intercepted during the periods of interception, or all statements or topics covered during the course of the intercepted conversations.

"Quick"), JOEL MONTGOMERY (aka "JoJo"), and STANLEY DRIVER, JR. did conspire with

each other and with others knowingly and intentionally to possess with the intent to distribute

and to distribute controlled substances, namely in excess of 5 kilograms of mixtures containing

cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States

Code, Section 846 and Title 18, United States Code, Section 2. Since this affidavit is being

submitted for this limited purpose, it does not include everything I know about this investigation.

## II.    PROBABLE CAUSE

### A.    *Summary*

6.        This investigation has focused on the involvement of corrupt CPD officers in

narcotics trafficking on the south side of Chicago. The CPD's 7th District (which is also known

as the Englewood District) handles the day-to-day patrol of most of the Englewood area.[4] As set

forth in greater detail below, this investigation has revealed that various police officers working

in and around the 7th District and other areas on the south side of Chicago, including CPD Officer

BRODERICK JONES (aka "Dink" and "Thirsty"), CPD Officer COREY FLAGG (aka "Big

Pun"), CPD Officer DAREK HAYNES, and CPD Officer EURAL BLACK, were involved in

narcotics trafficking on the south side of Chicago. Among other things, these officers obtained

and attempted to obtain drugs and money from various drug dealers through robbery and/or

extortion. As illustrated in more detail in this affidavit, these officers worked with each other

---

[4]The 7th District is one of five police districts within the CPD's Area One detective division.
In general, the CPD is broken up into 25 police districts (Districts 1 through 25), which fit within
5 detective divisions (Areas One through Five). Area One encompasses five CPD districts (2, 7,
8, 9, and 21), all of which are on the south side of Chicago. The remainder of the south side is
covered by Area Two, which encompasses CPD districts 3, 4, 5, 6, and 22. The remaining
detective areas – Area Three, Area Four, and Area Five – generally cover areas in and around the
Loop, the west side, and the north side of the city.

and others to conduct vehicle stops of drug dealers, or to enter homes that the officers believed

contained drugs and/or money, for the purpose of taking any drugs, money, and weapons for their

own benefit rather than for legitimate law enforcement purposes.

7.     The investigation further revealed that JOSEPH WILSON, JAMES WALKER

(aka "Quick"), JOEL MONTGOMERY (aka "JoJo"), and STANLEY DRIVER, JR. are drug

dealers who operate on the south side of Chicago, and that they worked with the above-

mentioned CPD officers to facilitate this drug conspiracy, in particular by identifying ripoff

targets for the corrupt CPD officers and otherwise assisting in these ripoffs and attempted ripoffs.

8.     JONES played a central role in this conspiracy, as he was the primary individual

who received information about potential ripoff targets, and then recruited corrupt police officers

to conduct vehicle stops or home invasions of the ripoff targets in order to steal drugs and money

from those targets. Importantly, since approximately August 22, 2003, JONES had been stripped

of his police powers and assigned to the CPD's Alternate Response Section ("ARS"). ARS is

also known as the "callback unit." JONES was assigned to the ARS unit and given restricted

duty as a result of a pending CPD/IAD investigation into allegations that JONES helped a

suspect in a shooting escape apprehension. As is typical of officers assigned to ARS, JONES's

badge and his CPD identification were taken from him on about August 22, 2003. JONES's

daily responsibilities in ARS primarily involved administrative paperwork, such as making out

case reports and accepting phone calls. Individuals in ARS generally do not perform field work.

Given that JONES was stripped of his police powers during the time that CPD officers FLAGG,

HAYNES, BLACK, and others were planning to conduct and did conduct car stops, arrests, and

residential searches at JONES's direction, there appears to be no legitimate law enforcement

-5-

purpose for most (if not all) of the discussions and actions taken by JONES and the other CPD officers named as defendants in this affidavit.

9.     As set forth in greater detail below, the participation of the charged individuals in this conspiracy to steal cocaine and money from drug dealers was evident on multiple occasions from July through December 2004.  In particular, each of them participated in the planning and execution of actual or attempted robberies/extortions of drug dealers on the following days:

(a)     On July 21, 2004, JONES, FLAGG, BLACK, WILSON, and others participated in the attempted robbery/extortion of five kilograms of cocaine from a drug dealer;

(b)     On August 16, 2004, JONES, FLAGG, WILSON, and DRIVER participated in the robbery/extortion of a drug dealer;

(c)     On September 4, 2004, JONES, FLAGG, and WALKER participated in the attempted robbery/extortion of at least two kilograms of cocaine and $10,000 from a drug dealer.

(d)     On September 8, 2004, JONES, FLAGG, HAYNES, and MONTGOMERY participated in the attempted robbery/extortion of at least three kilograms of cocaine and at least $50,000 from a drug dealer.

In addition, conversations intercepted pursuant to Title III wiretaps on JONES's and WALKER's telephones in the fall of 2004 revealed their plans and attempts to commit additional ripoffs of drug dealers during this time period.

10.     The following is a brief summary of the roles each co-conspirator played in the conspiracy and the paragraphs in this affidavit pertaining to each:

-6-

(a)    **BRODERICK JONES** (aka "Dink" and "Thirsty"): JONES has been a

CPD officer since May 1997, and has been previously assigned to the 7th CPD District in

Englewood, and later to the 4th CPD District, before being assigned to the ARS unit. JONES was

central to the planning and execution of the ripoffs and attempted ripoffs of drugs and/or money

from narcotics traffickers that are set forth throughout this affidavit. In particular, JONES was

the conspiracy's primary organizer and the main contact between drug dealers, such as WILSON

and WALKER, who were looking to set up other drug dealers to be robbed of their drugs and/or

money, and corrupt police officers, including FLAGG, HAYNES, and BLACK, who carried out

or attempted to carry out these ripoffs by using their police powers. JONES is referenced

throughout most of the affidavit.

(b)    **COREY FLAGG** (aka "Big Pun"): FLAGG has been a CPD officer since

November 1996, and he is currently a patrol officer assigned to a gun unit in Area Two. FLAGG

was previously assigned to the 7th CPD District before being transferred to the 4th CPD District in

the spring of 2003. Throughout the charged conspiracy, FLAGG served as JONES's primary

corrupt police associate, as FLAGG participated in nearly all of the planning and execution of the

ripoff and attempted ripoffs set forth throughout this affidavit, including the robbery/extortion

that occurred on August 16, 2004, and the attempted robberies/extortions that occurred on and

around July 21, 2004, September 4, 2004, and September 8, 2004. As with JONES, FLAGG is

referenced throughout much of the affidavit.

(c)    **DAREK HAYNES**: HAYNES is a CPD officer who was assigned to the

7th CPD District during the time period charged in this Complaint. As illustrated in this affidavit,

HAYNES assisted JONES and FLAGG in attempting to ripoff a drug dealer on September 8,

-7-

2004. JONES sought HAYNES's assistance on at least one other occasion when JONES was attempting to set up a narcotics ripoff. (*See* ¶¶ 128, 134, 159-225 (Section F), 240, 248, and 249.)

      (d)    **EURAL BLACK**: BLACK is a CPD officer who was assigned to the 7th CPD District as a tactical officer during the time period charged in this Complaint. As illustrated in this affidavit, BLACK assisted JONES and FLAGG in attempting to ripoff a drug dealer on July 21, 2004. In addition, JONES and BLACK sought each other's assistance on other occasions in robbing drug dealers and selling drugs. (*See* ¶¶ 11-51 (Section B), 249 252, 253, 255, 256, 260, and 261.)

      (e)    **JOSEPH WILSON:** WILSON is a drug dealer who assisted JONES and FLAGG in ripping off drug dealers by identifying potential ripoff targets and then helping to arrange for those ripoffs to occur. In particular, WILSON's participation was critical to the attempted ripoff of five kilograms of cocaine on July 21, 2004, and to the robbery/extortion of another drug dealer on August 16, 2004. In addition, WILSON and WALKER worked with each other to broker drug deals for various customers. (*See* ¶¶ 11-51 (Section B), 52-95 (Section C), 227-238 (Section H), and 239-261 (Section I).)

      (f)    **JAMES WALKER** (aka "Quick"): WALKER is a drug dealer who, like WILSON, assisted JONES and FLAGG in ripping off drug dealers by identifying potential ripoff targets and then helping to arrange for those ripoffs to occur. In particular, WALKER's participation was critical to the attempted ripoff of at least two kilograms of cocaine and $10,000 on September 4, 2004. In addition, throughout much of the fall of 2004, WALKER attempted to arrange for JONES and others to rob a narcotics stash house located at 2631 S. Troy in Chicago.

-8-

WALKER also sought out additional robbery/extortion targets for JONES and JONES's crew of corrupt police officers, and facilitated narcotics transactions for various drug customers. (*See* ¶¶ 36 (fn. 8), 53 (fn. 12), 96-126 (Section D), 127-158 (Section E), 159, 182, 184, 189, 191, 198, 227-238 (Section H), 239-261 (Section I), and 262-266 (Section J).)

        (h)    **JOEL MONTGOMERY** (aka "JoJo"): MONTGOMERY worked with JONES to arrange the attempted robbery/extortion of at least three kilograms of cocaine and $100,000 from a drug dealer on September 8, 2004. (*See* ¶¶ 159-225 (Section F).)

        (i)    **STANLEY DRIVER JR.**: DRIVER worked with JONES, FLAGG, and WILSON to arrange and execute the robbery/extortion of a drug dealer on August 16, 2004. (*See* ¶¶ 52-95 (Section C).)

    **B.**    *Attempted Ripoff of Five Kilograms of Cocaine By JONES, FLAGG, BLACK, WILSON, and Others Near WILSON's Car Wash (7/21/04)*

### Summary

11.    As described in greater detail below, on July 21, 2004, CPD Officer JONES, CPD Officer FLAGG, CPD Officer BLACK, WILSON, and others attempted to steal, through robbery/extortion, five kilograms of cocaine that they believed were going to be delivered to WILSON at WILSON's car wash. Unbeknownst to those CPD officers or to WILSON, one of the individuals arranging the five-kilo sale to WILSON was cooperating with law enforcement authorities. That cooperating individual ("CI-1"),[5] who was working with a CPD narcotics team

---

[5] CI-1 began cooperating with law enforcement authorities after being arrested in 2002 for possessing approximately one kilogram of powder cocaine (charges stemming from that arrest have since been dismissed because of the CI-1's subsequent cooperation). The CI has provided reliable information to law enforcement authorities that has been used in connection with at least five arrests and five seizures of narcotics. While CI-1 has no criminal convictions, he/she has been involved in illegal activity, specifically including drug trafficking, and has used aliases.

(that had not previously been involved in this investigation), had offered to sell WILSON five kilograms of cocaine that would be delivered to WILSON by one of CI-1's drug associates.

12.    As illustrated below, the evidence shows that once WILSON made arrangements to receive the five kilograms of cocaine from CI-1 at his (WILSON's) car wash, WILSON worked with JONES to set up CI-1 (and one of CI-1's drug associates) to be robbed of the five kilograms of cocaine that WILSON negotiated to be delivered to him at his car wash. JONES, in turn, enlisted the help of other CPD officers (FLAGG, BLACK, and Officer A) to conduct traffic stops on CI-1 and his/her drug associate, under the guise that these officers were doing legitimate police work, in order to steal the five kilograms of cocaine. The factors indicating that these officers were not conducting legitimate police work are discussed in much greater detail below, and include the fact that JONES was stripped of his police powers at the time and not permitted

_____

He/she has been arrested, but not convicted, of drug charges and various traffic offenses.

As noted below, on July 20, 2004, CI-1 contacted a CPD narcotics officer, indicated he/she could provide cooperation on an imminent narcotics deal, and asked for the CPD's assistance in connection with an outstanding arrest warrant for a prior narcotics arrest. Since that time, CI-1 has continued to cooperate with law enforcement officers and has requested assistance with any immigration problems he/she may have as he/she is an illegal alien.

I believe CI-1 to be reliable on matters relating to WILSON and the events surrounding July 21, 2004 because much of CI-1's information in that regard has been corroborated by independent investigation, including physical surveillance, telephone record analysis, consensually-recorded conversations, and interviews with CPD officers experienced in investigations targeting illegal narcotics activity. Much of this corroboration is set forth later in this affidavit, which addresses the events of July 21, 2004. CPD officers who have worked with CI-1 in the past have also informed me that CI-1 has provided them with reliable information on prior occasions.

According to CI-1, he/she had sold cocaine and marijuana to WILSON for approximately two years. CI-1 said that during that time, he/she initially sold WILSON approximately 30 kilograms of cocaine per week. CI-1 said that on one occasion, WILSON threatened CI-1 when CI-1 tried to collect $600 that WILSON owed to CI-1. CI-1 said that his/her last cocaine sale to WILSON had been in about May or June 2004, when CI-1 sold WILSON about 10 kilograms of cocaine over a week for $20,000 per kilogram. CI-1 believed that WILSON sold the kilograms of cocaine to WILSON's customers for $22,000 per kilogram.

to work on such a field investigation; and the fact that at the time these officers (JONES, FLAGG, BLACK, and Officer A) followed the cars and conducted traffic stops, they were not part of the CPD narcotics team investigating WILSON, they were not scheduled to be working together, and with the exception of BLACK, they were not even on duty.

### July 17 and 19, 2004

13.     On the morning of July 17, 2004, according to CI-1, he/she received a telephone call from WILSON. CI-1 recognized the voice of WILSON, as well as WILSON's telephone number on CI-1's Caller ID. A review of records for Wilson Telephone (which then had number (708) 768-1111) showed approximately four contacts between that phone and a telephone used by CI-1 on July 17, 2004. In that call, WILSON and CI-1 discussed CI-1 selling WILSON five kilograms of cocaine for $20,000 per kilogram.

14.     A review of records for Wilson Telephone showed four contacts between that phone and Jones Telephone on July 17, 2004.

15.     On July 19, 2004, CI-1 said that WILSON called CI-1. A review of records for Wilson Telephone showed approximately seven contacts between that phone and a telephone used by CI-1 on July 19, 2004. WILSON said that the guy who was going to supply the money for the deal was not ready, so WILSON wanted to do the deal on July 20. CI-1 agreed and said that WILSON should call when he was ready.

### July 20, 2004

16.     On July 20, 2004, CI-1 met with a CPD narcotics officer, providing him with information that WILSON wanted to conduct a narcotics deal. At that time, CI-1 asked if the CPD narcotics officer could help CI-1 with an outstanding arrest warrant in CI-1's pending

-11-

narcotics case, in exchange for CI-1's cooperation against WILSON.

17.     At about 3:00 p.m. on July 20, in the presence of a CPD narcotics officer, CI-1 called WILSON on Wilson Telephone. Both CI-1 and a CPD narcotics officer posing in an undercover capacity as CI-1's brother (the "UC") spoke with WILSON. In this approximately 3:00 p.m. telephone call,[6] the UC told WILSON that his/her supplier of cocaine only had two kilograms available to sell to WILSON on Tuesday (July 20), but could get three more kilograms of cocaine on Wednesday, July 21, 2004. WILSON responded that he wanted to buy all five kilograms at once. Later in the call, WILSON told the UC that he was upset that CI-1 could not get all five kilograms that day, and he (WILSON) later gave the phone to an unknown male ("UM"), who told the UC that UM wanted to do the deal that day because UM was leaving town. UM suggested doing the deal that night, but after the UC refused, the UM said he would try to wait.

18.     At about 5:00 p.m. on July 20, at the direction of the CPD narcotics officers handling CI-1's cooperation, CI-1 went to Sunrise Car Wash at 8540 S. Ashland Ave., Chicago, Illinois ("WILSON's car wash"). CI-1 was not surveilled during this visit nor was the conversation there recorded. According to CI-1, WILSON owned the Car Wash.[7] CI-1 said that he/she met WILSON at the Car Wash, and that WILSON said that he wanted five kilograms for

---

[6]Telephone records for Wilson Telephone indicate that there were about 11 contacts between a telephone used by CI-1 and Wilson Telephone on July 20, 2004, including contacts around 3:00 p.m.

[7]A check with a database of real estate records maintained by the U.S. Secret Service showed that WILSON owned the property at 8540 S. Ashland, and records from the City of Chicago Licensing Unit showed WILSON as the owner of Sunrise Car Wash, Inc., which was located at 8536-8540 S. Ashland in Chicago.

"Roger." CI-1 told WILSON that when WILSON had the money for the five kilograms, he should call CI-1.

19.    Telephone records confirm that Wilson Telephone was in contact with Jones Telephone on about five occasions on July 20, 2004.

### July 21, 2004

20.    Telephone records for Wilson Telephone and pen register and trap and trace data for Jones Telephone show numerous contacts between those telephones on July 21, 2004. According to these records, the first call between the two is a call from Jones Telephone to Wilson Telephone at approximately 8:42 a.m.

21.    According to CI-1, WILSON called CI-1 at about 8:58 a.m. (phone records for Wilson Telephone show a call from that telephone to the CI-1's phone at approximately 8:53 a.m.). According to CI-1, during this call, which was not recorded, WILSON indicated that he was ready to buy the cocaine. Immediately after this call, at about 8:54 a.m., phone records show that a 21-second call was made from Wilson Telephone to Jones Telephone.

22.    At about 9:39 a.m., the UC called WILSON on Wilson Telephone (telephone records confirm an approximately 24-second call at approximately this time from CI-1's telephone to Wilson Telephone). During this call, which was not recorded, the UC told WILSON that the UC would meet with the cocaine supplier at about 10:00 a.m. WILSON indicated that he understood. Again, phone records show that immediately after this call WILSON called JONES, evidenced by an approximately 1 minute and 12-second call at 9:40 a.m. from Wilson Telephone to Jones Telephone.

### CI-1 Meets WILSON at the Car Wash

23.     According to CI-1, CI-1 called WILSON on Wilson Telephone at about 10:30 a.m. This call was not recorded. According to CI-1, he/she told WILSON that he/she was on the way. WILSON indicated that he understood. Telephone records reflect a call from CI-1's telephone to Wilson Telephone at approximately 10:48 a.m.

24.     Shortly after that call, CI-1 picked up an individual ("Individual A"), who CI-1 indicated was his/her supplier of cocaine, on the corner of 47th and Winchester in Chicago. CI-1 was driving a black Chevy Blazer, and the two went to WILSON's car wash to meet with WILSON and confirm that WILSON had the money for the cocaine purchase.

25.     Around this same time, it appears that WILSON and JONES again spoke with each other. Telephone records show an approximately 1 minute call from Jones Telephone to Wilson Telephone at approximately 10:30 a.m., as well as two shorter calls from Wilson Telephone to Jones Telephone at approximately 10:50 a.m. and 10:51 a.m.

26.     At about 11:00 a.m., undercover CPD narcotics officers watched as CI-1 and a Hispanic male (identified as Individual A by CI-1) arrived at the Car Wash together in a black Blazer and went inside. According to CI-1, he/she and Individual A then met with WILSON. This meeting was not recorded. CI-1 said that WILSON used a Nextel telephone to call UM again. WILSON used a speaker phone feature, so CI-1 could hear the entire conversation. WILSON said that the guys were there and wanted to see the money. UM said that he would be there in five minutes. After about 15 minutes, WILSON made another call using his Nextel phone, which was also on speaker phone. In that call, UM said that he wanted to make sure that it was good, which CI-1 understood to mean that UM wanted to make sure that the quality of the

-14-

cocaine was good. WILSON indicated that he could vouch for CI-1 and Individual A, saying that he knew that the cocaine was good. UM said that he needed about one hour and fifteen minutes to get the money together. CI-1 then told WILSON to call CI-1 when WILSON was ready, and CI-1 and Individual A left together.

27.    Telephone records showed 7 contacts between Wilson Telephone and Jones Telephone between 11:00 a.m. and 11:54 a.m. Three of these calls, at approximately 11:15 a.m., 11:25 a.m., and 11:54 a.m., lasted approximately 1 minute, 3 minutes, and 3 ½ minutes respectively.

28.    Shortly before noon, undercover CPD narcotics officers saw CI-1 and Individual A leave the Car Wash. Officers followed CI-1 and Individual A as they drove in the black Blazer from the Car Wash towards 47th and Winchester. During that time, the officers noticed that a champaign or cream-colored Cadillac Escalade, Illinois license plate 5399422, (the "Escalade" or "JONES's Escalade") was following CI-1 and Individual A. The officers also noticed that this Escalade displayed a Fraternal Order of Police ("FOP") sticker. According to Illinois Secretary of States records, Illinois license plate number 5399422, is registered to BRODERICK JONES, and JONES has been seen driving the Escalade on prior occasions. The driver of the Escalade was not identified during that surveillance, but JONES was seen driving the Escalade at several points later that day. CPD officers followed the Escalade until surveillance was lost on the Escalade at about 47th and Damen.

29.    According to CI-1, he/she and Individual A saw that the Escalade was following them from WILSON's car wash. CI-1 lost sight of the Escalade at about 47th and Damen. According to CI-1, he/she dropped Individual A off at 47th and Winchester, and then met with the

-15-

CPD narcotics officers handling CI-1's cooperation.

30.     Shortly after the CPD narcotics officers handling CI-1's cooperation discovered

the presence of the Escalade displaying the FOP sticker, they contacted another CPD officer, who

was working on this police corruption investigation. At that point, agents and officers involved

in this police corruption investigation began working with the CPD narcotics team handling CI-

1's cooperation and in surveilling the actions of CI-1 and others on July 21, 2004.

31.     JONES does not appear to have any reason relating to his employment as a CPD

officer that would explain his presence at 47th and Damen on July 21, 2004. As noted above,

JONES had been stripped of his police powers and assigned to the ARS. In addition, JONES

was not part of the CPD narcotics team handling CI-1's cooperation, investigating the potential

narcotics deal with WILSON, or conducting surveillance that day. Finally, CPD Attendance and

Assignment records show that JONES had taken comp time from 11 a.m. to 3 p.m. on July 21,

2004, indicating that JONES was not even on duty at the time he was surveilled during the events

that day. Accordingly, based on the experience and training of CPD officers who are assisting in

this investigation, my own experience, and the investigation to date, I believe there is no

legitimate job-related reason for JONES to have been following the black Blazer.

Traffic Stop Conducted by FLAGG

32.     At approximately the same time that CI-1 and Individual A left the Car Wash,

CPD officers saw a red Chevy Malibu driving near the black Blazer. It appeared that the red

Malibu was driving in tandem with the black Blazer. As the two cars drove north on Ashland,

officers observed that a Chevy Caprice, Illinois license plate, M111363 (the "Caprice") appeared

to be driving along behind the two cars. The license plates on the Caprice were Illinois

-16-

municipal plates, which I know from experience are often used by City of Chicago vehicles, including unmarked CPD cars. In addition, CPD records revealed that the Caprice was assigned to an Area Two gun team, which is where CPD officer COREY FLAGG was assigned.

33.    At about 12:00 p.m., about two miles from the Car Wash, the Caprice activated emergency equipment and pulled over the red Malibu, which was being driven by a Hispanic male. CI-1 learned later that day when he/she met with Individual A and Individual A's son, that the son had followed Individual A to the Car Wash in a different car on their earlier trip. According to CI-1, Individual A always has someone follow him for security purposes. Individual A's son said that he noticed that an Escalade was following him until 47th Street. Individual A's son told CI-1 that he had been stopped by the police, and thus, was presumably the individual in the red Malibu. In summary, Individual A's son told CI-1 that the officer who pulled him over said he had been stopped for speeding through a yellow light, that the police asked for his license and insurance, and that the police searched his car.

34.    A CPD officer who was part of the undercover narcotics surveillance team working with CI-1, witnessed the stop of the red Malibu and drove around the block in his unmarked car to return to the scene of the stop. When that CPD narcotics officer returned, the Caprice pulled him over. Two individuals got out of the Caprice. The driver of the Caprice spoke with the CPD narcotics officer, and after the CPD narcotics officer identified himself as a CPD officer, the driver let the CPD narcotics officer go. The CPD narcotics officer recognized the driver of the Caprice as being a police officer that he had seen before. The CPD narcotics officer later identified a picture of CPD Officer COREY FLAGG as the driver of the Caprice.

35.    FLAGG does not appear to have any reason relating to his CPD duties to conduct

-17-

a traffic stop on the red Malibu or on the CPD narcotics officer conducting surveillance. FLAGG was not part of the CPD narcotics team handling CI-1's cooperation, investigating the potential narcotics deal with WILSON, or conducting surveillance that day. Instead, FLAGG was a patrol officer assigned to an Area Two gun unit. Area Two covers a large section of south Chicago, but the stop of the red Malibu took place outside of Area Two. Further, evidence suggests that FLAGG was not on duty at the time of the traffic stop. CPD Assignment and Attendance records show that FLAGG was not on duty until 5 p.m. that day. In addition, FLAGG checked out a personal data terminal, which is a mobile electronic device that patrol officers use in their patrol cars to receive duty calls and check records remotely, at 9:30 p.m. that night. Based on the experience of CPD officers involved in the investigation, patrol officers typically check out a personal data terminal at the beginning of their shift, not the end. Accordingly, based on these records and the experience of these CPD officers, I believe that FLAGG was not on duty when he stopped the red Malibu.

Telephone Contact Between JONES and FLAGG

36.    Information received from a court-authorized pen register and trap and trace device on Jones Telephone on July 21, 2004 showed a significant amount activity not only with Wilson Telephone, but also with several other Nextel telephones subscribed to by JONES[8] and one Nextel telephone subscribed to by COREY FLAGG ((773) 640-2920, IMSI# 316010026708779, hereinafter "Flagg Telephone"). In particular, it appears that there were approximately 20 "direct connect" contacts between Jones Telephone and Flagg Telephone

---

[8]In addition to Jones Telephone, JONES had nine additional Nextel telephones subscribed to his name. As noted in greater detail below, one of these telephones was being used by WALKER, and is referred to herein as Walker Telephone.

between 9:08 a.m. and 11:54 a.m. In addition, there were two additional "direct connect" contacts between the two telephones approximately 12:57 p.m. and 1:40 p.m.

### Meeting Between JONES and FLAGG

37.    At about 12:00 p.m., law enforcement officers conducting surveillance in connection with this investigation ("surveillance") saw Jones's Escalade parked near WILSON's car wash. Surveillance identified the driver of the Escalade as BRODERICK JONES, and saw JONES talking on a telephone and go into WILSON's car wash. At 12:25 p.m., surveillance observed JONES leave WILSON's car wash and get back into the Escalade, and surveillance followed JONES as he drove to the vicinity of 9418 S. Wabash, Chicago, Illinois. According to records maintained by the Illinois Secretary of State, 9418 S. Wabash is the home address listed on COREY FLAGG's Illinois driver's license and agents and officers had previously seen FLAGG at that address. There, surveillance witnessed JONES and FLAGG in conversation in the alley behind 9418 S. Wabash. At about 12:45 p.m., surveillance saw JONES leave the vicinity of 9418 S. Wabash, and surveillance on JONES was lost at about 87th and Racine.

38.    Based on my training and experience, and on the investigation to date, I believe that FLAGG and the other individual stopped the red Malibu with the intention of searching it for cocaine, and then illegally seizing that cocaine by robbery and/or extortion. I believe that based on FLAGG's telephone contact with JONES, FLAGG was aware that CI-1 was discussing a cocaine sale with WILSON, and that FLAGG expected that the red Malibu was transporting the cocaine to be delivered to WILSON. Further, I believe that JONES was driving the Escalade at that time to assist FLAGG with surveillance on the black Blazer and red Malibu as JONES was in communication with both FLAGG and WILSON. Given that neither FLAGG nor JONES

-19-

appeared to have been performing their official police duties at the time FLAGG stopped the red

Malibu, I believe that they intended to keep (rather than inventory as evidence) any cocaine

found in the red Malibu and then distribute that cocaine.

CI-1's Second Visit to WILSON's car wash

39.     After making the first trip to WILSON's car wash and dropping off Individual A,

CI-1 received a call from Individual A.  The call was not recorded.  According to CI-1, Individual

A wanted CI-1 to pick up and transport the five kilograms of cocaine to WILSON's car wash.

CI-1 then returned to the area of 47th and Winchester to pick up Individual A.  At that time, CI-1

met with Individual A and Individual A's son, where CI-1 first learned that Individual A's son

had been pulled over by the police.   According to CI-1, during this meeting, CI-1 called

WILSON on Wilson Telephone and gave the phone to Individual A's son.  Individual A's son

then told WILSON that he had been stopped by the police.  WILSON indicated that they were

counting the money.  Telephone records reflect two calls from a telephone used by CI-1 to

Wilson Telephone at approximately 12:30 p.m. and 12:37 p.m.  Telephone records further reflect

approximately 7 calls between Wilson Telephone and Jones Telephone between approximately

12:01 p.m. and 1:22 p.m., including a call from Wilson Telephone to Jones Telephone at

approximately 12:31 p.m (lasting approximately 1 minute) and 12:38 p.m. (lasting approximately

4 minutes), suggesting that WILSON spoke with JONES immediately after WILSON heard from

CI-1.

40.     According to CI-1, after speaking with WILSON over Wilson Telephone, CI-1

and Individual A drove to WILSON's car wash to check the money for the expected drug

transaction.  Surveillance followed CI-1 and Individual A from the vicinity of 47th and

-20-

Winchester to WILSON's car wash. CI-1 drove the black Blazer while Individual A drove the red Malibu. At about 1:10 p.m., surveillance saw CI-1 and Individual A go into WILSON's car wash.

41.     According to CI-1, he/she and Individual A met with WILSON at WILSON's car wash. That meeting was not recorded. CI-1 said that WILSON suggested that the guys with the money would be there in about five minutes. WILSON then called someone using the Nextel phone (not on speaker), and said that CI-1 and Individual A were there for the money. After some time, WILSON made two phone calls. The speaker on the second call indicated that he would be ready in five minutes. WILSON told CI-1 that if that customer was not ready, WILSON had plenty of other buyers. After approximately 10 minutes, CI-1 and Individual A left together. Prior to leaving, CI-1 told WILSON to call when he was ready.

### Surveillance of JONES, BLACK, and Others Near WILSON's Car Wash

42.     At about 1:10 p.m., surveillance saw JONES move the Escalade so that it was parked adjacent to a Crown Victoria, Illinois license plate M114781, (the "Crown Victoria").[9] The license plates on the Crown Victoria were Illinois municipal plates, which I know from experience are often used by City of Chicago vehicles, including unmarked CPD cars. There were two black males in the Crown Victoria. JONES got out of the Escalade and appeared to engage in conversation with the two men in the Crown Victoria for approximately 10 to 15 minutes. After that point, JONES returned to the Escalade and drove away. The Crown Victoria left the gas station shortly thereafter. While law enforcement officers could not identify the two

---

[9]A check of CPD records indicates that this Crown Victoria was assigned to EURAL BLACK and another officer (identified below as Officer E) from approximately 10:00 a.m. to 6:30 p.m. on that day.

individuals in the Crown Victoria at the time, as detailed below, CPD Officer EURAL BLACK

and another individual, identified herein as "Officer A," were identified driving the Crown

Victoria shortly thereafter.

Traffic Stop of CI-1 by BLACK and Officer A

43.     Shortly before 1:25 p.m., surveillance saw CI-1 and Individual A leave

WILSON's car wash after the above-mentioned meeting. CI-1 drove away from WILSON's car

wash in the black Blazer while Individual A left separately in the red Malibu. At about the same

time, JONES's Escalade was seen in the vicinity of WILSON's car wash. Shortly thereafter,

surveillance saw the Crown Victoria following the black Blazer traveling northbound on Ashland

Avenue about four blocks away from the Car Wash. Surveillance then saw JONES following the

Crown Victoria in his Escalade.

44.     At about 1:25 p.m., surveillance saw the Crown Victoria activate its emergency

equipment and pull over the black Blazer. At this time, JONES pulled his Escalade into a

parking spot about four or five car lengths behind the traffic stop.

45.     After the traffic stop, surveillance circled the block in unmarked cars to establish

their surveillance positions. When they returned, they saw two black men talking to CI-1, who

was outside the car. Surveillance was able to identify one of the two men as CPD Officer

EURAL BLACK. CI-1 later identified pictures of CPD Officer EURAL BLACK and of Officer

A as being the two individuals who stopped CI-1 in the black Blazer. Later, surveillance saw the

man CI-1 identified as Officer A inside the black Blazer. Officer A appeared to be searching the

Blazer, while BLACK and CI-1 were in the Crown Victoria.

46.     At about 1:50 p.m., CI-1 drove away in the black Blazer. JONES left the area

-22-

shortly before CI-1 was released. BLACK and Officer A drove away in the Crown Victoria after CI-1 left.

47.     Neither BLACK nor Officer A appears to have any reason relating to their CPD duties to be working together on July 21, 2004 to conduct a traffic stop on the black Blazer. Neither officer was part of the CPD narcotics team that was working with CI-1 and investigating the potential five kilogram cocaine deal with WILSON. In addition, CPD Attendance and Assignment records indicate that Officer A, who normally works in the 7th CPD District, was on medical leave on July 21, 2004. Further, the traffic stop on the black Blazer was done outside of the 7th District. Based on the experience of CPD officers involved in this investigation, it would be unusual for a member of a tactical unit to stop a car outside of his assigned area unless the officer had initially started following the car inside his assigned area. Here, the black Blazer was followed from WILSON's car wash and stopped about four blocks north of WILSON's car wash, which area is in the 6th CPD District. In addition, BLACK was a patrol officer with a different 7th District tactical unit (Unit #763) than Officer A. Accordingly, based on the experience and training of CPD officers who are assisting in this investigation and my own experience and the investigation to date, I believe that BLACK and Officer A had no legitimate job-related reason to stop and search the black Blazer.[10]

48.     According to CI-1, BLACK and Officer A stopped the black Blazer, handcuffed him/her outside the car, and asked him/her where the drugs and guns were. When CI-1 denied knowing about any drugs or guns, CI-1 was asked for his/her driver's license. CI-1 provided a

_____

[10]For the same reasons stated above in reference to JONES following the red Malibu, I also believe that JONES had no legitimate job-related reason to follow the black Blazer or to observe the stop and search of the black Blazer.

-23-

Mexican driver's license and said that he/she had been in the country for 11 years. CI-1 said that he/she was placed in the Crown Victoria while his/her car was searched. At some point, the man identified as Officer A returned to the Crown Victoria and said to let CI-1 go because Officer A could not find anything. Shortly thereafter, CI-1 was allowed to leave.

49.     Based on my experience and training, and on the investigation to date, I believe that BLACK and Officer A stopped CI-1's car with the intention of searching it for cocaine, and then illegally seizing that cocaine by robbery and/or extortion. I believe that BLACK and Officer A were aware that CI-1 was discussing a cocaine sale with WILSON, and that BLACK and Officer A hoped that CI-1 was transporting cocaine to be sold to WILSON (which is what CI-1 had done during previous drug deals with WILSON). I further believe that JONES was assisting BLACK and Officer A by providing them information regarding the target of the ripoff, and also by providing security and performing counter-surveillance during that attempted ripoff.

### Undercover Call to WILSON over Wilson Telephone

50.     On July 21, 2004, shortly before 4:00 p.m., the UC called WILSON on Wilson Telephone. During that call, which was recorded, the UC told WILSON that CI-1 had been stopped by the police. WILSON did not express surprise at that statement, saying "Yeah, yeah, you know, but you know something, things didn't look right." The UC also told WILSON that "you said bring the cars. We brought the five cars," indicating that CI-1 had brought five kilograms of cocaine. In response, WILSON said "yeah." Later, the UC asked WILSON "you say you have the papers (meaning the money for the cocaine), what happened to the papers?" In response, WILSON said "well the guy did come, and stuff, but you know something else, I'm saying now that things didn't look right around here."

-24-

51.     As set forth below in paragraphs 249, 252, 253, 255, and 256 of the affidavit, on November 13, 2004, JONES had conversations with BLACK that were intercepted over Jones Telephone in which they discussed a "car stop" ripoff near WILSON's car wash.

### C. Ripoff of Drugs and/or Money By JONES, FLAGG, WILSON, and DRIVER Near 83rd Street and Stoney Island Avenue (8/16/04)

#### Summary

52.     As described in greater detail below, on August 16, 2004, CPD Officer JONES, CPD Officer FLAGG, WILSON, and DRIVER participated in the robbery/extortion of a drug dealer behind a car wash located near 83rd Street and Stoney Island Avenue in Chicago. Before that ripoff, WILSON and DRIVER arranged for a drug dealer to meet with them (WILSON and DRIVER) in order to exchange drugs for money. As with the attempted ripoff on July 21, 2004 discussed above, WILSON contacted JONES to arrange for JONES to have corrupt police officers stage a "police stop" in which it would appear that any money and/or drugs taken from the drug dealers were taken pursuant to legitimate police activity. As with the above-mentioned attempted robbery/extortion, JONES enlisted FLAGG's help to conduct this ripoff, which took place on the evening of August 16, 2004. Among other things during this ripoff, some of which was captured on video, FLAGG and JONES appeared to place WILSON in custody, presumably as part of a ruse to make it appear that any drugs and/or money seized during that "stop" and "arrest" were legitimately taken from the drug dealers. However, telephone conversations intercepted over Wilson Telephone and related surveillance made it clear that WILSON was not actually arrested and that the police stop was staged in order to allow JONES, FLAGG, WILSON, and DRIVER to keep any drugs and/or money brought by the drug dealers to the

expected drug deal.

### August 13-15, 2004

53.    From approximately Friday, August 13, 2004 through Sunday, August 15, 2004,

WILSON and STANLEY DRIVER JR.[11] discussed meeting with each other.  Based upon the

context of these conversations and other conversations, it is my belief that WILSON and

DRIVER discussed meeting with each other in order to arrange for a drug trafficker to be sent to

a location where that trafficker could be robbed/extorted by law enforcement associates of

WILSON – CPD Officers JONES and FLAGG.  For example, in an intercepted call at

approximately 6:32 p.m. on August 13 (Wilson Tel. #343)[12], DRIVER called WILSON, and

asked, among other things, whether WILSON's "people be in motion."  WILSON advised

DRIVER to stop by to meet with WILSON in person, which DRIVER agreed to do.  The next

day, Saturday, August 14, at approximately 12:14 p.m. (Wilson Tel. #351), WILSON called

DRIVER, who indicated that he needed to check on the time.  WILSON responded that he

---

[11]Other agents and I have identified STANLEY DRIVER, JR. as the speaker in this and other conversations set forth in this affidavit based upon several factors, including the following: i) in some of these calls, DRIVER is identified as "Stan"; ii) subscriber information for one cellular telephone ((773) 991-9299) used by "Stan" lists the address for the subscriber as 1639 E. 84th Street, Chicago, and Illinois Secretary of State records indicate that two individuals named Stanley Driver reside at this same address; iii) Ameritech landline telephone ((773) 731-5521) used by "Stan" on August 16, 2004, lists the subscriber as Yolanda Driver, 1639 E. 84th Street in Chicago; iv) on December 8, 2004, officers working on this investigation spoke with STANLEY DRIVER JR., at which time DRIVER identified himself and the agents recognized DRIVER's voice as the same voice they had heard in intercepted conversations; v) the common sound of DRIVER's voice in intercepted conversations; and vi) the contents and context of intercepted conversations.

[12]The call or "session" numbers for conversations intercepted over Wilson Telephone, Jones Telephone, and Walker Telephone are identified as (Walker Tel. #____), (Jones Tel. #____), and (Walker Tel. #____), respectfully.

needed to know the "color" and "make," apparently referring to the car in which the drug

trafficker would be traveling with the drugs and/or money. WILSON attempted to reach

DRIVER on several additional occasions on August 14, and in an intercepted conversation at

approximately 5:57 p.m. (Wilson Tel. #358), DRIVER told WILSON that he was trying to call

his "guy" (the drug trafficker). WILSON told DRIVER that his friend had stopped by and was

asking what was going on. DRIVER responded that he would call WILSON back later that day

or the next day.

54.     The next day, Sunday, August 15, 2004, DRIVER called WILSON at

approximately 1:10 p.m. (Wilson Tel. #366). In that intercepted conversation, DRIVER told

WILSON that DRIVER would let WILSON talk with his "guy" (the drug associate), and that

they could "go ahead and do it" as DRIVER's guy was "going to get things ready." After

DRIVER asked WILSON where he was located, WILSON said he was at the car wash, referring

to his car wash on 8540 S. Ashland. DRIVER told WILSON that he would meet with WILSON

at WILSON's car wash, that he (DRIVER) was going to let WILSON talk with his "guy" to put

his "order in," and that they could just go then and "make the move," referring to the plan of

letting WILSON contact the drug supplier to place an order for drugs, after which WILSON

could "make the move" by directing corrupt CPD officers to ripoff the drugs.

55.     Pen register and trap and trace data indicate that on the afternoon of Sunday,

August 15, 2004, there were approximately 5 "direct connect" connections between Jones

Telephone and Flagg Telephone from approximately 4:30 p.m. to 6:15 p.m.

**August 16, 2004**

56.     At approximately 10:21 a.m. on Monday, August 16, 2004 (Wilson Tel. #372),

-27-

WILSON placed an outgoing call to DRIVER at (773) 991-9299. In that conversation, DRIVER indicated that another individual had to work, but that he would probably be done by 5:00 p.m. DRIVER stated "we could probably try to get it before then," perhaps by 2:00 or 3:00 by going through one of his "buddies." In this conversation, I believe DRIVER and WILSON were arranging for a drug transaction later that day, and that DRIVER was telling WILSON that a drug trafficker or one of that person's "buddies" could provide "it" (the drugs) later that day. I further believe that WILSON and DRIVER were planning on setting up this drug trafficker to be robbed and/or extorted of drugs and/or money later that day.

57.     At approximately 11:05 a.m., JONES placed a call to WILSON (Wilson Tel. #374). In that conversation, WILSON indicated that he "just finished talking to him (DRIVER)." WILSON told JONES that DRIVER said that "the person" (the drug trafficker) had to work that day, but that it was a "sure thing today," apparently referring to a drug transaction that was being set up by WILSON and DRIVER. WILSON further informed JONES that "the guy" (the drug trafficker) was "at work," but that he "might have another guy to do this (the drug transaction) for him." WILSON said that it was a "sure thing," that would probably take place between "2 o'clock and 5 o'clock."

58.     Shortly after this conversation between JONES and WILSON, JONES had two "direct connect" connections with FLAGG over Jones Telephone and Flagg Telephone. These two "direct connect" connections were made at approximately 11:10 and 11:50 a.m.

59.     On the afternoon of August 16, 2004, surveillance observed JONES leave work at approximately 2:20 p.m., from 2111 W. Lexington Avenue in Chicago, which is the location of the CPD ARS Unit where JONES was assigned. The surveillance then followed JONES, who

-28-

was driving his champagne-colored Cadillac Escalade, to a gym named Xtreme Sports located in the vicinity of West 95th Street and Ridgeland Avenue. After observing JONES make several stops, surveillance observed JONES exit his Escalade and enter the gym at approximately 3:30 p.m. Surveillance saw that the Escalade remained in the parking lot of Xtreme Sports until shortly after 6:30 p.m., when JONES exited the gym, entered his Escalade, and left the area.

60.     At approximately 4:38 p.m., DRIVER called WILSON (Wilson Tel. #383). During that intercepted conversation, DRIVER told WILSON "it's still supposed to be happening," referring to an anticipated drug transaction between WILSON and another drug trafficker as brokered by DRIVER. WILSON wanted DRIVER to come to WILSON's car wash so they "could get things together." DRIVER explained that they probably only needed "a couple words" and they "should be ready for it," and that he did not presently have a ride to meet WILSON. DRIVER further explained, "I'll probably have you look at it and tell him (the drug trafficker) if it's alright, he thought it was going to be the first thing he said," referring to WILSON looking at the drugs and/or money to be supplied by the drug trafficker. DRIVER also mentioned that he had just called "him" (the drug trafficker), who indicated the transaction would happen about the same time they had planned.

61.     At approximately 5:03 p.m., DRIVER called WILSON (Wilson Tel. #384), and asked whether WILSON was coming "over this way" by DRIVER. WILSON told DRIVER to wait until WILSON made a phone call to "see what's what." DRIVER said "he wanted everything to go right" and that he (DRIVER) would wait on WILSON's call. I believe that in this intercepted conversation, WILSON told DRIVER that he (WILSON) needed to contact the corrupt CPD officers to see whether they were ready to rob/extort the drug trafficker. Within two

-29-

minutes after this call, WILSON called JONES at Jones Telephone (Wilson Tel. #s 385 and 386),

leaving a voicemail message for JONES to call WILSON.

62.     At approximately 5:29 p.m., DRIVER again called WILSON (Wilson Tel. #388)

wanting to know if WILSON "heard something" (from JONES) because his "man" (the drug

trafficker) has been calling him. WILSON responded that he had called and left a message for

"him (JONES) to call me back." DRIVER asked WILSON to call his "man (JONES) again."

Within approximately one minute of this call, WILSON called JONES at Jones Telephone,

leaving JONES another message for JONES to contact WILSON (Wilson Tel. #389).

63.     Within approximately 2 minutes (at approximately 5:32 p.m.), JONES returned

WILSON's calls (Wilson Tel. #390). WILSON informed JONES "that person ready." JONES

responded, "now they ready?" After WILSON said "yeah," JONES replied, "fuck," and said,

"it's gonna be a little while now" and "a couple hours at least." WILSON replied that he would

see if he could "hold it for a couple of hours."

64.     Within a few minutes after Wilson Tel. #390, there was a telephone call from

Jones Telephone to Flagg Telephone, indicating a call from JONES to FLAGG.

65.     At approximately 5:38 p.m., WILSON called DRIVER (Wilson Tel. #392). In

that intercepted conversation, WILSON told DRIVER that his guy (JONES) could not do it (the

robbery/extortion) for a "couple of hours." DRIVER told WILSON to get a "specific time"

(when the corrupt CPD officers would be able to conduct the ripoff) so DRIVER could let "him

(the drug trafficker) know." DRIVER commented that the narcotics deal was "a for sure go,"

and indicated that the drug trafficker was "getting it together." DRIVER told WILSON to get a

time "so we can uhm, make sure it happens."

-30-

66.    Approximately one minute after call #392, WILSON called JONES (Wilson Tel. #393). In that intercepted conversation, WILSON told JONES that DRIVER wanted a specific time when JONES would be ready so WILSON could tell "him" (DRIVER) because "the guy (the drug trafficker) is ready, and he burning him up." JONES replied he could be there about "7:30." WILSON told JONES that he would tell DRIVER "a quarter to 8" because "you know it's out east" and "it's not around here, it's down there." JONES replied, "right . . . over there by what you got." Given that this ripoff ultimately took place in an alley behind a car wash located near 83rd Street and Stony Island Avenue later that night (as described below), I believe that WILSON was telling JONES that the location of the anticipated ripoff would not be near WILSON's car wash (located on S. Ashland Avenue, which is the 1600 block west on the south side of Chicago), but rather will be near another car wash at a location further east (where Stony Island Avenue is located).

67.    Within approximately one minute after call #393, WILSON called DRIVER (Wilson Tel. #394). In that intercepted conversation, WILSON gave DRIVER the time of about "7:30."

68.    Also within approximately one minute after JONES got off of the telephone with WILSON (Wilson Tel. #393), a call was placed from Jones Telephone to Flagg Telephone, indicating a call from JONES to FLAGG.

69.    At approximately 5:59 p.m., DRIVER called WILSON (Wilson Tel. #395). In that intercepted conversation, DRIVER told WILSON that his telephone just went out,[13] and

---

[13]DRIVER called WILSON from a landline telephone -- (773) 731-5521 -- which telephone was subscribed to by a Yolanda Driver at 1639 E. 84th Street in Chicago.

further said "he (the drug trafficker) said he getting it together" and wanted to see if DRIVER

could "be over there at 7" because the drug trafficker did not want to do the drug deal "too late."

DRIVER indicated that "he (the drug trafficker) got it," and he wanted to do the deal at 7. After

WILSON said "they ain't gonna be there," and DRIVER confirmed that "yo guy (JONES) gonna

be there at 7:30," DRIVER told WILSON that he would "stall him" (the drug trafficker). During

the call, DRIVER told WILSON to meet him at 84th and Stony Island Avenue.

70.     Shortly after 6:00 p.m., WILSON attempted to reach JONES, leaving him a

voicemail message (Wilson Tel. #s 396 and 397). And from approximately 6:00 p.m. and 6:30

p.m., there were approximately 3 telephone calls placed between Jones Telephone and Flagg

Telephone.

71.     At about 6:28 p.m., surveillance saw WILSON leave his car wash and enter a blue

Lincoln. Surveillance followed WILSON as he drove from his car wash in a blue Lincoln to

about 8359 S. Stony Island. At approximately 6:50 p.m., WILSON parked the blue Lincoln and

waited inside the car.

72.     JONES returned WILSON's telephone call at approximately 6:31 p.m. (Wilson

Tel. #398). In that intercepted conversation, WILSON informed JONES that he was "heading

over that way now" because they "don't want to do it too late." JONES told WILSON he was on

his way, and WILSON told JONES that he would notify JONES when he (WILSON) was close

by the location.

73.     At approximately 6:30 p.m., surveillance saw JONES, who was wearing a #54

Chicago Bears jersey, blue jeans, and a visor worn backwards, enter his Escalade and leave the

Xtreme Sports gym parking lot.

-32-

74.     From approximately 6:30 p.m. to approximately 7:00 p.m., there were 3 "direct connect" connections between Jones Telephone and Flagg Telephone. There was also another "direct connect" connection between Jones Telephone and Flagg Telephone at approximately 7:10 p.m.

75.     At approximately 6:57 p.m., WILSON received a call from JONES (Wilson Tel. #401). In that intercepted conversation, WILSON told JONES that he was already at "84th and Stony Island," and that he was waiting "on him to be here." JONES replied, "we on a, 87th and Cottage."[14] JONES asked, "you want me to ride through there and fuck with you," to which WILSON responded, "well, you could so we could get everything set up." JONES said, "cool, I'll be over there."

76.     At approximately 6:59 p.m., WILSON received an incoming call from DRIVER (Wilson Tel. # 403). In that call, WILSON told DRIVER that he (WILSON) was on "84th and Stony Island" and that "they finna pull up in a few minutes so we can get things all straight," referring to JONES and FLAGG arriving at that location so they could further plan the robbery/extortion. WILSON said that he was on "84th and Stony" in a "Lincoln," and DRIVER said he would be there in about five minutes.

77.     At about 7:10 p.m., surveillance saw WILSON sitting in a light-blue, four-door Lincoln with Illinois license plate 4906005 (the "blue Lincoln"),[15] which was located in front of

---

[14]As indicated in paragraph 94, later that night at approximately 8:48 p.m., surveillance agents observed FLAGG exiting JONES's Escalade in a Walgreen's parking lot located at 87th Street and Cottage Grove Avenue.

[15]Illinois Secretary of State records indicated that this license plate is registered to a 1994 Lincoln four-door, and registered to an Elijah Wilson at 8536 S. Ashland in Chicago.

8359 Stony Island Avenue. Surveillance then saw a black male wearing a white t-shirt and blue jeans (believed to be DRIVER)[16] get into the blue Lincoln, which then drove around the block.

78.     At about 7:13 p.m., DRIVER used Wilson Telephone to call an unknown male ("UM") (Wilson Tel. #406). In that intercepted conversation, DRIVER indicated that he was with his "man (WILSON) now, I'm about to pull up on you." The UM responded, "let me make this call then, cause it ain't here, I'm not with it man, cause you so late." I believe that in this call, DRIVER told the UM (the drug trafficker), that DRIVER was almost there, and that UM told DRIVER that he would make a call to have the drugs and/or money brought to their meeting location.

79.     At about 7:14 p.m., JONES called WILSON (Wilson Tel. #408). The call went into WILSON's voice mail, and no message was left. Within one minute, WILSON called JONES (Wilson Tel. #409). In that intercepted conversation, WILSON asked if JONES was "close." JONES replied, "You want me to come over there? Cause that's right by the place though, you know what I'm saying." WILSON responded "oh, yeah," and then told JONES to go down on "80, um, 4th . . . then we can talk." The two then agreed to meet on 84th Place.

80.     At about 7:15 p.m., surveillance saw WILSON and DRIVER sitting in the blue Lincoln, which was parked at about 84th Street and Stony Island Avenue.

81.     At about 7:19 p.m., JONES called WILSON (Wilson Tel. #410). In that call, JONES asked for WILSON's location, and WILSON indicated that he was at 84th Place on the

---

[16]Law enforcement surveilling this meeting were not able to make a definite identification of DRIVER as the black male who entered WILSON's car. I believe that the man was DRIVER based on the prior intercepted phone conversation, where DRIVER indicated that he would meet with WILSON in about five minutes, and later intercepted telephone conversations, where DRIVER used Wilson Telephone.

east side.

82.     At about 7:29 p.m., surveillance observed the following individuals meeting near the blue Lincoln, which was still parked on 84th Street near Stony Island Avenue: WILSON, wearing a light-colored cap; JONES, wearing a Bears jersey; a black male wearing a black tactical officer vest (later identified as FLAGG); and another black male wearing a long white t-shirt and blue jeans (believed to be DRIVER). Based on my experience and training, the experience and training of other agents and officers working on this investigation, and the investigation to date, I believe that JONES, WILSON, FLAGG, and DRIVER met to discuss their plan to ripoff the drug trafficker.

83.     At about 7:30 p.m., DRIVER used Wilson Telephone to call UM (Wilson Tel. #411). In that call, DRIVER asked if UM was "ready," and the UM (the drug trafficker) told DRIVER to "pull to the back, man, it's coming," in an apparent reference for DRIVER to pull behind a car wash located at 83rd Street and Stony Island Avenue where the drugs and/or money were "coming."

84.     At about 7:35 p.m., surveillance saw JONES and FLAGG (the same individual they previously saw wearing the black tactical vest) in a Chevy Caprice, Illinois license plate M111363 (the "Caprice") driving on Stony Island Avenue near 87th Street. This was the same Caprice that FLAGG was seen driving during the July 21, 2004 attempted ripoff, which is described above.

85.     At about 7:37 p.m., WILSON called JONES (Wilson Tel. #413). In that intercepted conversation, WILSON said he just talked to him (the drug trafficker), and he told JONES, "we can go around there now." JONES responded, "Okay, wait a couple of minutes

before you go around there, then go ahead," and further stated, "cause we like five minutes away." I believe that in this conversation, WILSON informed JONES that he was about to meet with the drug trafficker where the drugs and/or money would be present, and JONES told WILSON to wait a few minutes so that JONES and FLAGG would have enough time to happen upon the drug transaction and stage a police stop before the transaction was completed.

86.     At about 8:04 p.m., DRIVER used Wilson Telephone to call JONES (Wilson Tel. #416). The following conversation took place:

JONES:     Yeah?

DRIVER:    Yeah, it's back here, it's in the Honda car, well right now they got it all in the car with us, so, I don't know how you want to do it. It's in the uh, blue Honda car, the Honda car is blocked in though.

JONES:     Where it's at? It's blocked in?

DRIVER:    We blocked in behind the Honda, so . . .

JONES:     Y'all inside the uh, . . .

DRIVER:    No we just . . .

JONES:     . . . jeep.

DRIVER:    . . . in the, we, we right in the, back of the alley for it.

JONES:     Okay, you want us to come now?

DRIVER:    Uh, y'all can, so you play it all off?

JONES:     Yeah.

DRIVER:    Like take, cause it's in Joe's car right now though.

JONES:     Alright. We on our way.

87.     Based on my experience and training, the experience and training of other agents

-36-

and officers working on this investigation, and the investigation to date, I believe that in this intercepted conversation, DRIVER told JONES that the drugs and/or money had arrived and were in DRIVER's and WILSON's possession ("right now they got it all in the car with us"), and that DRIVER and WILSON were ready for JONES and FLAGG to come to the scene to stage a legitimate police stop, but in fact illegally take the drugs and/or money by robbery and/or extortion. I believe that DRIVER's question to JONES whether "y'all can, so you can play it all off?" indicates that JONES and FLAGG were not planning to conduct legitimate police work, but rather planned to take the narcotics and/or money for their own (and for WILSON's and DRIVER's) personal benefit. Moreover, as noted earlier this affidavit, JONES was not permitted to participate in this type of police activity on August 16, 2004, even if legitimate, as he had been stripped of his police powers since August 2003. Furthermore, Monday, August 16, 2004, was scheduled to be a day off for FLAGG. At the time, FLAGG was assigned to a Sunday/Monday "day-off group," meaning that those were the two days he was not scheduled to work. Given these circumstances, I believe that FLAGG's and JONES's subsequent actions, which are described below, were not legitimate police actions, but were rather FLAGG and JONES robbing/extorting drugs and/or money from drug traffickers with DRIVER's and WILSON's assistance.

88.     At about 8:15 p.m., surveillance located the Caprice, a blue Honda, a dark colored car which appeared to be a Dodge Intrepid (the "Intrepid"), and another unidentified car parked together in an alley behind a car wash located near 83rd Street and Stony Island Avenue in Chicago. Surveillance was able to video record some of what they observed. When surveillance first arrived, the Caprice was parked adjacent to the blue Honda and the Intrepid, and those cars

appeared to be blocking in the unidentified car. At one point, surveillance saw FLAGG standing in front of WILSON, and appearing to conduct a pat-down search of WILSON. Shortly thereafter, the trunk of the unidentified car was open, and FLAGG was observed moving some items around inside the trunk of the blue Honda, and conducting a cursory search of the passenger compartment and trunk of the Intrepid. After searching the blue Honda and the Intrepid, FLAGG walked away from the cars and in and out of the view of surveillance. A short time later, FLAGG returned to the area of the cars with WILSON, who appeared to be in handcuffs. FLAGG then put WILSON in the back seat of the Caprice. During the course of this "police stop," a large black male fitting the description of JONES was observed near the vehicles being searched. Shortly after FLAGG put WILSON in the back seat of the Caprice, surveillance observed the several cars and individuals at that location leave the area in the following fashion: a black male wearing a blue shirt and dark-colored pants (who did not appear to be a law enforcement officer or a person under arrest) entered the Intrepid and drove away on the street adjacent to the alley that was closest to the surveillance agents; a black male wearing a white t-shirt with a colored-sleeve (who similarly did not appear to be a law enforcement officer or a person under arrest) entered the blue Honda and also drove away on that same street; and the Caprice (presumably still containing WILSON) drove away through the alley (the opposite direction from the Honda and Intrepid).

89.     Based on my experience and training, the experience and training of other agents and officers working on this investigation, and the investigation to date, I believe that FLAGG was pretending to search WILSON, the Intrepid, and the blue Honda, in an effort to make it appear that FLAGG was conducting a legitimate police investigation, and thus a legitimate

-38-

search and seizure of WILSON and any drugs and/or money at that location. I also believe that FLAGG handcuffed WILSON and put him in the Caprice to make it appear that WILSON had been arrested as part of a legitimate police investigation.

90. At about 8:20 p.m., DRIVER used Wilson Telephone to call JONES (Wilson Tel. #421). In that call, DRIVER asked if JONES wanted to meet somewhere, and during that call, JONES handed the telephone to FLAGG[17]:

* * * * *

JONES:          What up homie?

DRIVER:         Shit, I'm over on uh, 84th Place.

JONES:          Okay, (unintelligible) it over.  This him right here, where the fuck we at?

DRIVER:         Y'all want to meet y'all somewhere?

JONES:          Uh, shit, we don't even know where the fuck we at yet, uh . . . .

FLAGG:          (Unintelligible)

JONES:          You in your car right?

DRIVER:         Huh?

JONES:          Hold on, hold on.

FLAGG:          Y'all good homie?

DRIVER:         Yeah I'm good, I'm good.  (Laughter)

FLAGG:          (Laughter)

---

[17]Around this same time, it appears that FLAGG was trying to reach DRIVER, who then had possession of Wilson Telephone.  The pen register data from Flagg Telephone showed three calls to 768-2303 and one call to 678-2303 at approximately 8:20 p.m.  It appears that FLAGG did not dial the proper area code for Wilson Telephone – 708 – as these attempted contacts were not intercepted over the Title III wiretap on WILSON's telephone.

| | |
|---|---|
| DRIVER: | That's good . . . |
| FLAGG: | Make it look good for you. |
| DRIVER: | Man, I gotta hollar at you when you get there, hey they supposed to have . . . |

\* \* \* \* \*

DRIVER then gave his location, which he said was on "84th Place," after which FLAGG said, "No motherfucker, you got to drive over this way somewhere," directing DRIVER to "Tuley Park" near "90th and King Drive."

91.     At about 8:30 p.m., DRIVER used Wilson Telephone to call JONES (Wilson Tel. #423). In that call, DRIVER said "what side y'all on," by the "tennis court or something," asking JONES about JONES's and FLAGG's specific location at Tuley Park. JONES replied that they were "by tennis court." A couple of minutes later, DRIVER again called JONES (Wilson Tel. #424). During that intercepted conversation, DRIVER asked where they were at, and then appeared to see JONES and FLAGG, saying "I'm right here, right behind you, I'm a follow you out."

92.     At approximately 8:36 p.m., DRIVER made another telephone call from Wilson Telephone to JONES (Wilson Tel. #426). In that intercepted conversation, DRIVER asked JONES if Joe (WILSON) "was coming over this way, by the park." JONES replied, "I told him by, uh, 90th and uh, King Drive." DRIVER then said he would "see if I see him sitting around." Based upon the context of this and other conversations, as well as the investigation to date, I believe that after making it appear that WILSON was placed under arrest by handcuffing him and placing him in the back of the Caprice, FLAGG later released WILSON, and JONES then

-40-

advised WILSON to meet up with JONES, FLAGG, and DRIVER near 90th and King Drive,

perhaps to discuss and/or to divide the drugs and/or money recovered from the ripoff of the drug

traffickers.

93.     At about 8:38 p.m., surveillance saw JONES and FLAGG in the Caprice parked at

about 90th Street and Eberhart, which is located across the street from Tuley Park and near some

tennis courts. Surveillance then followed the Caprice as it drove to an alley south of 90th Street

and stopped for some time. At approximately 8:41 p.m., surveillance saw a newer Lincoln in the

alley next to the Caprice.

94.     At about 8:48 p.m., surveillance saw the Caprice parked next to JONES's

Escalade at a Walgreen's parking lot at 87th Street and Cottage Grove Avenue. At about 8:55

p.m., FLAGG was seen getting out of JONES's Escalade and getting into the Caprice.

95.     At approximately 9:47 p.m., JONES placed a call to WILSON (Wilson Tel.

#431). In that intercepted conversation, JONES called WILSON to ask if he was alright, saying

"You all good Joe?" WILSON responded that he was okay, and told JONES that he might need

JONES's help the following night: ". . . . You know about like tomorrow and stuff, . . . you know

some others, yeah, we, we, we got something else up tomorrow." JONES indicated that he

knew, saying, "Yeah, yeah, he told me, he told me, so just let us know."

**D.    *Attempted Ripoff of at Least 2 Kilograms of Cocaine and $10,000 by JONES,
        FLAGG, and WALKER at 8029 S. Langley Street (9/4/2004)***

### Summary

96.     As described in greater detail below, conversations intercepted over Jones

Telephone revealed that between at least August 30, 2004 and September 4, 2004, WALKER

-41-

provided information to JONES regarding a house that he believed was storing $10,000 to $20,000 in cash ("10 to 20 on the cash side") and two to five kilograms of cocaine ("two to five on the other side" or "on the book"). JONES initially understood that the house was located at 7939 S. Langley, but WALKER later informed JONES that the house was located at 8031 S. Langley. During their conversations, WALKER provided other information about the target residence and the people living there, including cars driven by the residents of that location. Among other things, WALKER informed JONES that one of these cars was a red Alero, and WALKER provided JONES with a license plate number for that car. When JONES learned of this robbery target from WALKER, JONES called FLAGG to seek his assistance in the ripoff. FLAGG and JONES discussed various ways to get into the residence, including breaking into the house and finding the owner and "taking his keys." JONES also relayed to FLAGG various information about the drug dealer living at that location, including information about the cars driven by that drug dealer. At various times, surveillance observed FLAGG to be checking-out the location, and on September 4, 2004, surveillance saw FLAGG stop a red Alero with the same license plate number that had been provided by WALKER. FLAGG removed the female driver of the vehicle from her car, placed her in the back of his unmarked police car, and subsequently entered a residence located at 8029 S. Langley. Afterwards, during an intercepted telephone call, FLAGG told JONES that he and WALKER were "stupid motherfuckers" and that the house was 8029 S. Langley, not 8031. FLAGG further explained that he had taken the keys from the woman who lived at 8029 S. Langley, went upstairs into her unit, and that there were no drugs or money in it.

**August 30, 2004**

97.     On August 30, 2004, at approximately 9:01 p.m., JONES received an incoming

telephone call from WALKER (Jones Tel. #546). During the course of their conversation,

WALKER and JONES discussed a location on the east side of the city. WALKER asked if

JONES was "ready" and told JONES that there may be "10 to 20 on the cash side" and "two to

five on the other side." JONES asked, "On the book?," and WALKER said yes. Based upon the

context of this and other conversations, as well as the investigation to date, I understand that

WALKER told JONES about a residence that was located on the east side of Chicago, which

residence would contain approximately $10,000 to $20,000 ("10 to 20 on the cash side"). I also

understand JONES's reference to "book" to be a reference to a kilogram of cocaine, and thus,

that WALKER told JONES that the residence would also contain two to five kilograms of

cocaine. WALKER further told JONES that another person had "been in there," but did not

know the specific location of the drugs or money in the residence, and that the person who lives

at the residence carries no less than three to five "dollars" on him on the "stack side" ($3,000 -

$5,000). When JONES asked WALKER about the address of the residence, WALKER told

JONES he would get back to him with that address.

98.     At approximately 9:23 p.m. that same night, JONES called COREY FLAGG

(Jones Tel. #561). During their "push-to-talk" ("PTT") or "direct connect" conversation, JONES

told FLAGG about "something over east" and further told FLAGG about "five of them."

FLAGG asked JONES if it was "brick" and where they were located, and the two of them agreed

to discuss the matter further. Based upon the context of this and other conversations, as well as

the investigation to date, I understand the reference to "brick" to be a reference to a kilogram of

cocaine, and that in this call JONES told FLAGG about a location where there were approximately five kilograms of cocaine that they could attempt to steal.

### August 31, 2004

99.     At approximately 12:08 p.m. on August 31, 2004, JONES and FLAGG talked via PTT (Jones Tel. #600-602). During these conversations, JONES told FLAGG he had the information FLAGG was wondering about, referencing a prior conversation between the two, but did not want to give the address over the telephone. FLAGG asked JONES, "Is it there right now?" JONES told FLAGG it was and discussed the location inside the residence where the drugs and money might be hidden. JONES further told FLAGG that an unknown male and his girlfriend stay at the residence and that the unknown man was out driving. FLAGG asked if this person was driving around with it and JONES said, "No, it's (the cocaine) in the crib." FLAGG then asked if it was inside a "space" or something. JONES told FLAGG he did not know where it (the cocaine) was located inside the residence. FLAGG then told JONES he would rather "grab dude on the street and walk him in the house," meaning that FLAGG preferred to enter the residence by grabbing the ripoff victim on the street and then gaining entry into his house. JONES told FLAGG he was getting off of work at approximately 1:00 p.m., and the two agreed to meet at JONES's residence when JONES got off of work. Based on my experience and training, the experience and training of other agents and officers working on this investigation, and the investigation to date, I understand that JONES and FLAGG were discussing where drugs and narcotics were located in the residence they were planning to rob, and how FLAGG wanted to enter that house. I further understand that FLAGG's reference to a "space" inside the residence to be a reference to a trap or a concealed area, as I am aware that narcotics dealers, in

-44-

an effort to conceal their criminal activity, routinely hide narcotics and money in hidden compartments inside of vehicles and residences.

100.    At approximately 12:15 p.m. that same day, FLAGG contacted JONES via PTT (Jones Tel. #603). JONES told FLAGG that "his broad, she get down, too," and that this person "be on the business too." FLAGG asked her location and JONES told him she was at work. FLAGG then asked if anyone was home, and JONES told him no. After FLAGG inquired as to the address, JONES said "7939 Langley." JONES further told FLAGG that the person who lived there carried "a nice little load" in his car, but that everything else was upstairs in the residence. I understand that in this call, JONES told FLAGG that the person who lived at 7939 S. Langley had a girlfriend who was also involved in the drug trade, and that person who lived at this Langley address stored drugs and/or money in both his vehicle and residence.

101.    At approximately 12:16 p.m. that same day, JONES and FLAGG talked via PTT (Jones Tel. #604). During their conversation, they discussed that the man who resided at 7939 S. Langley drove a red Lexus automobile and spent time on the south side of Chicago. FLAGG told JONES that he was going to drive by the residence, which JONES indicated was on the second floor of 7939 S. Langley.

102.    At approximately 12:22 p.m. that same day, during a PTT conversation (Jones Tel. #606), FLAGG instructed JONES to "find out if anybody know where they could find him at right now," which I understand to be an instruction for JONES to find out the present location of the drug dealer living at 7939 S. Langley. JONES told FLAGG that he had already talked to someone (presumably WALKER) and that he did not know the drug dealer's whereabouts. JONES added that the drug dealer drove a red Alero and a grey Lexus automobile. JONES also

-45-

asked if FLAGG was going to go in "now," indicating that JONES wanted to know if FLAGG was going to enter 7939 S. Langley immediately.

103.    At approximately 12:23 p.m. that same day, during a PTT communication that was a continuation of the above-referenced conversation, FLAGG told JONES he felt like entering the residence now (Jones Tel. #607). JONES told FLAGG, in part, "If motherfuckers see it, it ain't gonna look right." I believe that in this call, JONES told FLAGG that if FLAGG entered the residence at that time by himself, and people in the neighborhood saw him do so, that it would not look like legitimate police activity. FLAGG further told JONES that he had driven past the location and did not see the man, referring to drug dealer who they believed was living at 7939 S. Langley.

104.    At approximately, 12:24 p.m., JONES and FLAGG engaged in a series of PTT conversations (Jones Tel. #608-616). JONES told FLAGG he was unaware of the man's (the drug dealer's) location, but stated that he was out on a $15,000 bond. JONES reiterated to FLAGG that this individual drove a red Oldsmobile Alero and a grey Lexus. FLAGG asked JONES how sure he was of the "five" (five kilograms of cocaine) and JONES said that "Lance" said between "two and five" (kilograms of cocaine), and "between fifteen and twenty on the other side" ($15,000 and $20,000) in the residence. FLAGG and JONES then discussed the appearance of the building. FLAGG asked JONES who provided him the information about the house, and JONES indicated that it was "Quick" (WALKER), leading me to believe that the individual referred to as Lance provided the information about the house to WALKER, who in turn provided it to JONES.

105.    At approximately 12:29 p.m. that same day, FLAGG contacted JONES via PTT

-46-

(Jones Tel. #617). FLAGG told JONES that he was "going to have to stop him on the street or type it up . . . that's the only two ways so we got to look for his ass," indicating to JONES that in order for FLAGG to enter the house he was going to need to find the drug dealer who lived at 7939 S. Langley and have this individual let him in the residence, or he (FLAGG) was going to have to obtain a search warrant.

106.    At approximately 1:14 p.m. that same day, FLAGG contacted JONES via PTT (Jones Tel. #624) and directed JONES to come to his house for a meeting. At approximately 12:55 p.m., surveillance observed JONES leave the CPD ARS Unit, enter his Cadillac Escalade, and at approximately 1:29 p.m., surveillance observed JONES arrive at and enter FLAGG's residence, located at 9418 S. Wabash.

107.    At approximately 6:19 p.m. that same day, JONES contacted FLAGG via PTT (Jones Tel. #649). FLAGG told JONES that he was "free" and JONES told FLAGG, "let me tell him to call." I understand that in this call, FLAGG told JONES he was available to commit the ripoff on S. Langley and JONES responded that he was going to direct another person, presumably WALKER, to contact the man who lived at the S. Langley address to see if he was home.

108.    At approximately 6:24 p.m., during a PTT conversation (Jones Tel. #652) between FLAGG and JONES, JONES said that he was waiting for a return call. FLAGG indicated that he was going to drive by the residence and see if the man's (drug dealer's) car was there.

109.    At approximately 6:30 p.m., during a PTT conversation between FLAGG and JONES (Jones Tel. #656), JONES asked FLAGG if he was heading to the residence, and

-47-

FLAGG replied that he was. JONES said that he was going to be close to that area and instructed FLAGG to let him know what it (the residence) "looked like."

110.    At approximately 6:35 p.m., surveillance observed FLAGG drive by 7939 S. Langley in a Caprice unmarked police car with the rear license plate flipped down.

111.    At approximately 6:36 p.m., FLAGG and JONES engaged in a continuing PTT conversation (Jones Tel. #658, 659, 661, 662, 663, 665, 667) during which FLAGG told JONES that he did not see either vehicle located near the house on S. Langley and that there were numerous people on the street. JONES told FLAGG that his "broad" (the girlfriend) might be inside the residence, and FLAGG responded that the girlfriend would have to drive a car and that FLAGG could see neither car (neither the red Alero nor the grey Lexus).

112.    At approximately 8:42 p.m. that night, surveillance observed FLAGG driving down the alley located behind 7939 S. Langley.

### September 1, 2004

113.    On September 1, 2004, at approximately 8:05 p.m., FLAGG and JONES engaged in a series of PTT conversations (Jones Tel. #735, 737). During their conversations, FLAGG asked if JONES had heard anything else. JONES said he had not and that another person "was asking if we went over there." FLAGG told JONES he was just about to go to the residence and JONES told FLAGG, "I know its there . . . hate to type that motherfucker up though." FLAGG told JONES he might "go in there right now, but there's too many fuckin' people out here if its negative." I understand that in this call, FLAGG and JONES discussed FLAGG going to 7939 S. Langley for the purposes of attempting to steal drugs or money from that residence. I further understand JONES's comment that you "hate to type that motherfucker up though" to mean that

-48-

JONES did not want to obtain a search warrant, and FLAGG's reference to "too many people" to mean that FLAGG was concerned of being seen by people on the street if FLAGG were to enter the house and not recover any drugs or money.

114.     During this same continuing PTT conversation, FLAGG told JONES he was going to walk and see if the "door was open." JONES told FLAGG to let him know if FLAGG actually intended to enter the residence, because JONES would then come to the area. FLAGG then said, "if this bitch beefs, she goin' to jail like a motherfucker," apparently referring to the girlfriend of the man who lived at the residence. I understand FLAGG's reference to the girlfriend to mean that if she was present and started to complain about FLAGG's illegal entry into the residence, he was going to arrest her.

115.     Within ten minutes that same night, at approximately 8:12 p.m., during a PTT conversation (Jones Tel. #742, 743) between FLAGG and JONES, FLAGG told JONES that there were "too many doors to get through" to get into the residence, describing those doors to JONES. JONES told FLAGG they would have to wait for the man to come home and "take his keys." At one point FLAGG responded, "fuck that . . . I should just hit this motherfucker."

116.     During this continuing PTT conversation, JONES asked if FLAGG was by himself, and FLAGG told JONES that he was not. JONES then asked "your man?," to which FLAGG replied no. JONES then told FLAGG he was coming towards his area. At approximately 8:30 p.m., surveillance observed FLAGG parked in his unmarked squad car on the corner of 80th and Langley. Present in the vehicle with FLAGG was an unidentified man.

### September 2, 2004

117.     On September 2, 2004, beginning at approximately 2:32 p.m., JONES and

WALKER engaged in a continuing PTT conversation (Jones Tel. #763, 771, 772, 775, 777, 778, 780, 784,785, 786). During this conversation, JONES asked WALKER if he was sure of the address being "8031," and WALKER indicated that JONES was correct. JONES informed WALKER that they were not going to enter the residence, but instead wanted to see the man who used the residence. WALKER said that one of the vehicles should be in front of the residence that night. I understand that in this conversation, WALKER and JONES were discussing the fact that the actual address of the robbery target was 8031 S. Langley and not 7939 S. Langley, which WALKER communicated to JONES through the reference to "8031." JONES then expressed his displeasure about learning of this different address, telling WALKER, "you got me looking fucked up on this man" and further stating "we came up with a little story for this shit . . . now we got to figure out how the fuck we gonna tell this motherfuckin' sergeant it's the wrong address." I understand that in this call, JONES told WALKER that he (and FLAGG) had come up with a "story" to tell their sergeant about the residence they were going to ripoff, and that now they would have to now come up with another story to explain to the sergeant why JONES was now turning his attention to 8031 S. Langley rather than 7939 S. Langley.[18]

118. During this same PTT conversation, JONES explained to WALKER what he and FLAGG had told their sergeant and how they wanted to approach the residence, telling WALKER that he and FLAGG had told the sergeant that there was a trap in the residence and that they wanted a dog to search the residence first and before they entered. JONES explained that at that point, "me and FLAGG will go in the motherfucker and pop everything, then

---

[18]On several occasions during the wiretap interceptions over Jones Telephone, including this conversation, JONES relayed information to WALKER apparently leading WALKER to believe that JONES still had police powers.

everyone can come in." Based upon my training and experience, the training and experience of other officers working on this investigation, and the context of these conversations, I believe that in this conversation, JONES was explaining to WALKER how he (JONES) and FLAGG would be able to steal drugs and/or money from the residence, which would be accomplished by JONES and FLAGG entering the residence before other law enforcement officers did so, which would allow them time to steal any drugs and/or money.

119.    During this continuing PTT conversation, WALKER and JONES further discussed the story JONES would have to provide to JONES's sergeant given the new information WALKER was providing about the ripoff target.  WALKER told JONES that he should explain to his sergeant that an informant gave him the wrong address, and that real address was only one block down.  JONES again commented that he had told his sergeant that his informant had observed a trap in the residence, and now he had to think of some "script" (lie) to explain the new information about the location.  WALKER told JONES to explain to his sergeant that it was simply a "mis-communication."  JONES replied that WALKER was not the police, indicating that WALKER does not know how "these motherfuckers (the police) be thinking."  WALKER commented that he was only relaying the information he was given, indicating that another individual was actually providing the information about 8031 S. Langley, and that WALKER was simply passing this information onto JONES.

120.    JONES then told WALKER during this continuing PTT conversation that he wished WALKER had "seen the shit" himself because they were going to kick in the door several days ago.  JONES complained to WALKER that if they had gone into the wrong address, it could have been a serious complaint if an old woman was living there.  WALKER later asked

-51-

JONES if he wanted to leave this one "alone" and wait until the next one (the next ripoff target) because WALKER had some more information concerning drugs. JONES replied that he did not want to leave this one alone, saying "I'm gonna get this motherfucker." WALKER reiterated to JONES that he now had the correct address.[19]

### September 3, 2004

121.    On September 3, 2004, at approximately 9:32 a.m., WALKER received a call from JONES (Jones Tel. #819). During their conversation, WALKER provided JONES with a specific license plate number, telling JONES that the plate belonged to the red Alero that was being driven by one of the individuals living at the 8031 S. Langley address.

### September 4, 2004

122.    On September 4, 2004, at approximately 11:36 a.m., FLAGG called JONES (Jones Tel. #878). During their conversation, FLAGG said that he had been "out there for five hours, three hours yesterday and two hours today." FLAGG told JONES that he observed "her car" yesterday, but she never left the residence on Langley. I understand that in this call, FLAGG informed JONES of the surveillance FLAGG was conducting on the residence on Langley Street.

123.    At approximately 12:20 p.m. that day, FLAGG called JONES (Jones Tel. #889). During this conversation, FLAGG and JONES again discussed the 8031 S. Langley address. JONES asked about the location of FLAGG's team, and FLAGG told JONES he was going to meet them. FLAGG then told JONES he did not want to "hit the house" but would prefer to see

---

[19]During this September 2, 2004 PTT conversation, WALKER also asked JONES to run an Illinois license plate for a another woman, which JONES agreed to do. It is my understanding that CPD law enforcement personnel are not permitted to provide such police information to civilians.

the individual who lived there and run his car plate to see if it came back to the suburbs. JONES then told FLAGG, "There's something in there." FLAGG also told JONES that he had talked to the Assistant State's Attorney ("ASA"), and told the ASA that he (FLAGG) had driven his informant by the location and that the houses looked the same. FLAGG explained to JONES that the ASA advised FLAGG to reword it (the search warrant affidavit) and send it back.

124. At approximately 2:15 p.m., surveillance involved in this investigation observed FLAGG driving his Chevrolet Caprice in the vicinity of 8050 S. Langley. FLAGG activated his emergency lights and stopped a red Oldsmobile Alero bearing the same license plate number that WALKER had provided to JONES. Surveillance observed FLAGG exit his vehicle and take an unknown black female (the "UF") who was driving the Alero and place her in the backseat of his Caprice. FLAGG then departed the area in his Caprice with the UF. At approximately 2:17 p.m., surveillance observed FLAGG parked at approximately 8150 S. Cottage Grove Avenue, where FLAGG was having a conversation with the UF in the rear of his vehicle. At approximately 2:35 p.m., FLAGG parked his vehicle at 8029 S. Langley and was observed meeting with several other CPD officers. Surveillance observed FLAGG enter 8029 S. Langley and talking on his cellular telephone at approximately this time. The UF remained in FLAGG's Caprice until she was released several minutes later.

125. Beginning at approximately 2:39 p.m., FLAGG contacted JONES and the two engaged in a continuing PTT conversation (Jones Tel. #901, 902, 904). FLAGG told JONES "you all some stupid motherfuckers," and further explained that the "motherfucking house was 8029" and that there was "shit in there, nothing," indicating that JONES and WALKER had given FLAGG the wrong address and that FLAGG found no drugs or money inside the address

he did enter. FLAGG further told JONES that the individual they were looking for did not even live at that location, and FLAGG expressed displeasure that they went into the wrong house. During this conversation, JONES asked FLAGG "you didn't do a search warrant did you?" FLAGG told JONES "no," and explained that he took the keys from a woman at that location and went upstairs into 8029 while his sergeant waited outside. FLAGG further told JONES that there were two red Aleros on the block. JONES indicated that he would call WALKER and tell him the address was incorrect.

126.     At approximately 2:43 p.m. JONES called WALKER (Jones Tel. #907). JONES said that WALKER should tell his "homie" the address is 8029, that the mother and brother live there, and that there was nothing in the house. After WALKER asked what happened, JONES replied that a woman had pulled up, her keys were taken from her and the police entered the residence. JONES further told WALKER that a mother and brother lived there and that the address was 8029 (S. Langley) not 8031. JONES further told WALKER that there were two Aleros parked in the vicinity of the house. Shortly after this call ended, JONES again called WALKER (Jones Tel. #909) and complained about WALKER's bad information, telling him, "I can't fuck with it unless you've seen it yourself . . . . I can't go through your homie." WALKER again asked what happened and JONES told WALKER that the sergeant was with them and everything was "fucked up." JONES said that "dude don't live there, dude ain't been there for a fucking month." WALKER told JONES he was going to call the individual who gave him the bad information and JONES told WALKER that FLAGG was "pissed."

-54-

### E. Conversations Among JONES, FLAGG, WALKER, and Others Regarding a Ripoff of at least 3 Kilograms of Cocaine and Guns at 2631 S. Troy Street (9/2-7/04)

#### Summary

127.    In early September 2004, conversations intercepted over Jones Telephone revealed that CPD Officers JONES and FLAGG, and JAMES WALKER, were plotting to ripoff at least three kilograms of cocaine (a "trey piece") and guns ("ninas" or "thumpers") from a house located at 2631 S. Troy Street in Chicago. As described in greater detail below, the intercepted conversations reveal that a drug associate of WALKER was negotiating a drug transaction with an individual who sold drugs from that Troy Street address, that WALKER passed this information along to JONES to enlist the help of corrupt police officers to take drugs and other contraband from that location, and that JONES turned to FLAGG for that assistance. Intercepted conversations and surveillance further revealed that JONES, FLAGG, and WALKER took steps toward committing this robbery/extortion. As described in subsection F, however, another robbery target was brought to JONES's attention, which diverted JONES's and FLAGG's attention from the Troy Street ripoff to another ripoff opportunity.

128.    At the time that JONES, FLAGG, and WALKER were discussing their plans to commit the ripoff at 2631 S. Troy, JONES received a telephone call from another CPD officer, DAREK HAYNES. HAYNES communicated to JONES his interest in participating in a ripoff with JONES. DAREK HAYNES did in fact do so, but not until several days later when he assisted in the attempted ripoff at 3420 W. 83rd Place, which is described below in subsection F.

#### September 2, 2004

129.    On September 2, 2004, at approximately 11:35 p.m., WALKER contacted JONES

-55-

(Jones Tel. #803). WALKER told JONES he had some more "moves" for him. WALKER's "man" told him of an address on 26th Street where some individuals were "putting a call in on the order side." WALKER's source of information was going to call back and confirm the address. WALKER further told JONES it was for a "trey piece." I understand that in this call, WALKER was telling JONES about another residence that JONES could attempt to rob, and that WALKER knew of some people ordering drugs from that location ("putting a call in on the order side") and that this order was for three kilograms of cocaine (a "trey piece").

### September 4, 2004

130.    On September 4, 2004, at approximately 6:19 p.m., FLAGG called JONES (Jones Tel. #923). During the course of the conversation, JONES and FLAGG discussed FLAGG's stop of the woman outside 8029 S. Langley, and FLAGG told JONES that the woman at the residence was going to file a complaint against him. JONES and FLAGG then discussed another robbery target. JONES told FLAGG he had "a for sure one," located near 26th Street. JONES told FLAGG that an individual had "placed an order" (for drugs), and JONES assured FLAGG that it's "guaranteed" and that "dude won't call him back until he got it." JONES then described to FLAGG how narcotics were dealt out of this 26th Street residence, explaining that after the order is placed, somebody brings drugs to the 26th Street residence as the drug dealer working out of that location (the "26th Street Dealer") did not normally keep drugs in the house. JONES and FLAGG agreed to discuss this matter further, and JONES indicated that he did not want to do this ripoff the next day because FLAGG was not working.

131.    A few minutes later, at approximately 6:25 p.m., JONES contacted WALKER (Jones Tel. #924). JONES told WALKER that it (the 26th Street ripoff) "might be able to

-56-

happen tomorrow," and WALKER indicated that he would have to call another individual before letting JONES know. JONES instructed WALKER to call him.

132.    On September 4, 2004, at approximately 7:45 p.m., JONES called WALKER (Jones Tel. #930). WALKER told JONES that "they," referring to the individual who had previously placed the order for drugs, had already done it and didn't want to "spook" them (by placing an order for more drugs). WALKER told JONES that another individual had also purchased narcotics from that same 26th Street Dealer that day. JONES and WALKER agreed to discuss further robbing that location.

133.    At approximately 7:47 p.m. that night, JONES contacted FLAGG (Jones Tel. #931). During this conversation, JONES told FLAGG that it (a drug deal involving the 26th Street Dealer) was not going to occur that day because they did not want to scare that individual. JONES further indicated that it was set up for the following Tuesday between 12:00 and 1:00. In addition, FLAGG and JONES continued to discuss events relating to the attempted ripoff at 8029 S. Langley. FLAGG stated that FLAGG's sergeant asked FLAGG about the source of FLAGG's information, apparently referring to the person providing the information about the 8029 S. Langley address. Without identifying him by name, JONES told FLAGG that he had met him (the individual who provided the information on 8029) several times; JONES further told FLAGG that this person knew another individual who supplied guns to a neighborhood near 103rd Street. At one point, FLAGG told JONES that people only complain against you for doing a search without a search warrant when you don't find anything, and the two of them (FLAGG and JONES) continued to discuss FLAGG's sergeant, commenting that the sergeant had questioned FLAGG in the past about FLAGG doing searches without a warrant.

-57-

134. On September 04, 2004, at approximately 10:36 p.m., DAREK HAYNES called JONES (Jones Tel. #944). During this conversation, HAYNES told JONES he was "hurting." JONES told HAYNES he was "trying right now." JONES told HAYNES he needed to be "looking" as well, and HAYNES told JONES that he was. JONES told HAYNES as "soon as I get something, its all good, I got you." I understand that in this conversation, HAYNES was telling JONES that he was in need of money. JONES replied that he was trying to set up a robbery, that HAYNES too should be looking for a robbery target, and that JONES would contact HAYNES as soon as JONES had a target set up.

### September 6, 2004

135. On September 6, 2004, at approximately 10:36 p.m., WALKER called JONES (Jones Tel. #1046). During their conversation, WALKER said that everything was "confirmed" for the following day. WALKER told JONES there might be a "box of ninas (nine millimeter handguns) in there" and that drugs were going to be located in the residence. After JONES said that he did not have the address, WALKER replied "2631" and later gave JONES the name of a person who lived at that address. WALKER further told JONES that "everything should be upstairs" and that a good time would be between 11:00 a.m. and 1:00 p.m. the following day. When JONES asked WALKER what time they should "go in there," WALKER stated, "he said 12:00" would be a good time, indicating that the person who was providing WALKER with information about the 26th Street address had told WALKER that 12:00 p.m. would be a good time for JONES and FLAGG to enter the residence to take the drugs and guns.

136. A few minutes later that same day, at approximately 10:44 p.m., JONES called WALKER (Jones Tel. #1049). In that call, JONES asked if "dude ain't gonna think his man told

-58-

on him" (the person who they were going to attempt to rob wasn't going to think someone had set him up). WALKER told JONES no, explaining that "they told me to do it like this." WALKER further told JONES that everything was going to be upstairs including the "thumpers" (guns). WALKER then told JONES to "pull me one if you can," meaning that if JONES recovered guns from the residence, WALKER wanted JONES to give one of them to WALKER.

137.   On September 6, 2004, at approximately 10:52 p.m., JONES called FLAGG (Jones Tel. #1053) and left a message that FLAGG needed to make sure they "hooked up" tomorrow at "12:00" because "it's all good."

## September 7, 2004

138.   On September 7, 2004, at approximately 10:09 a.m., JONES called WALKER (Jones Tel. #1066). During their conversation, JONES and WALKER discussed how WALKER's "man" normally conducted his drug deals with the 26th Street Dealer, and JONES asked how WALKER's "man" was going to act so JONES would know what "role to play."

139.   At approximately 10:14 a.m. that same day, WALKER called JONES (Jones Tel. #1067). In that call, WALKER said that his contact claimed to have conducted drug deals in the garage at 2631 on several occasions, that his contact had also gone through the garage into the house to conduct drug deals, and that his contact would normally call and then go to the residence. WALKER explained that he told his contact not to do anything "unusual." WALKER then instructed JONES to call him (when JONES was ready to do the ripoff), and explained that once he (WALKER) heard from JONES, he (WALKER) would tell his contact to call the 26th Street Dealer 15 minutes later to go ahead with the drug deal. JONES asked WALKER who else would be present at the residence, and WALKER said he would find out.

-59-

140.    At approximately 10:19 a.m., WALKER called JONES (Jones Tel. #1069). In that call, WALKER appeared to be providing JONES additional details about the ripoff target, telling JONES that the target's 20-year old younger brother and the mother were downstairs at the 2631 residence, and that no one lived upstairs.

141.    At approximately 10:36 a.m. JONES called FLAGG (Jones Tel. #1071). During the conversation, FLAGG asked what time it was "going to happen" (when the attempted robbery would occur), and JONES said about 12:00 p.m. FLAGG told JONES he was in court but could get away for a minute.

142.    At approximately 11:03 a.m., JONES contacted WALKER and they had a PTT conversation (Jones Tel. #1074, 1075). JONES and WALKER confirmed that the address was "2631" and the street is a four-letter word that rhymes with "toy" (Troy). Based upon my experience, the context of these conversations, and the investigation to date, I believe that in this call JONES and WALKER were confirming that the address of the ripoff target – *i.e.*, the location used by the 26th Street Dealer to conduct drug transactions – was 2631 S. Troy, which is located on the south side of Chicago. I also believe that in this call, JONES and WALKER were reluctant to say the actual street name over the telephone for fear of possibly being overheard by law enforcement. It is my belief that had this been legitimate law enforcement activity, JONES would not have been reluctant to say the street name over the telephone.

143.    At approximately 11:30 a.m., surveillance observed JONES leave the offices of the CPD ARS Unit located at 2111 W. Lexington and enter his champagne-colored Cadillac Escalade.

144.    At approximately 11:32 a.m., WALKER called JONES (Jones Tel. #1076). In

-60-

that call, WALKER told JONES that one of the individuals involved in the expected drug deal

was in DUI school, and that person was supposed to call WALKER's "man" as soon as DUI

school ended. WALKER told JONES it was still a "green light" (the drug deal would still occur)

but WALKER was unsure if "everything would be there" (drugs would be present) until he got

out of DUI school, which was supposed to happen at about 2:00 p.m.

145. At approximately 11:48 a.m., surveillance watched JONES drive his Cadillac

Escalade down the 2600 block of S. Troy and then go through the alley behind 2600 S. Troy.

146. At approximately 11:51 a.m., JONES called WALKER (Jones Tel. #1079).

JONES asked WALKER if "it's already there" (JONES wanted to know if narcotics were present

at 2631 S. Troy). WALKER said he did not know. JONES indicated that he wanted to wait for

the individual to arrive (at 2631 S. Troy) and to walk with him in the house. After JONES told

WALKER he was in the vicinity of that address, WALKER advised JONES that they wanted to

wait.

147. At approximately 11:53 a.m., JONES called FLAGG (Jones Tel. #1080). In that

call, JONES said that he was in the vicinity of the address, but that the man was in DUI class and

would not be getting out until later that afternoon. FLAGG asked JONES if the location looked

"easy" and JONES said that it did. I understand FLAGG's reference to "easy" to mean that

FLAGG was curious of the if the residence looked like it would be "easy" to break into or an

otherwise "easy" target for a ripoff.

148. At approximately 12:04 p.m., surveillance observed JONES drive past 2631 S.

Troy in his Cadillac Escalade before going to the Cook County Courthouse police parking lot

located on the corner of 26th Street and California Avenue.

149.    At approximately 1:18 p.m., JONES and WALKER engaged in a PTT conversation (Jones Tel. #1085). During this conversation, JONES told WALKER that they only had one more hour or they would have to "roll," meaning that if they did not get into the house at 2631 S. Troy in the next hour, then they could not do the ripoff. WALKER agreed.

150.    At approximately 1:35 p.m., JONES called FLAGG and told him he was going to go to a McDonald's restaurant, where FLAGG agreed to meet JONES (Jones Tel. #1089). At approximately 1:36 p.m., surveillance observed JONES, driving his Cadillac Escalade, and FLAGG, driving his unmarked Chevy Caprice, leave the vicinity of 26th Street and California Avenue. The two vehicles entered a McDonald's parking lot located at Kedzie Avenue just south of 26th Street. Surveillance observed FLAGG exit his vehicle and enter the passenger side of JONES's Escalade in the parking lot.

151.    At approximately 2:00 p.m., JONES called WALKER (Jones Tel. #1093). In that call, WALKER told JONES that "he didn't call me" (indicating that the person who was going to buy narcotics from the 26th Street Dealer had not called WALKER to advise that the drug deal would happen). JONES said that it (the drug deal and ripoff) was not going to happen, and WALKER agreed.

152.    At approximately 2:03 p.m., WALKER called JONES (Jones Tel. #1094), telling JONES that his guy had just called and that "dude" was just leaving (leaving DUI school) and "didn't have it (the drugs) there (at the 2631 Troy house)." WALKER added that it may be ready by 3:30 p.m. (the drug deal might take place at 2631 S. Troy at 3:30 p.m.). JONES replied that he might be unable to make it at that time. WALKER also said that his man wanted confirmation that drugs were located at that residence before JONES went into the house because

-62-

they "don't want the gun to get jumped," meaning that the individual working with WALKER in setting up this drug ripoff wanted to make sure that the drugs were at that location before directing the corrupt CPD officers (JONES and FLAGG) to enter the house and seize the drugs.

153.    At approximately 2:07 p.m., JONES called WALKER (Jones Tel. #1095), telling WALKER "it (the drug ripoff) ain't gonna happen" because "we gotta go do a search warrant." JONES expressed disappointment for not being able to do the ripoff saying "this shit was so sweet" because it was "nice and quiet" and no one was on the "block" and the doors were "easy." I understand that in this conversation, JONES was expressing his disappointment for not being able to conduct the drug ripoff at 2631 S. Troy, especially because it would have been an easy target given the quiet nature of the street and the easy access doors on the house, which would have allowed the corrupt officers to conduct the drug ripoff quickly and without calling undue attention to themselves.  WALKER responded to JONES's statements, saying "we might have to pull this motherfucker ourselves then," indicating that WALKER might have to conduct the ripoff on his own (without the assistance of JONES and other corrupt police officers).

154.    At approximately 2:56 p.m., WALKER called JONES (Jones Tel. #1103) and asked him if they could do it (the ripoff) at 6:00 or 6:30 p.m.  JONES told WALKER he would find out and call him back.  About one minute later, JONES contacted FLAGG (Jones Tel. #1104) and asked him if he would be available at 6:00 or 6:30 p.m.  FLAGG told JONES he did not know because he did not know what his work schedule was.  JONES then called WALKER (at approximately 2:59 p.m., Jones Tel. #1106), informing him (WALKER), that they were not going to be able to do the ripoff that day because they (JONES and FLAGG) could not get "the car."  JONES further stated that if he called somebody else there would be "two of them" and

-63-

that would "fuck up" the "split." Based upon the context of this conversation and the investigation to date, I understand JONES to be telling WALKER that he could not perform the ripoff that day because he could not obtain a police-style vehicle, especially given that JONES could not ensure that he would have FLAGG's assistance. Such a police car would be important in conducting the planned ripoff in order to create the false appearance that drugs were seized during the course of legitimate police activity. When discussing the "split," it is my understanding that JONES was advising WALKER that if he tried to get another car, that would likely bring two additional corrupt police officers (other than FLAGG) into the ripoff scenario in order to use their police car, which would result in each participant receiving a smaller portion of any proceeds from the ripoff.

155. At approximately 8:17 p.m., WALKER called JONES (Jones Tel. #1130), and the two discussed setting up the 2631 S. Troy drug ripoff for the next day. JONES told WALKER that he had a "jury trial" in the morning, and WALKER responded that he did not want to put it off for "two days."

156. At approximately 9:01 p.m., WALKER again called JONES (Jones Tel. #1143), asking JONES if they could do it (the ripoff) before JONES went to court. WALKER explained to JONES that he had confirmation that "it" (the narcotics) was still there (at 2631 S. Troy), and added that the individual who dealt narcotics out of 2631 S. Troy did not live there, but went over there every day to "take care of business." WALKER said he believed the drugs were still at 2631 S. Troy because the dealer had called one of WALKER's guy's "homics" to "come get these off me" because the dealer "don't want to sit with 'em." JONES told WALKER he would call him back so he (JONES) could make a call because "this shit should go down tonight."

-64-

157.  At approximately 9:04 p.m., JONES called FLAGG (Jones Tel. #1144), and relayed the information JONES just received from WALKER. During this conversation, a police radio can be heard in the background, indicating that FLAGG was on duty. After hearing a radio transmission, FLAGG told JONES, "some motherfucker just shot at the police or some shit. What's up?" JONES told FLAGG that "this motherfucker sitting over there right now with it, man, just sittin'" to which FLAGG responded, "the Mexican?" JONES replied "yes sir." After passing on some of the information he received from WALKER, JONES told FLAGG that they (WALKER and the others setting up the ripoff) want to do it (the ripoff) first thing in the morning or tonight, but JONES told WALKER that he had court. FLAGG responded, "yeah, I gotta be at court at 8:30 man, for a jury trial." JONES asked FLAGG if he wanted to "do it tonight, or what," to which FLAGG responded "I don't know" and indicated that he hoped the police work he was doing right then would not last all night long. JONES then asked FLAGG who he was riding with; FLAGG responded that he was by himself, but that they (other police officers) were behind him. JONES continued, if "motherfucker can go tonight, goin' go tonight." FLAGG asked, "how goin' get into the house?" to which JONES responded, "we goin' knock, fuck that." When FLAGG asked "motherfucker goin' open the door?", JONES replied, "we figure all that out, it's in there though." They then talked about the potential location for the drugs, with FLAGG surmising that the "shit might be in the garage, shit might be in a car," and JONES responding "he saying it's upstairs, it's in that crib though." JONES then told FLAGG to let him know and FLAGG said he would call JONES back.

158.  At approximately 9:07 p.m., WALKER called JONES (Jones Tel. #1147). During this call, JONES asked how WALKER know "for sure they (the drugs) in there." After

WALKER explained why he believed the drugs were still at the house, WALKER said he was

"pretty sure they in the [] garage" and that the 26th Street Dealer's brother was still there. During

this conversation, WALKER indicated that he checked out the garage, which faces the alley,

saying he "done been back there" and "checked the whole lick out," and the "block [was] still

quiet." After this call, JONES called FLAGG (Jones Tel. #1148), and told FLAGG the brother is

there and they are "positive it is in the garage."

### F.   Attempted Ripoff of at Least 3 Kilograms of Cocaine and at least $50,000 by JONES, FLAGG, HAYNES, and MONTGOMERY at 3420 W. 83rd Place (9/8/04)

### Summary

159.   Before JONES, FLAGG, and WALKER could conduct the ripoff at 2631 S. Troy,

FLAGG and JONES turned their attention, along with CPD Officer DAREK HAYNES and

JOEL MONTGOMERY (aka "JoJo"), to another ripoff target located at 3420 W. 83rd Place in

Chicago. This attempted ripoff occurred on September 8, 2004.

160.   As described in more detail below, intercepted conversations over Jones

Telephone revealed that MONTGOMERY provided information to JONES about the ripoff

target, who JONES indicated was MONTGOMERY's cousin and is identified herein as

Individual B. Among other things, MONTGOMERY told JONES that Individual B had at least

$100,000 (a "buck") and three kilograms of cocaine ("three books") in Individual B's residence,

which was an upstairs apartment located at 3420 W. 83rd Place. Upon learning of this new

robbery target, JONES enlisted the assistance of CPD officers FLAGG and HAYNES, both of

whom participated in the attempted ripoff of Individual B's residence on September 8, 2004.

161.   The intercepted conversations and surveillance revealed that on September 8,

-66-

2004, FLAGG and HAYNES attempted to break into 3420 W. 83rd Place, and that at this time, JONES was parked nearby in HAYNES's white Cadillac Escalade. While FLAGG and HAYNES were attempting to break into the residence, FLAGG spoke with JONES on the telephone, telling him (JONES) that he (FLAGG) was trying to kick in the door because Individual B was not home. FLAGG later told JONES that a downstairs neighbor was threatening to call the police about FLAGG's apparent illegal entry into the residence. FLAGG also expressed concern to JONES that HAYNES had shown the downstairs resident his badge. In further discussing how to get into Individual B's apartment, FLAGG told JONES that they may have to wait until Individual B showed up to "grab" him and "walk his ass back into the house."

162.    Upon learning that the downstairs neighbor at that address had called the police about FLAGG's and HAYNES's attempt to enter the upstairs apartment, FLAGG told JONES he was listening over his police radio for a "request for a supervisor," and if he heard that call, he could either wait for his sergeant ("stand here and wait for my sergeant to come") or flee the area to avoid getting caught ("I'm jetting"). FLAGG and JONES discussed calling FLAGG's sergeant, and if FLAGG did so, FLAGG could tell his sergeant "some shit" (make up a story) and that FLAGG should nonetheless "go out the back door and put that shit (the cocaine and/or money) in a garbage can" so JONES could pick it up later

163.    Given the concerns about the downstairs neighbor's complaint, FLAGG ultimately called his sergeant. After informing JONES of this development, FLAGG and JONES discussed the need for HAYNES to leave the building, which HAYNES did, joining JONES down the street in HAYNES's Escalade. Additional police officers arrived at the location, after

-67-

which FLAGG told JONES that he was going to get a search warrant. JONES again instructed

FLAGG that if FLAGG gained entry into the apartment, FLAGG should "hide that shit (drugs

and money) in the crib somewhere, do that 'cause I'm going in there to get it," which FLAGG

agreed to do. After FLAGG left the area to prepare a search warrant, FLAGG learned that

Individual B had come home, that the other officers had obtained consent to search Individual

B's residence, and that drugs and guns were recovered. FLAGG then returned to the area, where

Individual B had been placed under arrest.

164.    While transporting Individual B from his residence, in custody, FLAGG called

JONES. FLAGG then put Individual B on the telephone with JONES, during which time

JONES and Individual B discussed the possibility of FLAGG releasing Individual B in exchange

for a bribe. JONES ultimately advised Individual B that such a plan would not work given the

presence of other police officers in connection with Individual B's arrest.

### September 7, 2004

165.    At approximately 9:41 p.m. on September 7, 2004, JONES called FLAGG (Jones

Tel. #1149), and told FLAGG that he had something "even fuckin' better" (a potential ripoff

target that was even better than the house at 2631 S. Troy). JONES said that they would have to

do it tomorrow because JONES was unable to enter the residence himself. FLAGG asked

JONES the location of the residence, and JONES told FLAGG by his "OG" place (near his old

girl's, or mother's, house, which was located in the 8100 block of S. Francisco in Chicago).

JONES further told FLAGG that he would find out the exact location the next day because

JONES was going to "ride with his cousin" (Individual B's cousin) to look at it. JONES then

explained that about three days ago he had seen Individual B, and that Individual B had displayed

-68-

a large bag of money to him. JONES further said that Individual B's cousin told JONES that Individual B had to have at least a "buck" ($100,000) and "three books" (three kilograms of cocaine) present at this residence, which was in the vicinity of 83rd Street and Kedzie Avenue. FLAGG instructed JONES to get the exact location because FLAGG "could go right now," indicating that FLAGG was ready to do a ripoff of that location as soon as possible.

166.    At approximately 9:42 p.m., JONES called JOEL MONTGOMERY (aka "JoJo") at telephone number 773-577-4722 (Jones Tel. #1150).[20] JONES told MONTGOMERY that "motherfuckers ready to go over there right now." MONTGOMERY told JONES he would ride by the residence (to be robbed) and then contact JONES. I understand that in this conversation, JONES and MONTGOMERY discussed the house they planned to ripoff, and JONES told MONTGOMERY that he and others were ready to do the ripoff right now.

167.    At approximately 9:47 p.m., JONES called FLAGG (Jones Tel. #1151). JONES told FLAGG that it was "bonafide" but that "the nigger (Individual B) in the crib" FLAGG asked JONES if the target would answer the door; JONES said no and told FLAGG that FLAGG should "boot that motherfucker" (break down the door) and "it's in there for sure" (money and drugs were present at the target house). FLAGG asked JONES if "he" (Individual B) had a pistol. JONES told FLAGG there could be several pistols in the house, but that Individual B

---

[20]Other agents and I have identified JOEL MONTGOMERY (aka "JoJo") as the speaker in this and other conversations set forth in this affidavit based upon several factors, including the following: i) in some of these calls, MONTGOMERY is identified as "JoJo," as having the last name "MONTGOMERY," and as a relative of Individual B; ii) CPD arrest records list "JoJo" as an alias for JOEL MONTGOMERY, iii) subscriber information for the telephone used by MONTGOMERY indicates that the telephone was subscribed to Doris Montgomery; iv) the common sound of MONTGOMERY's voice in intercepted conversations; and v) the contents and context of intercepted conversations.

stayed in the upstairs attic area. JONES further relayed that Individual B "ain't gonna blast" (shoot anyone) but FLAGG would need somebody to go with him. FLAGG told JONES to get the address of the residence.

168. At approximately 9:57 p.m., FLAGG contacted JONES (Jones Tel. #1152) and asked his location. JONES said that he was waiting for MONTGOMERY to get him the exact location of the house (Individual B's house) and that JONES would wait by his mother's house. FLAGG said that he would meet JONES there. At approximately 9:58 p.m., FLAGG called JONES (Jones Tel. #1154). JONES told FLAGG he would be at 81st and Francisco near his "OG's" crib (mom's house) in his truck, and FLAGG said he would call JONES when FLAGG was nearby.

169. At approximately 10:05 p.m., surveillance observed JONES's Cadillac Escalade parked on the 8100 block of S. Francisco in Chicago.

170. At approximately 10:06 p.m., MONTGOMERY called JONES (Jones Tel. #1158). In that call, JONES told MONTGOMERY that they were "ready" and "close by," and that tonight was "good." MONTGOMERY asked JONES if he should meet him at "3420." JONES said no, and instructed MONTGOMERY to meet him at 81st and Francisco. MONTGOMERY told JONES it was 83rd Place. JONES told MONTGOMERY that "once we do this I'm gonna get up with you." In this call, I understand MONTGOMERY have provided JONES with the location to be robbed – 3420 W. 83rd Place – and that JONES told MONTGOMERY that they would do the robbery that night and meet up with each other.

171. At approximately 10:08 p.m., JONES and FLAGG had a PTT conversation (Jones Tel. #1161). During this conversation, JONES said that he had the location (of the expected

robbery) and that he (JONES) was near his "OG's crib." FLAGG replied that he was at 79th and Western.

172.    Approximately one minute later, JONES contacted MONTGOMERY (Jones Tel. #1162), and asked him if "he" (Individual B) was present at the residence (3420 W. 83rd Place). MONTGOMERY told JONES that Individual B was at the residence. JONES also asked MONTGOMERY to describe the number of floors and doors in the residence, which MONTGOMERY described, indicating that there was one door to get in and then an upstairs area. JONES told MONTGOMERY, "it's about to go down in a little while," meaning that attempted robbery would soon take place.

173.    At approximately 10:15 p.m., FLAGG, driving an unmarked CPD squad car bearing Illinois license plate M111363 (the same plate number on the car driven by FLAGG on July 21, 2004 and August 16, 2004) was observed by surveillance departing 8138 S. Francisco. FLAGG then drove around the neighborhood of 3420 W. 83rd Place in Chicago.

174.    At approximately 10:17 p.m., FLAGG and JONES had another PTT conversation (Jones Tel. #1165). FLAGG asked what Individual B was driving, and JONES replied that he was driving a black pick-up truck. FLAGG then asked if the individual who lived at 3420 W. 83rd Place drove a Cadillac truck. JONES agreed to "call and check," and FLAGG instructed JONES to hurry up.

175.    About one minute later, at approximately 10:18 p.m., JONES called MONTGOMERY (Jones Tel. #1170) and asked if "he (Individual B) ain't got a Cadillac truck." MONTGOMERY said no, and that Individual B drove a black pick-up truck. A few minutes later, at about 10:25 p.m., JONES called MONTGOMERY (Jones Tel. #1172) and told him that

-71-

they could not see an address located on the residence. MONTGOMERY said that the address

was "3420," and further explained that the house had floodlights in front and a driveway with

bushes in the front illuminated by floodlights. JONES told MONTGOMERY that they needed to

know the exact address so they would not go into the wrong residence.

176.    At approximately 10:36 p.m., MONTGOMERY contacted JONES (Jones Tel.

#1173) and asked if JONES had found the correct house. JONES confirmed that he had found it,

and he also asked MONTGOMERY who was living on the first floor. MONTGOMERY told

JONES there was a man, his wife and children living on the first floor and they should be

"checked" too, meaning that the first floor residence should also be searched for drugs.

177.    At 10:38 p.m., JONES called Officer B, who was assigned to the 7th Police

District (Jones Tel. #1175). JONES asked Officer B his location, and Officer B said that he was

working and was currently in the vicinity of 58th and May streets. JONES then told Officer B

that he had "something for you right now" in the vicinity of 81st and Francisco and that it was

"real simple too." I understand that JONES asked Officer B to help with the planned robbery,

which JONES indicated would be an easy robbery to accomplish. Officer B asked "what's the

business"(what's the plan)? JONES told Officer B that he didn't "want to say" (JONES did not

want to discuss the robbery plan over the phone) but it was "nice." Officer B said that he was

currently working with two other CPD officers, and JONES told him it was okay. Officer B

further told JONES that he hated to "miss out" because he needed a "blessing," which I

understand to mean that Officer B hated to miss out on the robbery attempt because he needed

the money. JONES asked if "Eural (BLACK) and them were working (on duty)," but Officer B

did not know. JONES further told Officer B that this was "simple and bona fide," meaning that

-72-

this was an easy robbery and that he (JONES) was sure that money and/or drugs would be present. Officer B told JONES he would call back, but if he did not, then JONES should go ahead and "handle it" (do the robbery without Officer B).

178. Based on the context of this (Jones Tel. #1175) and other conversations, and the investigation to date, I understand that JONES was looking for another corrupt police officer to help FLAGG with the robbery/extortion of drugs and money from the residence located at 3420 W. 83rd Place, which address was located in the 8th CPD District. According to CPD officers, it would be unusual to contact an officer assigned to the 7th CPD District to assist in the search of a residence located in the 8th CPD District. There is no indication in subsequent interceptions that JONES or FLAGG attempted to contact any police officers from the 8th CPD District to assist with a legitimate search at 3420 W. 83rd Place.

179. At approximately 10:43 p.m., JONES placed an outgoing phone call to DAREK HAYNES[21] at telephone number (773) 742-9824 (Jones Tel. #1176). HAYNES is a police officer who works for the CPD's 7th District. HAYNES did not pick up the phone and JONES left a message for HAYNES to call him.

180. At approximately 11:03 p.m., MONTGOMERY called JONES (Jones Tel. #1178). During that conversation, JONES told MONTGOMERY that the robbery might not occur until the following day, and the two discussed the individuals who lived at 3420 W. 83rd

---

[21]Other agents and I have identified DAREK HAYNES as the speaker in this and other conversations set forth in this affidavit based upon several factors, including the following: i) in some of these calls, HAYNES is identified as "Darek"; ii) subscriber information indicates that the telephone used by HAYNES is subscribed to DAREK HAYNES; iii) the common sound of HAYNES's voice in intercepted conversations; iv) the contents and context of intercepted conversations; and v) surveillance information, including that fact that HAYNES was observed with FLAGG at 3420 W. 83rd Place.

Place. JONES asked MONTGOMERY if he was "for sure the trey," which I understand to be JONES making sure that there were three ("trey") kilograms of cocaine at the house. Later that night, at approximately 11:27 p.m., JONES called MONTGOMERY (Jones Tel. #1181) and told him that the ripoff would occur the next day.

## September 8, 2004

181.    On September 8, 2004, at approximately 8:10 a.m., JONES received an incoming call from HAYNES (Jones Tel. #1188), who told JONES he (HAYNES) was not working. JONES relayed to HAYNES "we needed you last night" and might need him that day. JONES told HAYNES "it's there" and HAYNES told JONES "I need it." I believe that in this portion of the conversation, JONES told HAYNES that JONES and FLAGG needed HAYNES to help with a robbery the night before and that drugs were present at that location, and that HAYNES indicated that he wanted to be involved in the robbery. Next, JONES told HAYNES, "I can't go in ...because I know this motherfucker," meaning that JONES could not enter the residence because he knew the drug dealer they were planning to ripoff (Individual B). JONES indicated that he was calling HAYNES to go "in" with him (FLAGG), and informed HAYNES of the expected proceeds from the robbery – "three of 'em (three kilograms of cocaine) in there for sure and at least fifty bucks ($50,000)." JONES told HAYNES he was leaving work at 1:00 p.m., and was going to see if FLAGG was done with court. JONES told HAYNES that the target house was located in the 8th District, and explained that the ripoff target's (Individual B's) cousin (MONTGOMERY) gave him the information about the robbery target. JONES further told HAYNES that they were going to do the robbery the day before with a few CPD officers, but that those officers had a particular officer with them, which prevented them from doing the

-74-

robbery/extortion. JONES also told HAYNES that if FLAGG couldn't get out of a jury trial, at which FLAGG was presumably going to testify in his capacity as a CPD officer, JONES would have to find someone else to help with the ripoff.

182.     At approximately 8:14 a.m., JONES received an incoming telephone call from WALKER (Jones Tel. #1190). WALKER asked JONES if they were going to "try it," and JONES replied that he may not be able to because "something else" was going on. In this conversation, I understand that WALKER asked if JONES would be able to help him (WALKER) do the previously-discussed robbery at 2631 S. Troy, and that JONES replied that he could not be able to help because he had "something else" going on, referring to the planned ripoff at 3420 W. 83rd Place.

183.     At approximately 8:46 a.m., JONES received an incoming call from FLAGG (Jones. Tel. #1192). JONES told FLAGG he wanted to "handle this at 1:30," and FLAGG responded that he would like to do it as soon as he is out of court. JONES indicated that he had "somebody . . . goddammit gonna rock and roll." I understand FLAGG to have told JONES that he would join JONES to commit the robbery when FLAGG left court, and that JONES told FLAGG he had "somebody" to help, referring to HAYNES, and that they were ready to steal the drugs and money (they were ready to "rock and roll").

184.     At approximately 12:23 p.m., JONES received an incoming PTT call from Individual C[22] (Jones Tel. #1199, 1200). During the course of their PTT conversation, Individual C asked JONES if it went "right the other day," and JONES replied that it had not, but that

---

[22]Individual C was using one of the ten Nextel cellular telephones subscribed to in JONES's name.

something else was going on that day. Individual C informed JONES that someone called Individual C "for a thumper (gun) the other day," and JONES told Individual C that "he" was going to handle it on his own. I understand that in this conversation, Individual C asked JONES if the robbery planned for 2631 S. Troy had occurred. I further understand that Individual C informed JONES that WALKER had called Individual C for a "thumper" (gun) the other day, and that JONES informed Individual C that WALKER said he would commit the robbery himself. Individual C asked if it was the wrong move again, and JONES explained how the planning for the 2631 S. Troy robbery had occurred. JONES further told Individual C that JONES was going to do another ripoff that day at 1:30 p.m. near JONES's mother's house. JONES also told Individual C that it is "guaranteed," and that these were "books," referring to the proceeds of the robbery, which would be kilograms of cocaine ("books"). Individual C then offered to sell some of the drugs for JONES, asking JONES to let "me and [another individual] go ahead and take care of that . . . at least one (kilogram of cocaine)."

185.    At approximately 1:01 p.m., JONES placed an outgoing call to HAYNES (Jones Tel. #1212), leaving him a voicemail for HAYNES to call JONES.

186.    At approximately 1:18 p.m., a black Ford pick-up truck was observed arriving at 3420 W. 83rd Place. A subsequent check of Secretary of State records indicated that this truck was registered to Individual B.

187.    At approximately 1:40 p.m., surveillance observed JONES in his Cadillac Escalade driving past 3420 W. 83rd Place. JONES then left the area at approximately 1:42 p.m., and parked his Escalade several blocks away from the target residence next to a large park.

188.    At approximately 1:45 p.m., JONES received an incoming call from Officer C,

who was also a 7th District CPD officer (Jones Tel. #1216). During this call, a police radio can be heard in the background. JONES told Officer C that he had "some action" for him, and Officer C replied that he was tied up with a landlord/tenant dispute. JONES told Officer C that he was waiting on "Darek" (HAYNES), and he needed him to roll up to make it look "good," meaning that JONES was waiting on HAYNES who would "roll up" on the robbery/extortion victim in order to make any police stop look "good" (legitimate). Officer C told JONES to call him when they had everything "situated."

189.    At approximately 1:53 p.m., JONES received an incoming call from WALKER (Jones Tel. #1221), which call appeared to relate to the ripoff WALKER and JONES were planning for the 2631 S. Troy address, as well as JONES's plan to rob the 3420 W. 83rd Place address. WALKER told JONES "this nigger sitting there with it right now," and "he just dumped one and called for another one," referring to the drug dealer at the Troy address who was holding drugs and had ordered more. JONES said that he was "east." WALKER asked if this "was one of yours," and JONES replied that it was "one of ours . . . three of 'em (three kilograms of cocaine) and maybe fifty dollars ($50,000)." WALKER then asked JONES if this was "by the book." JONES replied, "no . . . we doin' this on our own." Based on the context of this and other conversations, and the investigation to date, I understand that in this portion of the call WALKER and JONES began discussing the robbery at 3420 W. 83rd Place that JONES was planning to commit. When WALKER asked whether this was "by the book," he was asking JONES whether he would be conducting legitimate law enforcement activity, and by responding "no . . . we doin' this on our own," JONES told WALKER that JONES was not planning on conducting legitimate law enforcement activity. Later in the conversation, WALKER asked if

-77-

JONES was "bringing something to the hood," and JONES told WALKER, "I don't know . . . 'cause uh, if its fifty bucks we just gonna let 'em have them." JONES further stated, "If it ain't fifty bucks, one of 'em is coming with me," indicating that if $50,000 in cash was present in the house, JONES was going to take that money and leave the drugs where they were; but if the money was not there, JONES was going to take cocaine ("one of 'em") from the residence.

190.    At approximately 1:56 p.m., FLAGG called JONES (Jones Tel. #1222). JONES told FLAGG that he needed "a car," and that the cars he had previously seen at the residence on 83rd Place were no longer there.

191.    At approximately 2:05 p.m., WALKER called JONES (Jones Tel. #1223). In that conversation, WALKER asked JONES if JONES "got nobody else that can go" (assist WALKER with his planned robbery at 2631 S. Troy), and JONES replied that he did not have anyone. In this call and a subsequent call (Jones Tel. #1224), WALKER and JONES discussed other CPD officers who may or may not be willing to help WALKER do the Troy Street ripoff. During that call (#1224), WALKER specifically asked about HAYNES saying, "What about your other man? . . . That nigger Darek," to which JONES replied, "He (HAYNES) ain't working today." WALKER then asked if HAYNES would help with the robbery, saying, "He got a couple of balls, don't he?" After JONES replied that HAYNES did, WALKER indicated that he needed to do the ripoff quickly: "Shit, I need this cuz I know this motherfucker ain't got wait too long after this one here."

192.    At approximately 2:13 p.m., JONES called HAYNES and the two discussed the robbery to occur at 3420 West 83rd Place (Jones Tel. #1234). JONES told HAYNES that there would be "fifty bucks and three of them things" ($50,000 and three kilograms of cocaine) present

-78-

in the house. JONES and HAYNES then discussed that the intended robbery/extortion victim (Individual B) lived in the attic. JONES told HAYNES to meet him and explained that "this motherfucker" (FLAGG) was still in court. JONES further told HAYNES he wanted to see what Officer C was going to do because JONES needed a "car" (police vehicle) to "ride up in front." In this call, I understand that JONES was asking HAYNES to participate in the anticipated robbery and that if FLAGG continued to be stuck in court, JONES was going to see if Officer C could provide a police vehicle to sit in front of the residence during the robbery. I believe that JONES wanted a police vehicle to be present in order to give the appearance to any bystanders of a legitimate police search being conducted at that location, rather than the corrupt police officers taking any drugs and/or money at that residence for their own personal benefit.

193.    At approximately 2:15 p.m., JONES called FLAGG (Jones Tel. #1235). FLAGG discussed the jury trial that he was involved in. JONES told FLAGG he was waiting on someone (HAYNES) and FLAGG asked if that individual (HAYNES) was "going by himself." JONES said, "No, we fuck with [Officer C]." FLAGG told JONES, "You better take care of me," to which JONES replied, "I got you for something, don't worry about it." I understand that in this call, FLAGG asked JONES whether HAYNES was going to commit the robbery by himself, and JONES said that Officer C was going to assist HAYNES. At that point, FLAGG wanted to make sure that JONES and the others provided FLAGG a cut of the robbery/extortion proceeds, which was evident by FLAGG's comment that JONES better "take care" of FLAGG.

194.    On September 8, 2004, at approximately 2:49 p.m., JONES received an incoming call from HAYNES (Jones Tel. #1248). During that conversation, JONES gave HAYNES directions to meet him at a park located several blocks east of 3420 W. 83rd Place.

-79-

195. At approximately 2:55 p.m., surveillance observed HAYNES, driving a white Cadillac Escalade, arrive at JONES's location and stop briefly in front of JONES's Cadillac Escalade. Surveillance then observed HAYNES's white Escalade drive by 3420 W. 83rd Place and that JONES was a passenger in that truck.

196. At approximately 3:21 p.m., surveillance observed a green Cadillac exit the area behind 3420 W. 83rd Place with a driver and two children inside the vehicle. At approximately 3:38 p.m., JONES received an incoming call from MONTGOMERY (Jones Tel. #1254), who asked JONES if everything was still "cool." JONES told MONTGOMERY he was "still waiting" and that he (JONES) had observed a green Cadillac parked at the residence of 3420 W. 83rd Place.

197. At approximately 3:39 p.m., JONES placed an outgoing call to FLAGG (Jones Tel. #1256), who indicated he was still in court.

198. At approximately 4:39 p.m., JONES received an incoming telephone from WALKER (Jones Tel. #1257). WALKER asked JONES how it "came out," referring to the planned ripoff at 3420 W. 83rd Place, and JONES replied that he was "still over here."

199. At approximately 4:44 p.m., JONES called FLAGG (Jones Tel. #1258), asking FLAGG how long FLAGG would be in court. FLAGG asked JONES's location and JONES told FLAGG he was in the vicinity of 83rd Street and California Avenue. FLAGG then asked about "Darek" (HAYNES), and JONES responded that HAYNES was with him. FLAGG told JONES that HAYNES "should be over there" (watching the target residence). JONES told FLAGG that they had seen "dude's car" at the residence, but would drive by the residence again.

200. At approximately 4:52 p.m., surveillance observed HAYNES's Cadillac Escalade

-80-

described above (license plate 5689336) driving in the vicinity of 3420 W. 83rd Place.

201.    At approximately 5:05 p.m., surveillance observed FLAGG's Chevrolet Caprice parked at 26th Street and California Avenue near the Cook County Criminal Courthouse. At approximately 5:07 p.m., surveillance observed JONES re-enter his Escalade at the park near the ripoff target residence. Approximately nine minutes later, surveillance observed FLAGG running to his Caprice wearing his CPD uniform.

202.    At approximately 5:53 p.m., JONES placed an outgoing call to FLAGG (Jones Tel. #1260), asking when FLAGG would arrive. FLAGG told JONES he would be there in a minute.

203.    At approximately 6:06 p.m., JONES called MONTGOMERY (Jones Tel. #1261). In that call, JONES and MONTGOMERY discussed if there were any "special places" to look in the house, referring to where the officers should look for drugs and/or money. MONTGOMERY directed JONES to look in the kitchen area, the cabinets, and two walk-in closets. JONES told JOEL MONTGOMERY they (the officers) were "going in there" in approximately 20 minutes.

204.    At approximately 6:26 p.m., FLAGG called JONES (Jones Tel. #1264). JONES and FLAGG discussed FLAGG's location, and JONES directed FLAGG to come west.

205.    At approximately 6:30 p.m., JONES received a call from MONTGOMERY (Jones Tel. #1266). During that call, JONES said that an individual had returned to the house. JONES asked MONTGOMERY whether the people living at the house would open the door if they (FLAGG and HAYNES) "knocked on the door" and stated they were the police. MONTGOMERY replied, "he should." JONES and MONTGOMERY then discussed the door to the attic apartment and whether or not it had any "gates," to which MONTGOMERY replied

-81-

that he did not think so.

206.    At approximately 6:33 p.m., FLAGG called JONES (Jones Tel. #1268) and advised that he (FLAGG) was located on the other side of the park (where JONES and HAYES were located). At approximately the same time, surveillance observed FLAGG's Caprice parked on the westside of the park and two individuals resembling HAYNES and JONES approach FLAGG's Caprice.

207.    At approximately 6:41 p.m., surveillance observed both vehicles (the Caprice and HAYNES's white Escalade) leave the park area and drive to 3420 W. 83rd Place. FLAGG, accompanied by HAYNES, parked his unmarked Caprice police car in front of 3420 W. 83rd Place. JONES, now driving HAYNES's white Escalade, parked approximately six houses west of the target residence on 83rd Place.

208.    During the ensuing surveillance of 3420 W. 83rd Place, surveillance observed both FLAGG and HAYNES at various times walking around 3420 W. 83rd Place, as well as approaching both the front and rear doors.

209.    Beginning at approximately 6:42 p.m., JONES and FLAGG engaged in a series of conversations (Jones Tel. #1271, 1272, 1273, 1274, 1276, 1277, 1278, 1279, 1282, 1285, 1286, 1287, 1288, 1289, 1290, 1291, 1295, 1296, 1298, 1299). During this series of conversations, FLAGG and JONES discussed the following:

> (a) FLAGG said that the resident was not home, and that he (FLAGG) was
> having difficulty breaking the door down and could not figure out why the door
> would not open. JONES described to FLAGG in detail ways to kick the door
> down, instructing FLAGG to turn around backwards and use his feet. FLAGG

-82-

described that the first floor resident was complaining and that HAYNES was at the bottom of the stairs. JONES told FLAGG to let HAYNES try to kick in the door.

(b) FLAGG then told JONES that HAYNES had shown the first floor resident "his badge" (police badge). FLAGG and JONES discussed whether FLAGG should go try the back door. FLAGG further told JONES that HAYNES had told someone who was on the first floor that they were looking for narcotics and repeated that HAYNES had shown his badge. FLAGG stated, "I don't know why this motherfucker keep doing this shit, showing his badge and shit." I believe that FLAGG was upset that HAYNES was showing his badge because the first floor resident would be able to see HAYNES's badge number. If FLAGG, JONES, and HAYNES were conducting a legitimate search of 3420 W. 83rd Place, they would not be concerned with the residents of this location ascertaining their identity.

(c) FLAGG further told JONES that the individual on the first floor was "beefing" (complaining) and telling FLAGG that if he didn't have a search warrant that he was going to call his (FLAGG's) sergeant. FLAGG and JONES discussed the individual who they believed to be living upstairs (the intended robbery victim – Individual B), hoping that he would arrive. FLAGG told JONES that they may have to wait until Individual B showed up and that they would "grab" him and "walk his ass back into the house."

(d) Later in this series of conversations, FLAGG told JONES that HAYNES let the first floor resident back into his house and that this person had called the

police. JONES asked if FLAGG was going to call his sergeant, and FLAGG said "I don't know if he's gonna go for this shit." FLAGG told JONES that he (FLAGG) was listening to the police radio because the first floor resident had said, "I don't see no badge, I don't see no radio." FLAGG told JONES that if he heard a "request for a supervisor" over the radio he could do two things: "stand here and wait for my sergeant to come, or I'm jetting" (leave the scene prior to getting caught). FLAGG asked JONES if FLAGG should call "him" (his sergeant). JONES instructed FLAGG to tell his sergeant "some shit" (make up a story), and further told FLAGG that if FLAGG called his sergeant, JONES wanted FLAGG to "go out the back door and put that shit (the cocaine and/or money) in a garbage can." FLAGG agreed. Hiding the narcotics and/or money in a garbage can in the back of the residence would allow FLAGG to hide this contraband from his (FLAGG's) sergeant – and thus, avoid having to log it as evidence – so that JONES or another person could later recover the drugs and/or money and keep it for themselves.

(e) Later in the series of conversations, FLAGG said that his sergeant would be unable to come because he was busy with a search warrant at another location. JONES told FLAGG that FLAGG may have to show his sergeant one of them "books" (kilograms of cocaine) and put the rest in the garbage can. I understand JONES to be telling FLAGG that he (FLAGG) may need to show his sergeant a kilogram of cocaine to justify the search, but that FLAGG should put the remainder of the cocaine in the garbage can so those drugs could be retrieved later

for JONES, FLAGG, HAYNES, and MONTGOMERY to keep for themselves. FLAGG relayed to JONES that his sergeant told him to do a search warrant. JONES said that "if your sergeant knows, once you get in there and get it what the fuck."

210. At approximately 7:00 p.m., FLAGG told JONES his sergeant was coming to the residence alone (Jones Tel. #1295). FLAGG said he was going to tell HAYNES to meet with JONES and that JONES should call HAYNES so that HAYNES could leave before FLAGG's sergeant arrived.

211. HAYNES then called JONES (Jones Tel. #1299), and told JONES that the person on the first floor was "calm." JONES told HAYNES to meet him because FLAGG called his sergeant. JONES also told HAYNES that FLAGG was going to "boot it" (break the door) and "put it in the garbage can" (hide any cocaine and/or money in a garbage can). HAYNES asked if FLAGG's sergeant "knows what's going on," and JONES said "not everything."

212. During the course of these conversations between JONES and FLAGG, surveillance observed a small green Chevrolet Geo exit the driveway of 3420 W. 83rd Place and depart down 83rd Place.

213. At approximately 7:05 p.m., surveillance observed an officer, who they believed to be HAYNES, walk over to HAYNES's Escalade that was parked down the street and enter the driver's side door, at which point JONES slid over to the passenger side of the Escalade. The Escalade then conducted a U-turn and went west on 83rd Place.

214. At approximately 7:12 p.m., JONES again spoke with FLAGG (Jones Tel. #1311). JONES told FLAGG that "here comes your man with two other motherfuckers,"

-85-

indicating that FLAGG's sergeant had arrived with two other police officers.

215.   At approximately 7:15 p.m., surveillance observed a CPD tactical vehicle arrive in front of 3420 W. 83rd Place, after which three male police officers walked towards the front of the residence and entered.

216.   At approximately 7:18 p.m, FLAGG contacted JONES (Jones Tel. #1315). FLAGG told JONES that the door would not open and further stated that he was going to leave to type a search warrant. FLAGG told JONES that people were stationed in front and in the rear of the residence and that he would like to meet JONES to talk about this further. At approximately 7:18 p.m., surveillance observed FLAGG depart the area of 3420 W. 83rd Place at a high rate of speed.

217.   At approximately 7:22 p.m., JONES contacted FLAGG (Jones Tel. #1320). During the call, JONES provided a physical description of Individual B and told FLAGG to tell the police officers still at the residence to stop a black truck if it arrived. In addition, JONES instructed FLAGG to get the "chalk" (cocaine), and to "try and get one of them bitches" (one kilogram of cocaine). FLAGG informed JONES he was going to the 8th CPD District to work on a search warrant. About one minute later, JONES again contacted FLAGG (Jones Tel. #1321), and they continued to discuss the search warrant that FLAGG was going to prepare. FLAGG told JONES he had a warrant he could use as a guide, and further stated he was going to go to the Judge's house to get the warrant signed.

218.   At approximately 7:32 p.m., FLAGG called JONES (Jones Tel. #1323), requesting additional information for the search warrant. JONES provided FLAGG with Individual B's name and indicated that he (JONES) did not know if Individual B had ever been

arrested. During this conversation, it appeared that FLAGG was accessing a CPD database to try and confirm information about Individual B, ultimately telling JONES that he found it. The two also discussed other identifying characteristics of Individual B, including his hair and a prior address, presumably for FLAGG to include this information in a search warrant.

219. At approximately 7:31 p.m., surveillance observed JONES exit the passenger side of HAYNES's Escalade and entering his own Cadillac Escalade. JONES drove north on Francisco and east on 83rd Street. At approximately 7:41 p.m., surveillance observed JONES's Escalade parked at his mother's residence on Francisco.

220. At approximately 7:39 p.m., JONES again contacted FLAGG (Jones Tel. #1329). JONES told FLAGG that if FLAGG had to "hide that shit it in the crib somewhere, do that, 'cause I'm going in there to get it," which FLAGG agreed to do. I understand that in this call, JONES was instructing FLAGG to take any drugs and money found inside 3420 W. 83rd Place during the execution of the search warrant, and to hide it in a place where FLAGG's sergeant and other officers would be unable to find it so that JONES could come back at a later time to steal the drugs and money.

221. At approximately 8:28 p.m., JONES received an incoming call from FLAGG (Jones Tel. #1342), who told JONES that Individual B had come home, that the CPD officers who were present at the residence obtained a consent to search, and that during that search they recovered three guns. FLAGG told JONES that the first floor resident had a key to the second floor and that FLAGG was going "to beat" that first floor resident. JONES then asked "where that shit (cocaine) at?" FLAGG told JONES it was somewhere on the first floor, and that he (FLAGG) he was going to return to 3240 W. 83rd Place.

-87-

222. At approximately 8:35 p.m., surveillance observed FLAGG returning to the 83rd Place address with his police car's lights and siren on. FLAGG, now observed to be wearing a bullet proof vest, which he was not wearing prior to his departure, entered the residence at 3420 W. 83rd Place.

223. At approximately 8:42 p.m., FLAGG called JONES (Jones Tel. #1344) and told him the officers recovered "three pistols and a little bit of something." JONES asked how much "work" (cocaine). FLAGG stated "maybe an eighth," to which JONES replied, "an eighth of a key?" (1/8 of a kilogram of cocaine). FLAGG also told JONES that when HAYNES let "dude" (the first floor resident) back in his residence, "that's when he moved the shit." JONES instructed FLAGG to "find that paper (money)."

224. At approximately 9:13 p.m., FLAGG called JONES (Jones Tel. #1352) and told him that Individual B said that there was no money in the residence. FLAGG told JONES they had searched the building and did not find any money. FLAGG also told JONES that Individual B was trying to bribe the sergeant and other officers. The two discussed that Individual B kept everything in his closet at the residence. FLAGG indicated that he found paperwork for a house on 115th Street, and that FLAGG believed that Individual B stored narcotics there. FLAGG told JONES he was going to take Individual B's keys and go to the 115th Street address.

225. At approximately 9:44 p.m., FLAGG called JONES (Jones Tel. #1360). During that conversation, FLAGG asked JONES if he knew Individual B, and told JONES that Individual B was "JoJo's brother" (JOEL MONTGOMERY's brother) from the east side of the city. FLAGG stated that he went into Individual B's residence, and then he (FLAGG) put Individual B on the telephone to speak with JONES. During their conversation, Individual B

asked JONES if there was anything he could do for him. Individual B admitted to JONES that he had "500 and probably a half and a 125" (amounts of cocaine). Individual B also told JONES there was no money in the residence. JONES asked Individual B if "he (FLAGG) with some white boys (white police officers)?" Individual B said "yea," causing JONES to swear. I believe that JONES asked Individual B about the people with FLAGG to ascertain if Individual B (and FLAGG) were in a position for Individual B to possibly provide money or drugs to FLAGG as a bribe. Individual B told JONES he could make some telephone calls and "put something together" (get money). JONES then said, "damn, he's with them white boys . . . it's gonna be hard to do this shit." Individual B told JONES that he might be able to get approximately $5,000. FLAGG got back on the telephone and JONES told FLAGG that Individual B could get "five stacks" ($5,000) but that he "ain't got shit" (Individual B had no money at that time). JONES said that he told Individual B that there was nothing they could do because FLAGG was with "white boys" (some officers who were not part of JONES's and FLAGG's criminal organization). Based on the context of this call, I understand that FLAGG contacted JONES in the presence of Individual B, who had been arrested at 3420 W. 83rd Place. Individual B then got on the telephone with JONES, and during their conversation, I understand that Individual B was attempting to see if he could be released if he provided JONES or FLAGG with money. I further understand that because Individual B (and FLAGG) were with officers who were not a part of JONES's and FLAGG's criminal organization, JONES was unable to help Individual B.

### G. *Conversation Between JONES and Individual D Regarding an Attempted Murder (9/21/04)*

226. On September 21, 2004, JONES received a telephone call from Individual D at

approximately 10:34 a.m. (Jones Tel. #2396). Individual D told JONES that he was coming from court.[23] Individual D described to JONES how one of the victims in his criminal case approached him at the courthouse, telling JONES, "One of the niggers I shot in the stomach . . . man gonna tried to pull me to the side, right. He's like 'man, you don't want hear what I have to say?' I say, 'Man, what you got to say, man?'" Individual D then told JONES that the individual who approached him wanted Individual D to pay him to make the case go away: "This motherfucker say, 'man, you know, we need . . . we don't really got to be going to court for this man.' I say, 'What you want to do?' . . . 'Man, you know a couple of dollars will solve' . . . I say 'man, somebody already came to me with that proposition man when I first shot you all man, I turned 'em down. So what you propose?'" Individual D continued: "You know what this mother fucker [the shooting victim] say? This mother fucker say 'two hundred.' I say 'two hundred what?' He say 'thousand.' I say 'man.'" At that point in the conversation, JONES, who was laughing, told Individual D that "he [the shooting victim] think you was loaded." Individual D told JONES that he told the victim, "man, we'll be going to court, man," and continued by explaining to JONES, "I could see if I shot a motherfucker with some potential or something. Nigger you ain't shit. You a mother fucking criminal. What the fuck I'm a gonna give you two hundred thousand for?" JONES can again be heard laughing at the story. As the conversation between JONES and Individual D continued, with the two of them discussing the status of Individual D's case, Individual D returned to the subject of the shooting victim trying to get money from him, telling JONES that the victim had "a lot of balls." JONES said "yeah, yeah"

---

[23]A review of Cook County records shows that Individual D is currently charged with three counts of attempted murder and related offenses, and that he was scheduled for a court appearance on September 21, 2004.

and asked Individual D, "That's the one that was fucked up right?" Individual D replied, " No,

nigger I shot in the chest, he was fucked up, he was in a coma. Fuck him. Shit . . . nigger. Tell

that mother fucker bitch, I don't get down like that on this . . . .", after which JONES laughed.

Individual D said to JONES, "Mother fucker, man, he got a lot of nerve, man." JONES replied,

"No shit."

### H.  Conversations Involving WALKER, WILSON, JONES, and Others Regarding An Additional Drug Deal and Potential Ripoff (10/26-27/04)

227.    On October 26, 2004 at approximately 11:57 a.m., WALKER received a call over

Walker Telephone from Individual E (Walker Tel. #3821). Individual E asked WALKER, "can

your guys come out and play, today?" I understand Individual E to be referring to WALKER's

corrupt police officer associates, and that in this conversation, Individual E was wondering if

these corrupt police officers were available to do a drug ripoff ("come out and play"). Individual

E then mentioned a house with "the refrigerator in the back," which appeared to be a reference

to the house located at 2631 S. Troy. Individual E said that "one guy going through today . . . to

talk about some numbers," meaning that somebody was going to 2631 S. Troy to discuss drug

prices. WALKER then told Individual E that he has "two groups, now," in an apparent reference

to WALKER having two different groups of corrupt police officers who could help him conduct

ripoffs of drug dealers.

228.    A few minutes later, at approximately 12:02 p.m., WALKER spoke with

Individual E (Walker Tel. #3827), who had another person ("UM") on the line in a three-way

call. In the call, Individual E stated, "I got my guy on the other line. Go on and explain it to him,

what's all going on today." The UM then stated, "My guy said he's going to get with dude at 3

o'clock, man." Individual E then asked the UM, if "they fixing to do something or just fixing to

discuss numbers?" UM then stated that "every time they go over there, they getting down." In

this call, I understand the UM to be involved with the "guy" that WALKER referenced in call

#3821 that was going over to 2631 S. Troy to discuss drug prices, and that the UM told

WALKER and Individual E that every time his "guy" went to that address, he obtained drugs

("they getting down"). WALKER then asked the UM if he knew how many kilos of cocaine the

UM's "guy" was going to purchase, saying, "you don't know how good he's going to be eating,

right now?" After the UM indicated that he did not know the answer, the UM said, "We need

somebody to put an order in for a couple of them, that way everyone can come out looking

good." I believe that the UM was telling WALKER and Individual E that they needed to order

multiple kilos of cocaine to make the robbery worth while. WALKER and Individual E asked

the UM if he knew if the drug dealer at 2631 S. Troy was "holding" drugs at the residence, after

which the UM said that once an order for drugs was placed, the drug dealer would leave the area

and return a short time later with drugs. Later in the same conversation, WALKER asked the

UM if anyone could "tail" the drug dealer from 2631 S. Troy to figure out where he obtained the

narcotics, saying, "maybe a motherfucker might just need to keep an eye on this cat for a day, you

know what I'm saying. And then we can find his location, find who he's meeting, motherfucker

cut the middleman out, and really get somewhere wild." I believe that WALKER was telling the

UM and Individual E to follow the drug dealer from 2631 S. Troy to his drug supplier so that

they could ultimately rob the supplier of drugs and/or money.

229. At approximately 12:21 p.m. that same day, JONES called WALKER (Jones Tel.

#4120). WALKER stated, "I had a lick up, Joe," and after JONES asked, "What is it?,"

WALKER replied, "It's maybe a deuce or better, right. You know the same address over there."

-92-

I understand that in this conversation, WALKER told JONES that he had a ripoff he wanted to conduct, and that it would be at 2631 S. Troy ("the same address") for two or more kilos of cocaine ("it's maybe a deuce or better"). WALKER told JONES, "I don't wanna get dude, yet. I wanna watch him. I wanna get the nigger that's going," to which JONES responded, "I know what your saying." I understand that in this exchange, WALKER told JONES that he wanted to rob the supplier of the individual who sold drugs at 2631 S. Troy, and that JONES agreed. Later in the conversation JONES asked WALKER about the robbery target, saying, "He know you?" WALKER responded, "No. Nigger don't know me, see, it's going through one of my guys. The one that put me on the whole lick." JONES then told WALKER, "What you can do, is go, watch him, follow him, hit us when he's getting close, and I'll have somebody whoop." I believe that JONES instructed WALKER to conduct surveillance of the drug dealer from 2631 S. Troy, and then to call JONES, who would have somebody stop the drug dealer and take drugs and/or money from him. JONES added that the police officers engaged in criminal activity with JONES might not be willing to travel that far to conduct the ripoff: "The only thing about it though, is the motherfucker who working, they ain't going down that far." WALKER further told JONES that he "don't want to many motherfuckers in on the lick (ripoff) because I don't want to chop that (the ripoff proceeds) many ways." JONES replied, "Yeah, because that's a deuce (two kilograms of cocaine), and that's going to be what, that's four of us (participants in the robbery/extortion) already." WALKER informed JONES that the drug deal was supposed to happen around 3 p.m., and JONES told WALKER to keep him informed because he's "going to put some motherfuckers on standby."

230. At about 4:25 p.m. that day, WALKER called JONES (Jones Tel. #4179), and

JONES said, "I guess it ain't happening." WALKER responded, "I ain't heard shit back from my man." JONES then told WALKER, "I gotta tell those boys to ride out, but night crew coming on," and WALKER told JONES that he would let JONES know something as soon as he (WALKER) heard. I believe that in this call, JONES and WALKER discussed why the ripoff had not occurred, and JONES informed WALKER that another group of police officers that were working the night shift might be available to conduct the drug robbery.

231. The next day, October 27, 2004, WILSON, WALKER, and Individual H engaged in a series of conversations concerning a cocaine deal and possibly setting up this cocaine supplier for a later robbery.

232. At approximately 10:46 a.m. on October 27, 2004, WALKER called WILSON (Walker Tel. #3962), and told WILSON, "Look, I need three to go to work," meaning that WALKER was asking WILSON to supply him with three kilos of cocaine. WILSON asked WALKER to stop by and see him at his carwash, and WALKER then told WILSON, "Well, you can just get on the phone because you know what I am talking about. But, I'll be up there, but go on and get on the phone."

233. About an hour later, at approximately 11:42 a.m., WILSON called WALKER (Walker Tel. #3986), and told WALKER, "I talked to him and stuff, in the next twenty minutes he is going to call me back." WALKER asked WILSON if "he" (WILSON's cocaine supplier) was "going to be ready to go," to which WILSON responded, "he said he would call me back."

234. About an hour later, at approximately 12:42 p.m., WILSON again called WALKER (Walker Tel. #3996). During their conversation WILSON told WALKER "about three o'clock," and WALKER said that he would "pass that word." After this call, WALKER

-94-

called Individual H (Walker Tel. #3997) and told Individual H that it would be around three

o'clock. Individual H responded, "as long as he can get them" (kilograms of cocaine) he would

tell his "guy" (Individual H's drug customer) it would be later in the day.

235.    Later that day, at approximately 2:57 p.m., WALKER called WILSON (Walker

Tel. #4025). During their conversation WILSON told WALKER to go to the vicinity of Division

Street and Grand Avenue, telling WALKER this was a "business." WALKER said that this

location was too far away, and that he (WALKER) would call his "man" (Individual H) to see if

this was too far.

236.    About ten minutes later, at approximately 3:06 p.m., WILSON called WALKER

(Walker Tel. #4027), and told WALKER that "he" (WILSON's drug supplier) wanted to do the

deal in the vicinity of 35th Street and Ashland Avenue. WALKER told WILSON "you talking

about a nigger riding up with damn near sixty bucks on him," referring to the approximate

amount of money ($60,000) that someone would need to pay for three kilograms of cocaine.

WALKER and WILSON then discussed the area around 35th and Ashland, with WALKER

stating that this area (35th and Ashland) would be "better than going way out there" (to Division

and Grand). WILSON said that the location would be "perfect for the next time when somebody

rolled up on them." WILSON added that "if they take a chance like that . . . they take a chance

on some big ones . . . and they can be easily rolled up on." WILSON said they were looking at

"nothing" but next time it would be "all." WALKER expressed concern about riding with

someone else's "cash." WILSON assured WALKER he would drive "the truck" and check

everything out. I believe that in this call, WILSON and WALKER were working to broker a

cocaine deal between WILSON's supplier and Individual H's customer. WALKER was

concerned about someone having to ride with $60,000 ("sixty bucks") to meet the supplier, which is why he wanted to find a nearby location. I further understand that WILSON and WALKER wanted this deal to go smoothly so that during the next drug deal between these parties, corrupt police officers could "roll up" on the supplier and ripoff a larger amount of drugs.

237.    At approximately 4:06 p.m., WALKER called Individual H (Walker Tel. #4037), and told Individual H that "they want a motherfucker to really come too far west" to Grand and Division. WALKER told Individual H that he told them if they would come "south" they would "fuck with them" (do the drug deal). WALKER and Individual H then discussed "other cats" (drug suppliers) who had a "sweeter ticket" (better price). Individual H told WALKER, "but we need them so we can do the other thing." WALKER told Individual H that "dude" (WILSON) was talking about "hittin' them upside the head the next time." Individual H said it would have been sweet because they could have done "a five piece spicy" the next time. WALKER replied, "no, we was going like six, seven . . .we doubling up." Individual H agreed and said "we actually need them." WALKER and Individual H then discussed getting the supplier in their "area so that the next time we get them we can get em out here, they feel confident, and the nigger can bang them." I understand that in this conversation, WALKER and Individual H discussed the need to do this drug deal with WILSON's supplier so that they could later rob him. During the call, the two discussed having the supplier come into their neighborhood for this three kilogram cocaine deal so that the supplier would feel comfortable. The two then discussed doubling the amount of cocaine for the next deal to "six" or "seven" kilos, at which time they could rob ("hit [] upside the head" or "bang") the cocaine supplier, taking the cocaine without paying for it.

238.    Following this conversation, numerous telephone calls between WALKER and

-96-

WILSON, and WALKER and Individual H were intercepted during which the location of the potential drug deal was discussed. After several conversations among these individuals, it became apparent that both WILSON's supplier and Individual H's customer were unwilling to travel in order to do the drug deal, and they agreed to try and conduct the drug deal the next day.

### I. Additional Conversations Involving JONES, FLAGG, HAYNES, BLACK, WILSON, WALKER, Including Conversations Regarding Another Potential Ripoff and Referencing the July 21, 2004 Attempted Ripoff (11/10-26/04)

239. On November 10, 2004, at approximately 2:59 p.m., JONES called Officer E (Jones Tel. #5626). JONES called Officer E after learning that he had received a reassignment, telling Officer E, "You finally fooled the motherfuckers and got into narcotics and you won't hit your man, huh?" Officer E replied, "I'm not going to narcotics, I'm going to gang intelligence." JONES stated "Yeah, 'cause you gonna need to call me anyway to learn some gang shit." JONES and Officer E laughed. The conversation continued regarding Officer E's reassignment, with JONES telling Officer E, "you gonna be all good with that shit. I wish I could get over there to that motherfucker," meaning that JONES wished he too would get reassigned to gang intelligence. Officer E replied, "Hold on, it's gang intelligence, not gang members." Officer E and JONES both laughed, and JONES responded, "Who better to have the intelligence, know what I'm saying, shit?"

### November 13, 2004

240. In summary, on November 13, 2004, JONES communicated with two drug dealers, JAMES WALKER and Individual F, regarding two separate ripoffs that each were planning for JONES. As illustrated below, during a call on November 13, 2004, WALKER provided the details to JONES of his plan to arrange a drug deal so that JONES could ripoff the

drug courier. Near the conclusion of their call, JONES told WALKER "let's go." Within approximately 15 minutes of completing this call with WALKER, JONES contacted several CPD officers over Jones Telephone -- including COREY FLAGG, DAREK HAYNES, and EURAL BLACK -- seeking to enlist their assistance in the robbery.

241. On November 13, 2004, at approximately 10:09 a.m., JONES received a call from Individual F (Jones Tel. #5873). During that conversation, Individual F asked JONES if he would still be working at 3 p.m. JONES then asked Individual F what was he talking about, to which Individual F replied, "Is this a good phone for me to talk on?," leading me to believe that Individual F planned on discussing criminal activities with JONES and that he was concerned about talking about it over the telephone. JONES responded, "hell no," but asked Individual F to give him a "demonstration" and asked "what are we talking about?" Individual F said that "it has to be an interception," which I understand to be car stop by JONES or one of his corrupt CPD associates. Individual F then clarified that "it was supposed to be four of the whole things," to which JONES responded, "Okay, that's what I am talking about." Individual F went on to tell JONES that there was going to be a drug transaction taking place and that his people were providing the money for the drug deal. JONES stated, "my people ain't here, but, I might have to call some more motherfuckers." I believe that in this call, Individual F sought JONES's help in robbing a drug dealer of four kilograms of cocaine ("four of the whole things") through a street stop (an "interception") by corrupt law enforcement officers who would make the stop look like legitimate police activity. When JONES said he that his "people ain't here," and that he might have to "call some more motherfuckers," I believe that JONES was referring to the fact that his primary accomplice in such criminal activity (FLAGG) was not available, and that he would have

to call some other corrupt police officers to see if they wanted to participate in the robbery/extortion of four kilos of cocaine.

242.    In several telephone calls intercepted over Walker Telephone on November 12 and 13, 2004, it appeared that WALKER, WILSON, and other individuals were attempting to set up a drug deal, possibly for multiple pounds of marijuana. In one of these calls, at approximately 2:51 p.m., WALKER spoke with one of the individuals trying to set up the deal (Individual G) (Walker Tel. #6715). In that call, WALKER and Individual G discussed the fact that WILSON had told WALKER his supplier won't "run for one." WALKER was upset and told Individual G he did not ask WILSON how many his supplier would come with because WALKER would "take them." WALKER then said, "what the fuck do you want to give a motherfucker a picture for, but then don't want to do one," which I understand to mean that WALKER had received a sample (a "picture") of the marijuana but that now the supplier didn't even want to do a one pound deal. WALKER and Individual G discussed WALKER telling WILSON "bring five and then jack 'em," meaning that they should order five pounds of marijuana and then steal them ("jack 'em") rather then paying for them. WALKER then said he was going to call WILSON and tell him "six," so that everyone "grab two a piece . . .you get two, your man get two, I get two, fuck it, and then your man still got his bread." I understand WALKER to have told Individual G that WALKER would order six pounds of marijuana, which they would steal, which would result in WALKER, Individual G, and Individual G's drug customer each receiving two pounds of marijuana, as well as Individual G's customer being able to keep his money ("bread"). WALKER then said "I'm about to call him (WILSON) back and I'm gonna tell him the motherfucker (the marijuana customer) want a ticket like 950, but he'll do six (buy six pounds) if

-99-

he can do 950 (sell it for $950 a pound)," which would be a "believable" scenario.

243.    A couple of minutes after talking with Individual G, at about 2:54 p.m.,

WALKER called WILSON (Walker Tel. #6716) and ordered up six pounds of marijuana and

tried to bargain for a lower price. During their conversation, WALKER and WILSON discussed

how many pounds of marijuana WILSON's supplier "would run for." WALKER told WILSON

he had another "cat" (customer) that wanted "six" (pounds of marijuana) if the ticket (price) was

"better." WALKER told WILSON this person wanted "750, 8," referring to $750 or $800 per

pound of marijuana. WILSON told WALKER he would try and "talk him down to 8."

244.    At about 2:57 p.m., WALKER called JONES (Jones Tel. #5911 & Walker Tel.

#6718). WALKER asked JONES, "What time you getting off?" and JONES said "right now."

WALKER then told JONES that he was about to "pull [the] old double cross" because the "old

man" (WILSON) had "pissed him off," and WALKER proceeded to explain to JONES that he

wanted to rob WILSON's drug supplier with JONES's help. WALKER told JONES that

WILSON had an "Esse" (a Mexican individual) with some "nice looking gorilla side" (high

quality marijuana), but that this individual did not want to deliver only "one" pound of marijuana

to WALKER. WALKER then told JONES how he was planning a robbery and wanted to have

the supplier meet with WALKER's customer (Individual G). WALKER explained that

Individual G would tell the supplier he did not want the marijuana, and when the supplier left,

"we gonna do what we do." WALKER told JONES he "cuts everybody out," and JONES replied

"its me and you." WALKER explained that the supplier would leave and "it's a done deal . . . its

(the drugs) got to get took." JONES replied "let's go."

245.    At the end of the prior conversation with JONES, WALKER received an

-100-

incoming call from Individual G (Walker Tel. #6720). WALKER and Individual G discussed the robbery, where it would occur, and how they would take all "six" (pounds of marijuana) so everybody gets a "deuce." WALKER again relayed how angry he was that WILSON and his supplier did not want to come for the drug deal if it only involved one pound of marijuana.

246.    Within five minutes of JONES's conversation with WALKER, at approximately 3:00 p.m., JONES called Officer D (Jones Tel. #5912). JONES explained the ripoff plan to Officer D, saying "real simple, same little move," referring to the officers conducting a car stop in which the officers would take the drugs and/or money for themselves rather than logging it into evidence. Officer D asked JONES when this ripoff was going to take place; JONES stated that it might happen in the next hour, and if so he'll have to cut Officer D out and call Officer B. JONES continued that if it was later than the next hour, JONES would call Officer D, who stated, "just call." Within the next two minutes, JONES tried to contact Officer B (Jones Tel. #5913, 5914). In call #5914, which took place at approximately 3:02 p.m., JONES asked Officer B if he was working, and Officer B responded, "no, we off." JONES said that he needed to see who was working, and that he would call Officer B back later.

247.    JONES then took an incoming call from WALKER, which took place at approximately 3:02 p.m. (Jones Tel. #5915 & Walker Tel. #6721). JONES asked, "Is it going down?" WALKER replied that he was waiting on "old dude" (WILSON) to call him back. WALKER told JONES he wanted to meet the supplier at the "wash" (WILSON's car wash), and the two then discussed the specifics of the robbery and how Individual G's customer would have the "bread" (money). JONES asked WALKER why he called him so late and told him, "I got to make a call, man, I got to see if my buddies and them are working."

248.    After getting off the telephone with WALKER, JONES called DAREK HAYNES

(Jones Tel. #5916). JONES asked HAYNES if he was at work. When HAYNES said he was not

at work, JONES became upset. HAYNES then stated, "don't tell me that." I believe that in this

call, JONES became upset when HAYNES was not at work because JONES would not have

been able to enlist HAYNES (or utilize HAYNES's police car) to conduct the traffic stop drug

ripoff. I further believe HAYNES responded "don't tell me that" because HAYNES knew

JONES was calling in order to solicit him to commit a robbery/extortion. JONES told

HAYNES, "I got something going right now, man," to which HAYNES replied, "Street stop?"

After JONES indicated that it was a "simple street stop," HAYNES became upset, saying,

"Damn! Simple street stop." HAYNES went on to say, "I was trying to get you before my

furlough," which I understand to mean that HAYNES wanted to commit a robbery/extortion with

JONES – like the one they attempted in September 2004 – before HAYNES went on vacation.

JONES then told HAYNES, "It's a hot four piece dinner, too man." HAYNES then asked, "Four

piece dinner?," to which JONES responded, "yeah, four of 'em," referring to four kilograms of

cocaine, which were the expected proceeds of the ripoff. I further believe that in this call,

JONES may have been confusing the potential drug ripoff being arranged by Individual F that

JONES and Individual F discussed earlier that day (which ripoff was to be for four kilograms of

cocaine), with the drug ripoff being organized by WALKER.

249.    After getting off the telephone with HAYNES, at about 3:06 p.m., JONES called

BLACK (Jones Tel. #5917). JONES's call went to voicemail. That voicemail message indicated

that "EURAL BLACK" was not available. JONES then tried to contact Officer E (Jones Tel.

#5918), which call also went to voicemail.

250.    At approximately 3:07 p.m., JONES called FLAGG (Jones Tel. #5919), telling FLAGG, "I got something right now, man." FLAGG asked JONES, "What is it?" JONES responded, "Three of 'em, 1, 2, 3," and told FLAGG he would call him back.

251.    At about 3:13 p.m., JONES called Officer F (Jones Tel. #5925). JONES told Officer F, "I need you." Officer F asked, "What's up?" JONES responded, "man, you know what's up," prompting Officer F to laugh, which indicates to me that Officer F knew JONES needed help with a drug ripoff or some other illegal activity. Officer F then asked JONES, "What you got going on?" JONES then told Officer F, "you and your man can have at least an eight ball apiece," which I believe to be a reference to the profit that Officer F that and his partner (Officer D) would each receive from the robbery/extortion. Officer F then asked JONES where the car stop was going to take place. JONES stated, "Remember the last demo? Coming from the wash?," and Officer F responded that he did. JONES then said, "it will be coming from the wash, simple little stop, wham, wham." I understand that in this portion of the conversation, JONES is referring to a prior ripoff attempt at WILSON's car wash. JONES also described the plan for the ripoff as a "simple stop, ride in, gone." Officer F asked if the stop would take place "in the wood," which I believe to be a reference to Englewood, the CPD District (and neighborhood) to which Officer F is assigned. JONES indicated that it would be in Englewood if the victim came from that direction, but that the plan was for the victim to be at "the wash first" and then "ride off" with Officer F following the victim. Officer F said "okay," and indicated that he started work at "six." JONES asked if Officer F needed backup, and Officer F said to call Officer D. JONES replied that he already called Officer D, and Officer F then said to call them at 6:00.

252.    After speaking with Officer F, JONES called Officer D (Jones Tel. #5926).

JONES asked Officer D if he was ready, and Officer D said he wanted to know the "dilly-o."

JONES replied, "I already told you what it is," and further said "you guys will probably get about

eight stacks ($8,000) apiece." JONES further stated, "It's only a trey piece. Like 1, 2, 3,"

referring to kilos of cocaine. JONES then reiterated the profit from the robbery: "eight bucks in

your pocket, pretty sure you can use that." JONES went on to tell Officer D how the traffic stop

should go down, and indicated that it would be near 85th and Ashland (which is the location of

WILSON's car wash). When Officer D asked if the robbery victim would be by himself, JONES

told Officer D that the victim might be by himself of with another person. JONES told Officer D

that he was counting on the two of them (Officers D and F), and asked who was riding with them

that night, mentioning "Eural" (BLACK) specifically. Officer D replied that he did not know.

Towards the end of the call, Officer D asked if JONES had already talked with Officer F, and

JONES assured him (Officer D) that the two of them (JONES and Officer F) had spoken.

253.    At approximately 3:55 p.m., JONES received a call from EURAL BLACK (Jones

Tel. #5928), presumably returning JONES's earlier voicemail message. JONES asked BLACK

if he was working, and BLACK responded that he was working. In addition, a police radio could

be heard in the background. JONES asked BLACK who BLACK was working with, and then

asked BLACK what time he got off work. BLACK said he got off at 6:00. JONES then stated,

"I might have something for you" and BLACK replied, "call me man." JONES told BLACK to

stay close, and BLACK asked JONES where he wanted him (BLACK) to be. JONES then told

BLACK that the ripoff is "going to be over there, where we were last time, by the carwash, by

85th and Ashland." BLACK responded, "Okay, okay, I am going to head that way then." In this

call, I believe that JONES was asking BLACK to participate in the car-stop ripoff that JONES was planning, and that the JONES's reference to the "car wash," where they were "last time" to be a reference to the attempted robbery/extortion of five kilograms of cocaine from by JONES, FLAGG, BLACK, WILSON and others on July 21, 2004.

254.    About one minute later, at approximately 3:56 p.m., JONES called WALKER (Jones Tel. #5930 & Walker Tel. #6766), and told WALKER, "We ready." WALKER told JONES he was waiting for "dude" to call him back, and informed JONES that the customer with the "paper" was ready and "dude" (WILSON) was waiting on the "Esse" (the Mexican drug dealer) to call him back. JONES said, "That's one, two, three," and continued saying "you get yours, I get mine," to which WALKER responded, "right, 1, 2, 3."

255.    After JONES ended his call with WALKER, he called BLACK (Jones Tel. #5931). JONES told BLACK, "we waiting for them to call back. He ain't back yet. I'm just putting you on alert, it's real simple too." BLACK asked JONES if he should head that way, and JONES said "if you want to come holler at me about it real quick, it's all good." JONES told BLACK he was in a barber shop parking lot across the street from Reeses, and BLACK said he was on his way.

256.    At approximately 4:16 p.m., surveillance observed an unmarked CPD Crown Victoria bearing Illinois license plate M114781 travel eastbound on 87th Street, turn northbound on Ashland, and park in front of Maxwell's restaurant, which was located in the vicinity of WILSON's carwash. A subsequent review of CPD records indicated that this unmarked squad car was assigned to BLACK on November 13, 2004. Two black male occupants, one believed to be BLACK, were observed in this police vehicle.

257. At approximately 5:27 p.m. that same night, November 13, 2004, FLAGG called JONES (Jones Tel. #5960). FLAGG asked JONES his location and JONES replied "87th." FLAGG asked JONES, in part, "What you doin' over there?", to which JONES replied "I'm waiting for something right now." FLAGG asked JONES how long he would be waiting and further asked if "something about to happen." JONES replied "yeah" and told FLAGG he would call him back. At approximately 6:07 p.m., surveillance observed JONES drive from the vicinity of Reese's bar located near 87th Street and Honore towards Ashland Avenue, turning north on Ashland Avenue from 87th Street.

258. Following the above conversations and events, WALKER and JONES and WALKER and WILSON engaged in additional intercepted telephone calls during which they discussed the drug deal and ripoff. During these calls, it is apparent that WILSON asked WALKER to come meet his supplier, and the two subsequently decided to attempt to make the drug deal happen the following day before noon.

259. At approximately 6:58 p.m., WALKER called JONES (Jones Tel. #5981 & Walker Tel. #6906). During their conversation, WALKER told JONES that the deal was going to happen the following day. WALKER asked "Who's working tomorrow, you?" JONES said, "Yea, FLAGG on vacation man, but uh, I'll figure something out." JONES told WALKER that the "old man" (WILSON) might not "fuck with you" because WILSON had told JONES that he suspected that WALKER was going to "double cross" him during an unrelated incident. WALKER told JONES, "I am." JONES and WALKER then discussed the planned ripoff. WALKER told JONES that his customer would purchase "two" and leave. When the supplier left and JONES "picked him off" he would have "cash" and the "other four" on him. JONES

-106-

replied, in part, "I though it was going to be a trey ball, the plot thickens." WALKER and

JONES then discussed the robbery and the split of the money and drugs and WALKER told

JONES that WILSON was unaware of the plan. JONES and WALKER then described how they

would split the money and drugs, during which it became apparent that JONES believed

WALKER's ripoff opportunity involved cocaine rather than marijuana. WALKER told JONES

that he (WALKER) didn't care if the police kept "16, 17 bucks" ($1600-$1700). JONES

responded, "for two of them?", to which WALKER replied that he always gets them for "850"

($850). JONES asked if WALKER's man was going to grab two for "thirty-two" ($32,000).

WALKER said, "no" it would be "16, 1700" ($1,600-$1,700). JONES sounded confused and

said, "wait, he grabbin' two books (two kilos of cocaine), at seventeen a whop ($17,000 each),

that's thirty-four ($34,000)." WALKER said no, "this the other thing, this ain't that lick, this the

other thing." JONES said, in part, "shit, what the fuck, I think you talking about books (kilos of

cocaine), I just counted up a fifty-ball apiece, shit." WALKER told JONES that "dude"

(WILSON) is "spooked" to "bring that shit," and further told JONES this was something for

JONES "to do one of his moves with." WALKER and JONES then discussed that the drug deal

and ripoff was for "gorilla," referring to pounds of marijuana. JONES told WALKER to let him

know. WALKER told JONES the deal would occur the following morning.

     260.   On November 18, 2004 at approximately 8:16 p.m., JONES called BLACK

(Jones Tel. #6389), and asked him, if he was "on tomorrow?" BLACK replied, "we off

tomorrow." JONES responded, "oh shit" and asked, "when you go back?" BLACK told JONES

he got back on "Saturday," which JONES repeated. JONES then said he would check and see,

then he'll hit BLACK, and BLACK told JONES to definitely call him and let him know. As the

call began to end, BLACK told JONES, "hey, hey . . . call me tomorrow cause I got something I want to get rid of too, I got something right now." JONES asked if it is what JONES had, and BLACK replied, "no it ain't what you had . . . what I got is a . . . it's already hooked up." JONES asked BLACK, "in what amount though?", to which BLACK replied, "I don't know I got like . . . I'll talk to ya in person." BLACK then told JONES to call him the next day, because BLACK had some "right now" that he (BLACK) wanted to get rid of. JONES said, "Alright, cool." I understand that in this call, BLACK told JONES that he (BLACK) had an amount of drugs that he was trying to sell and that he (BLACK) wanted JONES to help him do so.

261.    On November 26, 2004, at approximately 3:20 p.m., JONES called BLACK (Jones Tel. #6934). JONES asked if BLACK was at work, and BLACK responded, "furlough stud." JONES then asked BLACK, "What's up with that thing you say you got though?" BLACK responded, "I had to find another way to move it . . ." JONES then asked BLACK if he got rid of it (the drugs) and BLACK responded, "yeah, it was just two sacks, that was all." During this call, I believe that JONES and BLACK are referring to the drugs BLACK was trying to get rid of in call #6389 (Jones Tel.). BLACK informed JONES that he was able to get rid of the drugs, which amounted to only "two sacks." BLACK also told JONES that he was looking for JONES before he (BLACK) went on furlough, but he guessed nothing came up. I believe that in this portion of the call, BLACK told JONES he was looking for JONES before he (BLACK) went on vacation because BLACK wanted to participate in a drug ripoff, which BLACK could more easily do while on duty as a police officer. BLACK later told JONES, "hook me up something for Christmas," prompting JONES to laugh and tell BLACK that he would "hit him" (call), meaning that JONES would call BLACK if a ripoff opportunity came up before Christmas.

**J.** **_Conversations Between JONES and WALKER After WALKER is Tipped–Off That He is Being Investigated_**

262.    On November 29, 2004, Individual I was arrested by the FBI and subsequently interviewed. Individual I agreed to cooperate with the FBI and make consensual recordings against WALKER and others. However, conversations intercepted over Walker Telephone and Jones Telephone beginning that same day, including conversations intercepted almost immediately after Individual I's arrest, revealed that Individual I warned WALKER of the investigation against him (WALKER), including the fact that Individual I was going to be approaching WALKER wearing a recording device.

263.    On November 29, 2004, at approximately 7:00 p.m., Individual I met with law enforcement agents in order to be equipped with a recording device for a meeting with WALKER that night. Individual I had been instructed to engage WALKER in conversations about drug robberies. After making that recording, Individual I again met with law enforcement agents and stated that he had met with WALKER, but that WALKER was not interested in conducting any drug robberies.

264.    On November 29, 2004, at approximately 7:28 pm, JONES called WALKER (Jones Tel. #7261 & Walker Tel. 10177). WALKER told JONES "swing around here on Justine, I gotta holler at you real quick." After JONES told WALKER that he was not in the area, WALKER stated, "It's like 911 holler. But, you can't say a fucking thing, man, I mean to no one."

265.    On November 29, 2004, at approximately 8:20 p.m., Individual I called WALKER (Walker Tel. #10193), telling WALKER that he (Individual I) was calling him from a payphone. WALKER asked Individual I, "Problems?", to which Individual I replied, "Yeah." WALKER

-109-

then asked, "How long ago?", to which Individual I stated, "today." WALKER also asked if the

FBI was "on my line," and later asked Individual I if "You got that thing off you?", referring to

the recording device that Individual I was wearing when he met with WALKER in person.

Individual I responded, "yeah, yeah, I'm cool." The two then agreed to talk at an unknown

location, and Individual I ended the conversation telling WALKER, "watch your tracks." Within

a few minutes, WALKER called JONES (Jones Tel. #7274 & Walker Tel. #10195). WALKER

told JONES, "He just called me from a payphone, Joe. He said they just came at him today."

WALKER further told JONES that he was going to meet with Individual I, find out where the

investigation against them stands, and then call JONES at a later time.

266. At about 10:27 p.m. that night, WALKER called JONES (Jones Tel. #7279 &

Walker Tel. #10206). In this call, WALKER informed JONES about how Individual I

approached him. At this point, both WALKER and JONES knew that Individual I was

cooperating with the government and that Individual I was wearing a wire. WALKER told

JONES, "I just got up with dude," referring to Individual I, and then WALKER proceeded to tell

JONES how Individual I approached him: "When I got in the truck, let me tell you what he

(Individual I) said to me. When I got in the truck he said, there's a nigger that wants two things,

he got the cash, $40,000 cash. Man, let's get up on it and we can split the cash." WALKER then

told JONES to "think about that. What that sound like? Do that sound like he want me to do

some business or you want me to take something?," telling JONES that Individual I was not

trying to set up WALKER by purchasing drugs from him, but rather with by having WALKER

participate in the robbery of a drug dealer. WALKER then explained to JONES his

understanding that the FBI must be trying this undercover scenario because the FBI was trying to

-110-

get to JONES and WALKER through Individual I: "Cuz, they are trying to get at you!" JONES

responded, "Straight up?", and WALKER stated, "I just got through meeting with him, right.

We just went way out somewhere and met in a lounge. They asked about you." Later in the

conversation, JONES asked WALKER, "What he (Individual I) say they (the FBI) said about

me?" WALKER responded, "They asked about you, they asked what do he know about you"

WALKER further stated to JONES, "they asked about you specifically because you are

associated with me."


FURTHER AFFIANT SAYETH NOT.

Joshua Skule, Special Agent
Federal Bureau of Investigation

Sworn before this 26th day
of January, 2005

Michael T. Mason
UNITED STATES MAGISTRATE JUDGE

-111-