

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

# FILED

JUN - 7 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA )
)
v. ) No. 05 CR 70-2
)
COREY FLAGG ) Hon. Ronald A. Guzman

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, COREY FLAGG, and his attorney, JEFFREY STEINBACK, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed by Rule 11(c)(1)(C), as more fully set forth in Paragraph 16 below.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 05 CR 70-2.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, COREY FLAGG, and his attorney, JEFFREY STEINBACK, have agreed upon the following:

1. Defendant acknowledges that he has been charged in the indictment in this case with one count of conspiracy to distribute and to possess with intent to distribute controlled substances,

namely 5 kilograms or more of mixtures containing cocaine and quantities of marijuana, in violation of Title 21, United States Code, Section 846, and one count of possessing, using, carrying, and brandishing a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c).

2.    Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

3.    Defendant fully understands the nature and elements of the crimes with which he has been charged.

4.    Defendant will enter a voluntary plea of guilty to Counts One and Three of the indictment in this case.

5.    Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Three. In pleading guilty, defendant admits the following, which establishes his guilt and relevant sentencing facts beyond a reasonable doubt:[1]

From at least 2004 and continuing until early 2005, in Chicago, in the Northern District of Illinois, Eastern Division, defendant COREY FLAGG conspired with codefendants Broderick Jones (a/k/a "Dink"), Darek Haynes, Eural Black, Erik Johnson, Joseph Wilson, James Walker (a/k/a "Quik"), Stanley Driver, Jr., Joel Montgomery (a/k/a "Joe Joe"), Brent Terry (a/k/a "B"), and others, knowingly and intentionally to possess with intent to distribute and to distribute controlled

---

[1]The following statement is merely a summary, which is meant to provide a factual basis that will allow the Court to evaluate whether it should accept defendant's guilty plea. This statement is not a full recitation of all relevant facts known by defendant regarding the incidents described below or regarding narcotics trafficking or police corruption more generally.

substances, namely, 5 kilograms or more of mixtures containing cocaine and quantities of marijuana, in violation of 21 U.S.C. § 846.

Further, on or about August 16, 2004, in Chicago, in the Northern District of Illinois, Eastern Division, defendant FLAGG knowingly possessed, used, carried, and brandished a firearm in furtherance of and during and in relation to a drug-trafficking crime for which he may be prosecuted in a court of the United States, namely, drug conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A).

More specifically, FLAGG, who was an officer with the Chicago Police Department (CPD), agreed with other CPD officers, including Broderick Jones, Darek Haynes, Eural Black, and Erik Johnson, as well as other individuals, including Joseph Wilson, Joel Montgomery, Stanley Driver, Jr., and Brent Terry, to obtain wholesale quantities of cocaine and marijuana, as well as drug money, through robbery, extortion, and other unlawful means. FLAGG understood that any cocaine and marijuana obtained by the conspirators during the course of the conspiracy would be distributed to other individuals in exchange for cash, which cash would be divided among the conspirators participating in each individual robbery/extortion ("ripoff").

FLAGG knew that Jones recruited CPD officers, including himself (FLAGG), Haynes, and others, to conduct vehicle stops and home invasions of drug dealers in order to illegally obtain drugs, money, and weapons from those drug dealers. FLAGG also understood that Jones received information about the activities of various drug dealers from other individuals, including Wilson, Walker, Driver, Terry, and others, and FLAGG knew that these other individuals provided the information to Jones not for legitimate law enforcement purposes, but rather to enable Jones, FLAGG, and other CPD officers to illegally obtain drugs, money, and weapons from drug dealers, which proceeds would be divided among the individuals participating in each individual ripoff.

3

It was further a part of the conspiracy that FLAGG agreed with Jones, Haynes, and other CPD officers to conduct vehicle stops and home invasions of drug dealers, and did conduct such activity, not for legitimate law enforcement purposes, but for the purpose of illegally obtaining drugs, money, and weapons from those drug dealers. In doing so, FLAGG and the other CPD officers used their power, authority, official position, and knowledge as law enforcement officers to promote and protect the operation of the conspiracy.

FLAGG had been a CPD officer since November 1996, and at various times worked in the 7th, 22nd, and 4th CPD Districts. At various times while working in the 7th and 4th CPD Districts, Broderick Jones was FLAGG's partner.

In 2004, FLAGG participated in multiple ripoffs and attempted ripoffs with Broderick Jones, along with other CPD officers and other individuals. During this time, FLAGG knew that Jones had been stripped of his police powers and assigned to the "callback unit," and accordingly, FLAGG knew that Jones was not authorized to be on the street doing police work. On several occasions, Jones called FLAGG with information about drug dealers, and pretty much every time Jones gave FLAGG this information, FLAGG understood that Jones wanted FLAGG to take drugs and money from these drug dealers and to share some of these drugs and money with him (Jones). During the time Jones was stripped of his police powers, FLAGG saw that Jones carried his gun with him in Jones's Cadillac Escalade.

In approximately June 2004, FLAGG stopped a car at Jones's direction not for legitimate law enforcement purposes, but rather to steal drug money from individuals in that car for his (FLAGG's) and Jones's own benefit. On that day, Jones was in his Escalade watching activity at a carwash located at 85th Street and Ashland Avenue in Chicago. FLAGG, who was in an unmarked CPD

4

squad car and wearing his CPD badge and gun, understood that Jones was receiving information from somebody involved in a drug deal at that carwash. Jones told FLAGG, over the telephone, to pull over a particular car, which FLAGG did. Based upon what Jones told FLAGG, FLAGG expected the car to contain at least one gun and a white box containing money, which FLAGG understood was drug money from a cocaine deal that was supposed to happen at the carwash. FLAGG pulled over the car, which contained several Hispanic males, in the area of 67th Street and Ashland Avenue in Chicago. FLAGG searched the car and found a white box containing a large amount of cash, which FLAGG put into his CPD car. At one point, FLAGG released everyone but the driver. After taking the box containing the cash and talking with the driver, FLAGG also let the driver go. Afterwards, FLAGG met Jones behind a Church's chicken on 79th Street near the Dan Ryan Expressway, where FLAGG gave Jones the white box containing the cash. FLAGG told Jones to put his cut of the money in the trunk of a 1988 Mustang in FLAGG's garage, and FLAGG gave Jones the security code to his garage door opener so he could get in. Later that day, FLAGG saw that Jones had left about $8,500 in the trunk of the Mustang. Based on the amount of money FLAGG received, FLAGG assumed that the box contained a total of $17,000 to $19,000.

One day about a month or so later, Jones called FLAGG to seek his assistance in following some drug dealers to a stash house. FLAGG understood that Jones was not enlisting FLAGG's help to conduct legitimate law enforcement activity, but rather to help Jones and others steal drugs and/or money from the stash house. FLAGG had taken that day off of work because he was planning on going to a car race in Tennessee, but FLAGG decided not to go. Jones told FLAGG that he (Jones) was following people connected to the same carwash on 85th and Ashland to a stash house. After

5

speaking with Jones, FLAGG went to help Jones, driving his unmarked CPD squad car, and wearing his CPD badge and gun.

Other CPD officers, including Haynes, were present that day as well. Even though FLAGG and Haynes were both police officers, they were assigned to different CPD teams, as FLAGG was on an Area 2 gun team and Haynes was an officer in the 7th CPD District. In addition, FLAGG knew that neither he nor Haynes were authorized to be conducting police activity with Jones, who was still in the callback unit.

At one point, while FLAGG was on Kedzie Avenue waiting for direction from Jones, Jones called FLAGG and told him that one of the people Jones was following, who was a Hispanic male, had recognized FLAGG in the area. FLAGG understood that this Hispanic male was in a car with a black male from the carwash, and that this black male was feeding Jones information about what was happening in order to lead Jones and the others to the stash house. Jones said that after the Hispanic male recognized FLAGG, he ran from the car that he and the black male were driving to the stash house.

Shortly after that, Jones told FLAGG that he had spotted some of the guys working security ("security workers") for the Hispanic male at a Burger King located at 64th Street and Kedzie Avenue. At that point, FLAGG picked up Haynes, who was also in the area, and they drove to the Burger King, where they conducted a vehicle stop on two suspected security workers who were in a large, black SUV. Because these two individuals were believed to be providing security for a drug deal, FLAGG thought they might have guns with them. In addition, since the Hispanic male who was supposed to be leading the officers to the stash house left the area, and it looked like FLAGG, Jones, Haynes, and the others would not find the stash house and not be able to steal any drugs or

6

money from that stash house, FLAGG looked to gain credit for legitimate police work by recovering any guns from the security workers.

During the vehicle stop, which took place on July 17, 2004, FLAGG and Haynes pulled the two individuals from the SUV, which FLAGG searched, recovering a partially loaded semi-automatic handgun and a golf-ball to tennis-ball sized bag of cocaine. Jones also came to the Burger King parking lot, where he talked with Haynes and at least one of the individuals from the SUV. After FLAGG recovered the drugs and gun, he placed the two individual under arrest and drove them to the CPD Area 2 police station for processing. Haynes drove their SUV to Area 2. FLAGG processed the two individuals and wrote the police report for the incident, in which FLAGG falsified some information about the vehicle stop and intentionally excluded Haynes's name. FLAGG inventoried the gun, cocaine, and a small amount of money from one of the individual's wallets. Jones had wanted FLAGG to keep the money, but FLAGG did not do so.

A few days later, Jones again called FLAGG and told FLAGG about another ripoff opportunity connected to the carwash at 85th and Ashland. FLAGG knew that Jones was not calling him to do legitimate police work, but rather Jones wanted FLAGG's help in stealing drugs from drugs dealers who were supposed to be bringing several kilograms of cocaine to the carwash.

On that day, which was July 21, 2004, Jones told FLAGG to pick up Haynes, which FLAGG did. At that time, FLAGG was driving an unmarked CPD squad car, and wearing his CPD badge and gun. As with their activity a few days earlier, FLAGG and Haynes remained in different CPD units and they were not authorized to be conducting police activity with Jones, who was still in the callback unit. After FLAGG picked up Haynes, the two of them waited for further direction from Jones.

7

Over the course of several phone calls, Jones explained to FLAGG and Haynes that some Hispanic males were going to the carwash on 85th and Ashland, and that they were bringing multiple kilograms of cocaine. Jones said that the people at the carwash were calling Jones, pretending that Jones was the guy providing the money for the deal, in order to entice the Hispanic males to show the kilograms of cocaine. At one point, Jones called either FLAGG or Haynes, and told them that the Hispanic males had refused to show the kilograms of cocaine without seeing the money, they had left the carwash, and they were driving in a black Chevy Blazer with the kilos. Jones also said he was following the Blazer. FLAGG and Haynes eventually ended up driving on Ashland Avenue, following the Blazer and a burgundy-colored Chevy Malibu, which FLAGG understood contained someone conducting security for the guys in the Blazer. Jones directed FLAGG and Haynes to pull over the Blazer, but after the Malibu ran through a red light, FLAGG and Haynes conducted a traffic stop on the Malibu. FLAGG and Haynes found no drugs or money in the Malibu.

After stopping the Malibu, FLAGG noticed another Hispanic male who appeared to be interested in why FLAGG stopped the Malibu. FLAGG then stopped that person's car as well. The driver of that car identified himself as a CPD officer, after which FLAGG let him go. At that point, FLAGG thought that the Hispanic males bringing the cocaine to the car wash actually had CPD officers working as security for their drug operation. Unbeknownst to FLAGG, however, the CPD officer whom FLAGG stopped was conducting legitimate police activity with other CPD officers who were investigating an expected five-kilogram cocaine deal at the car wash located at 85th and Ashland.

After not finding any drugs or money in the Malibu and stopping the second car containing the CPD officer, FLAGG dropped off Haynes at Haynes's car and went home. FLAGG understood

8

that Jones continued to follow the Blazer, because Jones kept calling FLAGG on the telephone, telling FLAGG to come back to the area and stop the Blazer. Later that day, Jones went to FLAGG's house, where the two of them discussed, among other things, FLAGG's stop of the individual who turned out to be a CPD officer. Jones told FLAGG that FLAGG should have searched the CPD officer's car. Later that day, after Jones left FLAGG's house, Jones again called FLAGG and told FLAGG that the drug dealers with the cocaine were going back to the carwash. FLAGG told Jones that he had something else to do, and FLAGG did not return to the carwash.

Later, in August 2004, Jones told FLAGG about another ripoff opportunity in which they were to steal about 25 or 30 pounds of "dro," which is hydroponic marijuana. Jones and FLAGG talked about the ripoff over the telephone, and they also met in person to discuss the robbery plan. The ripoff was to take place, and did take place, on August 16, 2004, in an alley behind a carwash and restaurant located in the 8200 block of South Stoney Island Avenue in Chicago.

Shortly before conducting the ripoff, Jones and FLAGG met with an older black male (Joseph Wilson) and a younger black male (Stanley Driver Jr.) at a location near the carwash on Stoney Island, where they talked about the ripoff plan. As part of the plan, Driver was to make it appear that he was ordering marijuana for Wilson. FLAGG also understood that the people supplying the marijuana would bring a smaller amount of marijuana before the main load arrived, and thus, the plan was for Jones and FLAGG to be called to the drug deal location when the main load arrived so that Jones and FLAGG – appearing to act in their capacity as police officers – could stop the car containing the main load and take the marijuana. FLAGG understood that he, Jones, Wilson, and Driver all planned on ultimately receiving some money from the robbery after they took the marijuana and sold it.

9

After this meeting, Jones and FLAGG waited in an unmarked CPD squad car, and after they received a call to head to the carwash, they drove to that location. Even though FLAGG was not on duty that day, he was wearing his CPD badge, gun, and bullet-proof vest. When Jones and FLAGG arrived behind the carwash, there were several cars and people in the alley. FLAGG parked the CPD car in the alley, blocking in the cars. In order to make it look like a legitimate police stop, Jones and FLAGG patted down several people in the area, and searched the cars. During this search, FLAGG and Jones found a small amount of the marijuana, approximately three to four pounds, in Wilson's car. At one point, FLAGG also slapped Driver in the face to make it look like he wasn't involved in the ripoff. FLAGG also handcuffed Wilson and put him into the back of the CPD car. Jones and FLAGG then let everyone but Wilson leave the area, after which FLAGG drove away in the CPD car (which still contained Wilson) and Jones drove away in Wilson's car (which still contained the marijuana). Jones and FLAGG then met up with each other, they released Wilson and gave him (Wilson) back his car, and Jones re-entered the CPD car. At that time, Jones also brought some of the marijuana with him. Jones later gave FLAGG $500, which FLAGG understood to come from the sale of the marijuana they had stolen.

In early September 2004, Jones told FLAGG about a residence located in the 7900 block of South Langley Avenue in Chicago, which Jones said contained approximately two to five kilograms of cocaine and about $15,000 to $20,000. Throughout several conversations with Jones, FLAGG understood that the information about this residence came from Walker, and that Jones and Walker were providing this information because they wanted FLAGG to steal some, if not all, of the cocaine and money at that residence, and so that Jones, Walker, FLAGG, and anyone else participating in the ripoff could split the proceeds.

10

With members of his CPD Area 2 gun team, FLAGG ultimately entered a residence on Langley Avenue on September 4, 2004, but this residence was a block away from the first address Jones gave to FLAGG. Because other members of the Area 2 gun team knew of FLAGG's interest in the address, FLAGG thought he would have to inventory any items ultimately recovered from the address rather than stealing them. FLAGG never told Jones he would not be able to steal the drugs or money, and FLAGG continued to target that location with members of the gun team.

FLAGG ultimately entered a residence on Langley after receiving a second address from Jones. FLAGG identified a car believed to be associated with that address based upon information provided by Jones, and FLAGG stopped the driver of that car. FLAGG and other members of FLAGG's gun team then entered the residence where that woman said she lived, which was actually next door to second address provided by Jones, where FLAGG and other officers conducted a cursory search, finding no drugs or money.

Also in early September 2004, FLAGG and Jones took steps to conduct a drug ripoff at a house located near 26th Street and Troy Avenue in Chicago. During their conversations, Jones told FLAGG that the house contained several guns and three kilograms of cocaine, and Jones also gave FLAGG the address and layout of the target residence. At one point, Jones and FLAGG drove through the alley behind the target residence in order to stake out the location. FLAGG also learned that Walker was the person providing information to Jones about the target residence, and that Walker was trying to set up a drug deal that would ensure there would be drugs at the house. FLAGG believed that the plan was for FLAGG and Jones to steal at least one kilogram of cocaine from the address, and for FLAGG to arrest the drug dealer for any other drugs or guns found at that location. FLAGG and Jones never completed the ripoff, among other reasons, because they turned

11

their attention to other ripoff opportunities, including a ripoff opportunity on West 83rd Place in Chicago.

In early September 2004, Jones told FLAGG about a residence on West 83rd Place in Chicago where drugs, money, and guns would be located. Jones told FLAGG that the person living at this address, identified herein as Individual B, had once flashed a large amount of cash in front of Jones. FLAGG and Jones later drove by the building so Jones could show it to FLAGG. Based upon his conversations with Jones, FLAGG believed that there would be multiple kilograms of cocaine and a large sum of money at Individual B's residence. For example, in a telephone conversation, Jones told FLAGG that there were at least three kilograms of cocaine and at least $100,000 at Individual B's residence. In other conversations, Jones told FLAGG that there might be even more cocaine and money there.

On September 8, 2004, FLAGG went to Individual B's residence located on West 83rd Place with Haynes in order to steal drugs and money which they believed would be found at that address. As with the events on July 17, 2004 and July 21, 2004, FLAGG and Haynes were still members of separate CPD teams and neither of them were authorized to conduct police activity with Jones, who remained in the callback unit.

Before going to Individual B's residence, FLAGG met with Jones and Haynes at a nearby park. After this meeting, FLAGG and Haynes drove over to Individual B's building in FLAGG's unmarked CPD squad car, and their plan was to take any drugs or money located inside that residence, and then share the drugs and money with Jones.

When FLAGG and Haynes arrived at Individual B's building, they knocked on the door. At that time, FLAGG was wearing his CPD badge and gun. A downstairs resident answered the door,

12

and Haynes talked with that person in the doorway. FLAGG then went to the upstairs apartment, which was believed to be Individual B's residence. There were a couple of locks on the door, but only one of them was locked. Jones kept telling FLAGG over the telephone to kick in the door, which FLAGG believed he could have done if he wanted. By that time, however, FLAGG had become uncomfortable kicking in the door because he was not familiar with the neighborhood, which appeared to be nice. In addition, Haynes showed his CPD badge to the downstairs neighbor, which would have allowed him to be identified. At that point, FLAGG didn't want to leave the area because he thought that Jones and Haynes would still probably do the ripoff without him, and FLAGG was afraid that he could be identified as somebody who was there that day. FLAGG also wanted to claim credit for any guns he could recover inside Individual B's apartment. FLAGG then called his Area 2 gun team sergeant, who said he was going to come to that location.

After FLAGG told Jones and Haynes that his sergeant was going to be arriving at Individual B's residence, Haynes left the area. FLAGG, Jones, and Haynes knew that they were not conducting legitimate law enforcement activity at Individual B's residence, and they knew that Haynes's presence at the scene would not appear to be legitimate to other law enforcement officers given that Haynes was not in his regular police district (the 7th CPD District) and he was not assigned to be working with FLAGG. Accordingly, FLAGG, Jones, and Haynes needed Haynes to leave the area to conceal their true intent in being at Individual B's residence, which was to steal any drugs and money for their own personal benefit and not for legitimate law enforcement purposes.

Even after FLAGG told Jones that he had called his sergeant, and that FLAGG might need to get a search warrant for the location, Jones told FLAGG to hide drugs and money he recovered from any other law enforcement officers who arrived at Individual B's building, and to put the drugs

13

and money into a garbage can so Jones could recover them at a later time. After FLAGG's sergeant arrived at the 83rd Place address, FLAGG left the area to go prepare a search warrant. In that warrant, FLAGG planned on falsely claiming that he received information about Individual B's residence from an informant rather than stating that the information came from Jones. FLAGG's sergeant later called FLAGG and told him that Individual B had returned to his residence, and that he had given the officers consent to search it. After FLAGG returned, he and members of his Area 2 gun team searched Individual B's apartment and other areas of the building, finding guns and nearly a kilogram of cocaine. FLAGG also talked with Individual B, who had given consent to search because he thought the downstairs neighbors had already taken the cocaine from his apartment. FLAGG actually recovered the cocaine in the downstairs basement area near a washing machine, and not in a closet in Individual B's apartment as FLAGG wrote in his CPD report. After the search was completed and FLAGG and members of the Area 2 gun team arrested Individual B, FLAGG drove Individual B to the police station. At that time, Individual B mentioned that he knew Jones. With Individual B in FLAGG's CPD car, FLAGG then called Jones and let Individual B talk with Jones to make it seem like Jones had nothing to do with Individual B's arrest.

In approximately early 2005, FLAGG asked another police officer, identified herein as Officer F, for Walker's telephone number. FLAGG knew Walker to be a longtime friend of Jones. FLAGG used to work with Officer F, and knew that Officer F either had Walker's number or would get it for FLAGG. FLAGG didn't ask Jones for Walker's number because FLAGG didn't want Jones to know he was talking with Walker. FLAGG later talked with Walker, who gave FLAGG some information about certain people selling firearms. FLAGG gave Walker some heroin, approximately 70 to 125 grams, that FLAGG had recovered during a search. Walker offered

14

FLAGG some cash for the heroin, but FLAGG turned it down because he gave Walker the heroin so that Walker would provide FLAGG with information regarding gun crimes. FLAGG told Walker not to tell Jones about the heroin, but Jones later asked FLAGG about it. Jones also told FLAGG that he (Jones) knew someone who could sell the heroin for FLAGG if FLAGG needed someone to do so.

In addition to the ripoffs and attempted ripoffs they conducted in 2004, FLAGG, Jones, and Haynes had conducted ripoffs of other drug dealers on prior occasions. In particular, Jones and FLAGG knew an individual nicknamed "Corky," who provided them with information that they used to rob other drug dealers. FLAGG understood that Corky was involved in robbing drug dealers, and the information that Corky provided to Jones was for individuals that Corky wanted to rob but could not do so for some reason.

Corky provided Jones with information that led to at least two search warrants, one of which occurred on North Sheridan Road in Chicago at a time when FLAGG and Jones were assigned to the 7th CPD District gang team. During the execution of that search warrant, FLAGG recovered approximately $17,000 from a kitchen drawer, which money FLAGG did not inventory, but rather split with Jones. Heroin was also recovered during the execution of that search warrant, which heroin was inventoried in connection with the arrest of a Nigerian individual living at the residence that was searched. In addition, FLAGG believes that Jones paid Corky money for his assistance in the ripoff, which money was taken from the wallet of the person they arrested.

Corky provided Jones with information for another search warrant that occurred on 104th Street in Chicago. At this time, FLAGG and Jones were no longer on a gang team, but a gang team did support their search. One-half kilogram of cocaine and $2,000 were recovered during the

15

execution of this search warrant. Jones gave some of the $2,000 to FLAGG, which FLAGG kept for his own benefit.

On at least two occasions in 2003, Corky provided FLAGG with information that FLAGG used to commit and attempt to commit drug ripoffs with Haynes and other police officers.

On one occasion in the vicinity of a carwash located at 77th Street and Vincennes Avenue in Chicago, Corky's brother was supposed to broker a one kilogram cocaine deal, and Corky told FLAGG about the expected deal. FLAGG observed Corky's brother and another individual enter a green Pontiac Aztec and a Monte Carlo, and then drive eastbound on 73rd Street. Haynes conducted a vehicle stop on the Aztec and recovered ½ kilogram of cocaine that was in approximately two to nine ounce quantities. FLAGG followed the Monte Carlo to the vicinity of a barber shop located near 75th Street. Haynes, who was driving with another CPD officer, then arrived with the driver of the Aztec in the back of his car and stopped the Monte Carlo. FLAGG subsequently recovered about $7,000 from the trunk of the Monte Carlo. FLAGG, Haynes, and the other CPD officer released Corky's brother and the other individual. FLAGG, Haynes, and the other officer then met in the alley behind FLAGG's house where they split the money, and FLAGG gave the ½ kilogram of cocaine to Corky to sell. The next day, Corky gave FLAGG approximately $3,500, which was money from the sale of the cocaine that FLAGG had stolen with the other officers.

Later in 2003, FLAGG, Haynes and another CPD officer attempted another drug robbery based on information from Corky. On this occasion, Corky's cousin met with a Hispanic drug dealer in a residence located near the 3200 block on the south side of Chicago. After this meeting, two unknown Hispanic males took Corky's cousin's van to go pickup cocaine. After they left, FLAGG,

16

Haynes, and another CPD officer entered the residence and waited for the two Hispanic males to return with the cocaine. These two Hispanic males called the residence when returning with the cocaine, but FLAGG did not allow the Hispanic drug dealer who remained at the residence to answer the telephone. Because the telephone call was not answered, the two Hispanic males returned the cocaine to the supplier and returned the van. Accordingly, nobody was arrested, and no drugs or money were stolen during this incident.

In addition to using information from Corky to rob drug dealers, FLAGG also checked license plate numbers through law enforcement computer systems at Corky's request. FLAGG then provided Corky information about the individuals connected to those license plates, sometimes including their addresses. In addition, on at least one occasion at Corky's request, FLAGG checked a law enforcement database to determine whether there was a warrant for Corky's arrest.

The information contained in the following paragraphs of this factual basis was provided by FLAGG pursuant to a proffer agreement with the government. Accordingly, pursuant to USSG § 1B1.8, this information, including any drug amounts, cannot be used against FLAGG in calculating his sentence.

At some point during Individual B's arrest on September 8, 2004, Individual B's girlfriend came to Individual B's residence. Jones later told FLAGG that Individual B's girlfriend was a player, meaning that she was a major narcotics supplier. A few weeks later, Jones came to FLAGG's house, and told FLAGG that he had a friend who had just ordered some "work" from Individual B's girlfriend. Based on his conversations with Jones, FLAGG understood that Jones's friend had ordered approximately ten kilos of cocaine from Individual B's girlfriend. Jones and FLAGG then planned to steal and did steal these kilograms of cocaine from Individual B with the help of Brent

17

Terry (a/k/a "B"), who FLAGG understood to be the person who helped set up the ripoff by acting as the purported "buyer" of this cocaine.

On the night of the ripoff, which was approximately the last week of September 2004, Jones parked his Escalade at FLAGG's house, and the two of them went to the vicinity of 87th Street and the Dan Ryan Expressway in FLAGG's unmarked CPD car. At that time and during this entire event, FLAGG was wearing his CPD badge and gun. While at that location, Jones talked on the telephone with the individual who FLAGG understood to be ordering the cocaine from Individual B's girlfriend. FLAGG understood that Individual B's girlfriend was supposed to bring the cocaine to the Cub Food store located at 87th Street and the Dan Ryan Expressway, but she ultimately met with Terry, the purported buyer of the ten kilograms of cocaine, at a Burger King on 87th Street near Michigan Avenue.

At one point while Jones and FLAGG were sitting in FLAGG's squad car, Jones received a telephone call, which FLAGG understood to be a call from Terry, who was pretending to call the person (Jones) to bring the money to the drug transaction. In reality, this call was a signal for Jones and FLAGG to come to the area where the drug deal was happening so that Jones and FLAGG could steal the drugs. As planned, Jones and FLAGG then went by the Burger King, where they saw Individual B's girlfriend in an older, greenish-colored Nissan, along with Terry, who FLAGG understood to be the person posing as the "buyer" of the cocaine. FLAGG then pulled Individual B's girlfriend out of the car, handcuffed her, and placed her in the back of his CPD squad car. Jones pulled Terry out of the car, and also placed him in the back of the squad car. FLAGG then drove his squad car away from the Burger King, and parked in an alley a short distance away. Jones, who drove the Nissan, followed FLAGG into the alley. In the alley, Individual B's girlfriend said that

18

all of the cocaine in her car belonged to Terry. Jones retrieved a black duffel bag containing cocaine from the Nissan, and placed it in the trunk of FLAGG's squad car. FLAGG then released Individual B's girlfriend, after which she got into her car and left the area. FLAGG and Jones then uncuffed Terry, and the three of them drove to FLAGG's house.

At FLAGG's house, Jones took the black duffel bag from the squad car and opened it, displaying the kilograms of cocaine. FLAGG saw at least two to three stacks of kilograms of cocaine, which kilos had an Izod alligator sticker on them. FLAGG could tell by the shape of the bag that there were numerous kilograms of cocaine underneath the couple of kilograms he saw. Jones and Terry then left FLAGG's house in Jones's Escalade, taking with them the bag containing the kilos of cocaine.

Later that night, Jones gave FLAGG approximately $10,000 to $12,000. Several days later, Jones paid FLAGG another $10,000 to $12,000, and Jones later gave FLAGG another $1,000. At one point, after Jones gave FLAGG the second $10,000 to $12,000, Jones wanted to borrow $10,000 back from FLAGG. By that point, some of the money had been stolen from the place FLAGG was hiding it in his garage. Jones owed FLAGG additional money for the robbery, but FLAGG never received it. Jones told FLAGG that they took a total of ten kilograms of cocaine in the robbery, and that Jones gave five kilos to Terry and kept five for himself. Jones also said that he sold his kilograms of cocaine for $13,000 each, and that he needed to give some money to the individual that gave him the information for the ripoff. Overall, FLAGG received about $24,000 to $26,000 as his cut from this ripoff.

FLAGG understood that he, Jones, and Terry robbed Individual B's girlfriend while Individual B was still in locked up as a result of his September 8, 2004 arrest. After Individual B was later released on bond, Individual B was stopped by some other CPD officers working in the

19

22nd District, who told FLAGG about the police stop. FLAGG then went to the scene of the stop and spoke with Individual B. During their conversation, Individual B talked about the robbery of his girlfriend, telling FLAGG that it was because "B" knew them all. FLAGG understood that "B" was Jones's guy (Terry) who had ordered the drugs and helped set up Individual B's girlfriend to be robbed.

After FLAGG was arrested in January 2005, and at a time FLAGG was in custody with Jones, Jones and FLAGG talked about certain things in the criminal complaint. Jones also told FLAGG about the circumstances of his arrest. Jones told FLAGG that he didn't have his gun with him at the time he was arrested, because he had locked his gun in his safe when he had gone to Miami for a boxing match. Among other things, Jones also told FLAGG that the feds didn't know about their ten kilogram cocaine ripoff.

In addition, in approximately the summer of 2002, FLAGG participated in the ripoff of a drug dealer with Jones and Officer F. On that occasion, Jones received information from an individual regarding a person who would be traveling by car to purchase approximately one kilogram of cocaine. FLAGG, Jones, and Officer F, who were in an unmarked CPD squad car, stopped a vehicle containing two men and one woman on Ashland Avenue near 62nd Street in Chicago. After making the stop, FLAGG opened the trunk of the vehicle and found a large amount of money in the trunk. Jones recovered some money from the passenger compartment of the vehicle, as well as the money that FLAGG found in the trunk, which money totaled approximately $20,000. The occupants of the vehicle were subsequently released, and FLAGG, Jones, and Officer F went to the alley behind FLAGG's house and split the money. FLAGG, Jones, and Officer F each received about $5,000, with the remaining $5,000 going to the individual who provided Jones with the information leading to the ripoff.

20

6.    For purposes of applying the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

     (a)    <u>Count One</u>

       (1)    Pursuant to USSG §§1B1.3, 2D1.1(a)(3), and 2D1.1(c)(3), the base offense level is level 32 because the amount of drugs involved in the offense of conviction and relevant conduct, and not learned through proffer protected statements, including the amounts of cocaine, marijuana, and heroin discussed above, is the equivalent of between 1,000 and 3,000 kilograms of marijuana.

       (2)    Pursuant to USSG § 3B1.3, the offense level should be increased by 2 levels because defendant abused a position of public trust in a manner that significantly facilitated the commission of the offense.

       (3)    Pursuant to USSG § 3B1.5, the offense level should be increased by 4 levels because the defendant used body armor during the commission of a drug trafficking offense.

       (4)    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to accept responsibility for his actions, within the meaning of USSG § 3E1.1, a 2-level reduction in the offense level is appropriate.

       (5)    Defendant notified the government timely of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently, within the meaning of USSG § 3E1.1(b); an additional 1-level

reduction in the offense level is therefore appropriate, provided the court determines the offense level to be 16 or greater prior to the operation of Guideline Section 3E1.1(a).

(b) Count Three: As a result of defendant's conviction on Count Three, pursuant to 18 U.S.C. § 924 and USSG § 2K2.4(b), the Court should impose a sentence of 84 months' imprisonment, to be served consecutive to the sentence imposed on Count One.

(c) Criminal History: Based upon the information presently known by the government, defendant has no criminal history, and accordingly, his criminal history category is I.

(d) The government's predicted, preliminary sentencing guideline range on Count One is 168-210 months' incarceration based upon the calculations set forth above, which include an expected offense level of 35 and criminal history category of I. As a result of defendant's conviction on Count Three, pursuant to 18 U.S.C. § 924 and USSG § 2K2.4(b), the Court should impose a sentence of 84 months' imprisonment, to be served consecutive to the sentence imposed on Count One. Thus, defendant's preliminary expected guideline range for Counts One and Three is 252-294 months' incarceration.

(e) The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

7. Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by

22

stipulation or by a statement to the probation office and/or Court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

8. Defendant understands that, in imposing the sentence, the Court will be guided by the United States Sentencing Guidelines. The defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

9. Defendant understands that Count One, to which he is pleading guilty, carries the following penalties: a maximum penalty of life imprisonment, a statutory minimum penalty of 10 years' imprisonment, a maximum fine of $4,000,000, a term of supervised release of at least five years and up to life, and any restitution ordered by the Court.

Defendant further understands that Count Three, to which he is also pleading guilty, carries a statutory minimum term of imprisonment of 7 years (84 months), which term must be served consecutive to the sentence imposed on Count One. Count Three further carries a maximum term of imprisonment of life, a maximum fine of $250,000, and a term of supervised release of not more than five years.

10. The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty imposed. The defendant agrees to pay the special assessment of $200 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

11. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

23

(a)    If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b)    If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt, and that it was to consider each count of the indictment separately.

(c)    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d)    At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

24

(e) At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

12. Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant also understands that a defendant may appeal his sentence under certain circumstances pursuant to Title 18, United States Code, Section 3742. Acknowledging this, the defendant knowingly waives the right to appeal any sentence within the maximum provided in the statute of conviction (or the manner in which that sentence was determined), in exchange for the concessions made by the United States in this Plea Agreement. The defendant also waives his right to challenge his sentence or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

13. Defendant agrees he will fully and truthfully cooperate with the government in any matter in which he is called upon to cooperate.

(a) Defendant agrees to provide complete and truthful information in any investigation and pre-trial preparation, and complete and truthful testimony, if called upon to testify, before any grand jury and court proceeding, and any related civil, administrative, or court proceeding.

25

(b) Defendant further agrees to cooperate fully and truthfully in identifying and forfeiting tainted assets subject to forfeiture, regardless where they may have been transferred or hidden.

(c) Defendant agrees to postpone his sentencing until after the conclusion of the prosecution any of his codefendants.

14. Defendant understands that the indictment and this Plea Agreement are matters of public record and may be disclosed to any party.

15. Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

16. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation and, if the defendant has provided full and truthful cooperation, shall move the Court, pursuant to USSG § 5K1.1 and Title 18, United States Code, Section 3553(e), to depart from the applicable sentencing guidelines range, and to impose the sentence agreed to by the parties as outlined below. Defendant understands that the decision to depart from the applicable guidelines range rests solely with the Court. However, this Plea Agreement is governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment of 50% of the combined total of the low end of the applicable sentencing guideline range on Count One and the statutory consecutive minimum sentence on Count Three, or 50% of the combined total of the statutory minimum sentence on Count One and the statutory consecutive minimum sentence on Count Three, whichever is higher. The defendant understands that the decision to depart from the applicable guidelines range rests

26

solely with the Court. Other than this agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of incarceration set forth herein, the defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d). If, however, the Court refuses to impose the agreed term of incarceration set forth herein, thereby rejecting the Plea Agreement, or otherwise refuses to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

17.    The indictment charges that defendant FLAGG is liable to the United States for approximately $165,000, which funds are subject to forfeiture pursuant to Title 21, United States Code, Section 853(a)(1) and Title 28, United States Code, Section 2461(c) because they represent property that constitutes or is derived from proceeds traceable to the commission of the charged offense. By entry of a guilty plea to Count One of the indictment, the defendant understands that funds in the amount of $165,000 representing proceeds of the offense are subject to forfeiture. Defendant agrees to the entry of a forfeiture judgment in the amount of $25,000, and that these funds are subject to forfeiture because they represent property that constitutes or is derived from proceeds traceable to the commission of the charged offense. Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right, title or ownership interest he has in the above funds. Defendant further agrees to assist law enforcement in locating the funds to satisfy the judgment amount so that these funds may be disposed of according to law. Defendant understands that pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the government shall be entitled to satisfy the judgment amount with substitute assets. Defendant further understands that forfeiture of this property shall

27

not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to the forfeiture judgment.

18.     Defendant understands that his compliance with each part of this Plea Agreement extends throughout his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

19.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

20.     Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

21.     Should the judge refuse to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

22.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: June 7, 2006

PATRICK J. FITZGERALD
United States Attorney

COREY FLAGG
Defendant

JOHN LAUSCH
CHRISTOPHER NIEWOEHNER
BRIAN HAYES
Assistant United States Attorney

JEFFREY STEINBACK
Attorney for Defendant

29